# Exhibit 1

EXECUTION COPY

Date: as of June 16, 2020

**BRAVERY MARITIME CORPORATION**
as Borrower

**THE FINANCIAL INSTITUTIONS**
**listed in Schedule 1**
as Lenders

– and –

**OLD HILL PARTNERS INC.**
as Agent
and as Security Trustee

---

# LOAN AGREEMENT

---

relating to
a US$16,575,000 loan facility to partially finance
the acquisition of the m.t. DEWI MAESWARA (to be renamed "OMAN PRIDE")

**INDEX**


| Clause | | Page |
|---|---|---|
| 1. | INTERPRETATION | 1 |
| 2. | FACILITY | 22 |
| 3. | POSITION OF THE LENDERS | 23 |
| 4. | DRAWDOWN | 23 |
| 5. | INTEREST | 24 |
| 6. | INTEREST PERIODS | 25 |
| 7. | DEFAULT INTEREST | 25 |
| 8. | REPAYMENT AND PREPAYMENT | 25 |
| 9. | CONDITIONS PRECEDENT | 27 |
| 10. | REPRESENTATIONS AND WARRANTIES | 30 |
| 11. | GENERAL AFFIRMATIVE AND NEGATIVE COVENANTS | 39 |
| 12. | FINANCIAL COVENANTS | 47 |
| 13. | MARINE INSURANCE COVENANTS | 48 |
| 14. | SHIP COVENANTS | 53 |
| 15. | COLLATERAL MAINTENANCE RATIOS | 58 |
| 16. | INTENTIONALLY OMITTED | 60 |
| 17. | PAYMENTS AND CALCULATIONS | 60 |
| 18. | APPLICATION OF RECEIPTS | 61 |
| 19. | ACCOUNTS | 63 |
| 20. | EVENTS OF DEFAULT | 65 |
| 21. | FEES AND EXPENSES | 69 |
| 22. | INDEMNITIES | 70 |
| 23. | NO SET-OFF OR TAX DEDUCTION; tax indemnity; FATCA | 72 |
| 24. | ILLEGALITY, ETC | 75 |
| 25. | INCREASED COSTS | 76 |
| 26. | SET-OFF | 78 |
| 27. | TRANSFERS AND CHANGES IN LENDING OFFICES | 78 |
| 28. | VARIATIONS AND WAIVERS | 82 |
| 29. | NOTICES | 83 |
| 30. | SUPPLEMENTAL | 85 |

**INDEX**

**Clause** **Page**

31. THE SERVICING BANKS ........ 85
32. LAW AND JURISDICTION ........ 90
33. WAIVER OF JURY TRIAL ........ 91
34. PATRIOT ACT notice ........ 91
35. Confidentiality ........ 91

EXECUTION PAGE ........ 93

SCHEDULE 1 LENDERS AND COMMITMENTS ........ 95

SCHEDULE 2 DRAWDOWN NOTICE ........ 96

SCHEDULE 3 CONDITION PRECEDENT DOCUMENTS ........ 98

SCHEDULE 4 TRANSFER CERTIFICATE ........ 102

APPENDIX A FORM OF COMPLIANCE CERTIFICATE ........ 106

THIS LOAN AGREEMENT (this "**Agreement**") is made as of June 16, 2020

**AMONG**

(1) BRAVERY MARITIME CORPORATION, a corporation formed and existing under the laws of the Republic of Liberia, whose registered address is at 80 Broad Street, Monrovia, Liberia, as borrower (the "**Borrower**", which expression includes its successors, transferees and assigns);

(2) NIMR INTERNATIONAL LLC, a limited liability company formed under the laws of the Sultanate of Oman (the "**Parent Guarantor**", which expression includes its successors, transferees and assigns);

(3) THE FINANCIAL INSTITUTIONS listed in Schedule 1, as lenders (the "**Lenders**", which expression includes their respective successors, transferees and assigns); and

(4) OLD HILL PARTNERS INC., a Delaware corporation, as agent for the Lenders (in such capacity, the "**Agent**", which expression includes its successors, transferees and assigns) and as security trustee for the Lenders (in such capacity, the "**Security Trustee**", which expression includes its successors, transferees and assigns).

**BACKGROUND**

(A) The Borrower wishes to purchase the vessel DEWI MAESWARA (to be renamed "OMAN PRIDE") from Valorous Shipping Company who, immediately prior to the sale thereof, will have acquired the vessel from Front Vision, Inc., a Marshall Islands corporation (the "**Ultimate Seller**") pursuant to a back-to-back purchase and payment arrangement more fully described herein.

(B) Subject to the provisions of this Agreement, the Lenders have agreed to make available to the Borrower a loan facility up to the lesser of $16,575,000 and 65% of the Fair Market Value of the Ship for the purpose of partially financing the acquisition of such vessel.

(C) The Lenders have agreed to share *pari passu* in the Collateral to be granted to the Security Trustee pursuant to this Agreement.

**IT IS AGREED** as follows:

**1. INTERPRETATION**

**1.1 Definitions.** Subject to Clause 1.5, in this Agreement:

"**Acceptable Accounting Firm**" means PKF Euroauditing SA, Baker Tilly or such other recognized accounting firm as the Agent may, with the consent of the Majority Lenders, approve from time to time in writing, such approval not to be unreasonably withheld;

"**Account Bank**" means Signature Bank, acting through its office at 75 Holly Hill Lane, Greenwich, CT 06830;

"**Agent Account**" has the meaning given to it in Clause 17.1(c);

"**Advance**" means the principal amount of the borrowing by the Borrower under this Agreement;

"**Affiliate**" means, as to any person, any other person that, directly or indirectly, controls, is controlled by or is under common control with such person or is a director or officer of such person, and for purposes of this definition, the term "**control**" (including the terms "**controlling**", "**controlled by**" and "**under common control with**") of a person means the possession, direct or indirect, of the power to vote a majority of the Voting Stock of such person or to direct or cause direction of the management and policies of such person, whether through the ownership of Voting Stock, by contract or otherwise;

"**Agreed Form**" means in relation to any document, that document in the form approved by the Agent with the consent of the Majority Lenders (such consent not to be unreasonably withheld), or as otherwise approved in accordance with any other approval procedure specified in any relevant provision of any Finance Document;

"**Approved Broker**" means Clarksons or such other company which the Agent may, with the consent of the Majority Lenders (such consent not to be unreasonably withheld), approve from time to time for the purpose of valuing the Ship, who shall act as an expert and not as arbitrator and whose valuation shall be conclusive and binding on all parties to this Agreement;

"**Approved Flag**" means the Liberian flag or such other flag as the Agent may, with the consent of the Majority Lenders, approve from time to time in writing as the flag on which the Ship shall be registered;

"**Approved Management Agreement**" means, in relation to the Ship in respect of its technical management, a management agreement between the Borrower and the Approved Manager in Agreed Form;

"**Approved Manager**" means in respect of the technical management of the Ship, TNI, Seller or any other company which the Agent may, with the consent of the Majority Lenders (such consent not to be unreasonably withheld), approve from time to time as the technical manager of the Ship;

"**Approved Manager's Undertaking**" means an undertaking of the Approved Manager, in Agreed Form;

"**Approved Surveyor**" means Wilhelmsen or such other company which the Agent may, with the consent of the Majority Lenders (such consent not to be unreasonably withheld), approve from time to time for the purpose of surveying the Ship, who shall act as an expert and not as arbitrator and whose valuation shall be conclusive and binding on all parties to this Agreement;

"**Assignment of Management Agreement Guaranty**" means in relation to the Approved Management Agreement, an assignment of any guarantee granted in connection therewith, in Agreed Form;

"**Availability Period**" means, in relation to the Advance, the period commencing on the Effective Date and ending on the earlier of:

(a) June 30, 2020 (or such later date as the Agent may, with the consent of the Majority Lenders, agree with the Borrower); or

(b) the date on which the Total Commitments are fully borrowed, cancelled or terminated;

"**Balloon Repayment**" means, in relation to the Advance, the principal amount of the Advance on the Drawdown Date minus all repayment installments in respect of the Advance through the Maturity Date;

"**Bank Secrecy Act**" means the United States Bank Secrecy Act of 1970, as amended;

"**Business Day**" means a day on which banks are open in London, England, New York, New York and Muscat, Oman;

"**Capitalized Lease**" means, as applied to any person, any lease of any property (whether real, personal or mixed) of which the discounted present value of the rental obligations of such person, as lessee, in conformity with GAAP, is required to be capitalized on the balance sheet of such person; and "**Capitalized Lease Obligation**" is defined to mean the rental obligations, as aforesaid, under a Capitalized Lease;

"**Change of Control**" means:

(a) in respect of the Parent Guarantor, the occurrence of any act, event or circumstance that without prior written consent of the Majority Lenders results in (i) Mr. Al Rajhi and Mr. Al Habsi, in the aggregate, ceasing to own directly less than 100% of the Equity Interests in the Parent Guarantor, or (ii) Mr. Al Rajhi and Mr. Al Habsi, collectively, ceasing to control the day to day operations of the Parent Guarantor; and

(b) in respect of the Borrower, the occurrence of any act, event or circumstance that without prior written consent of the Majority Lenders results in the Parent Guarantor owning directly or indirectly less than 100% of the issued and outstanding Equity Interests in the Borrower;

"**Charter**" means, in relation to the Ship, (a) the Initial Charter or (b) any other time charter in respect of the Ship for a term which exceeds, or which by virtue of any optional extensions may exceed, 12 months, in each case in Agreed Form;

"**Charter Assignment**" means, in relation to the Ship, an assignment of any Charter, in Agreed Form;

"**Classification Society**" means, in relation to the Ship, DNV, Lloyds Register, the American Bureau of Shipping or such other first-class vessel classification society that is a member of IACS that the Agent may, with the consent of the Majority Lenders (such consent not to be unreasonably withheld), approve from time to time;

"**Code**" means the United States Internal Revenue Code of 1986, as amended, and the regulations promulgated and rulings issued thereunder;

"**Collateral**" means all property (including, without limitation, any proceeds thereof) referred to in the Finance Documents that is or is intended to be subject to any Security Interest in favor of the Security Trustee, for the benefit of the Lenders, securing the Secured Liabilities;

"**Collateral Maintenance Ratios**" mean, collectively, the Market Value LTV Ratio and the Scrap Value LTV Ratio;

"**Collection Account**" means an account in the name of the Borrower with the Account Bank designated as the "Collection Account", or any other account (with that or another office of the Account Bank or with another bank or financial institution acceptable to the Majority Lenders, such approval not to be unreasonably withheld) which is designated by the Agent as the Collection Account for the purposes of this Agreement;

"**Collection Account Control Agreement**" means the account control agreement by and among the Borrower, the Account Bank and the Agent in Agreed Form, which is collateral to the Collection Account Pledge giving the Security Trustee "control" (as such term is defined in the UCC) over the Collection Account;

"**Collection Account Pledge**" means a pledge of the Collection Account, in Agreed Form;

"**Commitment**" means, in relation to a Lender, the amount set opposite its name in Schedule 1, or, as the case may require, the amount specified in the relevant Transfer Certificate, as that amount may be reduced, cancelled or terminated in accordance with this Agreement (and "**Total Commitments**" means the aggregate of the Commitments of all the Lenders);

"**Compliance Certificate**" means a certificate executed by an authorized person of the Borrower, in the form set out in Appendix A;

"**Contractual Currency**" has the meaning given in Clause 22.4;

"**Contribution**" means, in relation to a Lender, the part of the Loan which is owing to that Lender;

"**Creditor Party**" means the Agent, the Security Trustee or any Lender, whether as at the date of this Agreement or at any later time;

"**Currency Agreement**" means any foreign exchange contract, currency swap agreement or other similar agreement or arrangement designed to protect a person or any of its subsidiaries against fluctuations in currency values to or under which such person or any of its subsidiaries is a party or a beneficiary on the date of this Agreement or becomes a party or a beneficiary thereafter;

"**Delivery Date**" means the date of the scheduled (or actual) acquisition by, and delivery of the Ship to, the Borrower;

"**Dollars**" and "**$**" means the lawful currency for the time being of the United States of America;

"**Drawdown Date**" means, in relation to the Advance, the date requested by the Borrower for the Advance to be made, or (as the context requires) the date on which the Advance is actually made;

"**Drawdown Notice**" means a notice in the form set out in Schedule 2 (or in any other form which the Agent approves or reasonably requires);

"**Earnings**" means, in relation to the Ship, all moneys whatsoever which are now, or later become, payable (actually or contingently) to the Borrower or the Security Trustee and which arise out of the use or operation of the Ship, including (but not limited to):

(a) except to the extent that they fall within paragraph (b):

(i) all freight, hire and passage moneys;

(ii) compensation payable to the Borrower or the Security Trustee in the event of requisition of the Ship for hire;

(iii) remuneration for salvage and towage services;

(iv) demurrage and detention moneys;

(v) damages for breach (or payments for variation or termination) of any charterparty or other contract for the employment of the Ship; and

(vi) all moneys which are at any time payable under Insurances (including in respect of loss of hire); and

(b) if and whenever the Ship is employed on terms whereby any moneys falling within paragraphs (a)(i) to (vi) are pooled or shared with any other person, that proportion of the net receipts of the relevant pooling or sharing arrangement which is attributable to the Ship;

"**Earnings Assignment**" means, in relation to the Ship, an assignment of the Earnings and any Requisition Compensation of the Ship, in Agreed Form;]

"**Effective Date**" means the date on which this Agreement is executed and delivered by the parties hereto;

"**Email**" has the meaning given in Clause 29.1;

"**Environmental Claim**" means:

(a) any claim by any governmental, judicial or regulatory authority which arises out of an Environmental Incident or an alleged Environmental Incident or which relates to any Environmental Law; or

(b) any claim by any other person which relates to an Environmental Incident or to an alleged Environmental Incident,

and "**claim**" means a claim for damages, compensation, indemnification, contribution, fines, penalties or any other payment of any kind whether or not similar to the foregoing; an order or

direction to take, or not to take, certain action or to desist from or suspend certain action; and any form of enforcement or regulatory action, including the arrest or attachment of any asset;

"**Environmental Incident**" means:

(a) any release of Environmentally Sensitive Material from the Ship; or

(b) any incident in which Environmentally Sensitive Material is released and which involves a collision or allision between the Ship and another vessel or object, or some other incident of navigation or operation, in any case, in connection with which the Ship is actually or potentially liable to be arrested, attached, detained or injuncted and/or the Ship and/or the Borrower and/or any operator or manager of the Ship is at fault or allegedly at fault or otherwise liable to any legal or administrative action; or

(c) any other incident in which Environmentally Sensitive Material is released otherwise than from the Ship and in connection with which the Ship is actually or potentially liable to be arrested and/or where the Borrower and/or any operator or manager of the Ship is at fault or allegedly at fault or otherwise liable to any legal or administrative action;

"**Environmental Law**" means any law relating to pollution or protection of the environment, to the carriage of Environmentally Sensitive Material or to actual or threatened releases of Environmentally Sensitive Material;

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law;

"**Environmentally Sensitive Material**" means oil, oil products and any other substance (including any chemical, gas or other hazardous or noxious substance) which is (or is capable of being or becoming) polluting, toxic or hazardous;

"**Equity Interests**" of any person means:

(a) any and all shares and other equity interests (including common stock, preferred stock, limited liability company interests and partnership interests) in such person; and

(b) all rights to purchase, warrants or options or convertible debt (whether or not currently exercisable), participations or other equivalents of or interests in (however designated) such shares or other interests in such person;

"**ERISA**" means the United States Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated and rulings issued thereunder;

"**ERISA Affiliate**" means a trade or business (whether or not incorporated) that, together with the Borrower or its subsidiaries, would be deemed to be a single employer under Section 414 of the Code;

"**ERISA Funding Event**" means:

(a) any failure by any Plan to satisfy the minimum funding standards (for purposes of Section 412 of the Code or Section 302 of ERISA), whether or not waived;

(b) the filing pursuant to Section 412 of the Code or Section 303 of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan;

(c) the failure by the Borrower or any subsidiary of it or any ERISA Affiliate to make any required contribution to a Multiemployer Plan;

(d) a determination that any Plan is, or is expected to be, in "at risk" status (within the meaning of Section 430(i) of the Code);

(e) the incurrence by the Borrower or any subsidiary of it or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan;

(f) a determination that a Multiemployer Plan is, or is expected to be, insolvent within the meaning of Section 4245 of ERISA, in reorganization within the meaning of Section 4241 of ERISA or in endangered status within the meaning of Section 432 of the Code or Section 305 of ERISA;

(g) any Reportable Event; or

(h) the existence of a non-exempt "prohibited transaction" for purposes of Section 406 of ERISA or Section 4975 of the Code with respect to any employee benefit plan as defined in Section 3(3) of ERISA (other than a Multiemployer Plan) in respect to which the Borrower or any subsidiary of it or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4062 or Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA and in respect of which a liability (other than one of an immaterial amount) could reasonably be expected to be incurred by any Security Party;

"**ERISA Termination Event**" means:

(a) the imposition of any lien in favor of the PBGC on any Plan or Multiemployer Plan, or on any asset of any Security Party or any ERISA Affiliate in connection with any Plan or Multiemployer Plan;

(b) the receipt by the Borrower or any subsidiary of it or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Multiemployer Plan or to appoint a trustee to administer any Plan or Multiemployer Plan under Section 4042 of ERISA;

(c) the receipt by the Borrower or any subsidiary of it or any ERISA Affiliate of any notice that a Multiemployer Plan is in critical status within the meaning of Section 432 of the Code or Section 305 of ERISA;

(d) the filing of a notice of intent to terminate a Plan under Section 4041 of ERISA; or

(e) the occurrence of any other event or condition which might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan or Multiemployer Plan;

"**Estate**" has the meaning assigned such term in Clause 31.1(b)(ii);

"**Event of Default**" means any of the events or circumstances described in Clause 20.1;

"**Excess Cash Flow**" means, in respect of a relevant successive three (3) month period and in the reasonable determination of the Agent, the aggregate amount of the Earnings of the Ship minus:

(a) the quarterly service fees owed to the Account Bank;

(b) the ordinary operating expenses of the Ship (not to exceed $6,500 per day);

(c) the scheduled principal payments under this Agreement (in the amount of $750,000);

(d) the interest payments under this Agreement;

(e) the "Monitoring Fee" or any other fees payable to Old Hill Partners, Inc. under the Fee Letters and any other amount payable to Creditor Parties under the Finance Documents;

(f) for each of the first three Repayment Dates only, $333,334 for the anticipated cost of $1,000,000 special survey and drydocking of the Ship (to be expended for those purposes on or about July 1, 2021);

(g) all reasonable and documented expenses related to repairs, up-gradings, water ballast treatment, and other customary and documented expenses necessary for maintaining the operating condition of the Ship at high standards; and

(h) the vessel management service fee in the amount of $1,000 per day payable to the Approved Manager;

"**Excess Cash Flow Sweep**" has the meaning given to it in Clause 19.2(d)(iii).

"**Executive Order**" means an executive order issued by the President of the United States of America;

"**Fair Market Value**" means, in relation to the Ship, the market value of such Ship at any date that is shown by a single valuation prepared for and addressed to the Agent by an Approved Broker selected and appointed by the Agent **where** if a range of market values is provided in a particular appraisal, then the market value in such appraisal shall be deemed to be the mid-point within such range; and

such valuation shall be:

(i) as at a date not more than 14 days prior to the date such valuation is delivered to the Agent;

(ii) on a "desk-top" basis without physical inspection of that Ship;

(iii) on the basis of a sale for prompt delivery for cash on normal arm's length commercial terms as between a willing seller and a willing buyer, free of any existing charter or other contract of employment (and with no value to be given to any pooling arrangements); and

(iv) after deducting the estimated amount of the usual and expenses which would be incurred in connection with the sale;

"**Fair Scrap Value**" means, in relation to the Ship, a desktop appraisal obtained by the Agent from an Approved Broker as to the current scrap value of the Ship;

"**FATCA**" means:

(a) sections 1471 to 1474 of the Code or any associated regulations;

(b) any treaty, law or regulation of any other jurisdiction, or relating to an intergovernmental agreement between the U.S. and any other jurisdiction, which (in either case) facilitates the implementation of any law or regulation referred to in paragraph (a) above; or

(c) any agreement pursuant to the implementation of any treaty, law or regulation referred to in paragraphs (a) or (b) above with the IRS, the U.S. government or any governmental or taxation authority in any other jurisdiction;

"**FATCA Deduction**" means a deduction or withholding from a payment under a Finance Document required by FATCA.

"**FATCA Exempt Party**" means a Party that is entitled to receive payments free from any FATCA Deduction.

"**Fee Letter**" means any letter agreement, dated as of the date hereof, entered into between the Agent and the Borrower, setting forth fees payable to the Creditor Parties in connection with the transactions contemplated hereby;

"**Finance Documents**" means:

(a) this Agreement;

(b) the Approved Manager's Undertaking;

(c) any Assignment of Management Agreement Guaranty;

(d) any Charter Assignment;

(e) the Collection Account Pledge;

(f) the Collection Account Control Agreement;

(g) the Earnings Assignment;

(h) the Insurance Assignment;

(i) the Mortgage;

(j) the Note;

(k) the Shares Pledge; and

(l) any Fee Letter;

(m) the Parent Guaranty;

(n) any Limited Guaranty;

(o) any other document (whether creating a Security Interest or not) which is executed at any time by any person as security for, or to establish any form of subordination or priorities arrangement in relation to, any amount payable to the Lenders under this Agreement or any of the other documents referred to in this definition;

"**Financial Indebtedness**" means, with respect to any person (the "**debtor**") at any date of determination (without duplication):

(a) all obligations of the debtor for principal, interest or any other sum payable in respect of any moneys borrowed or raised by the debtor;

(b) all obligations of the debtor evidenced by bonds, debentures, notes or other similar instruments;

(c) all obligations of the debtor in respect of any acceptance credit, guarantee or letter of credit facility or equivalent made available to the debtor (including reimbursement obligations with respect thereto);

(d) all obligations of the debtor to pay the deferred purchase price of property or services, which purchase price is due more than six months after the date of placing such property in service or taking delivery thereto or the completion of such services, except trade payables;

(e) all Capitalized Lease Obligations of the debtor as lessee;

(f) all Financial Indebtedness of persons other than the debtor secured by a Security Interest on any asset of the debtor, whether or not such Financial Indebtedness is assumed by the debtor, **provided that** the amount of such Financial Indebtedness shall be the lesser of (i) the fair market value of such asset at such date of determination and (ii) the amount of such Financial Indebtedness;

(g) all Financial Indebtedness of persons other than the debtor under any guarantee, indemnity or similar obligation entered into by the debtor to the extent such Financial Indebtedness is guaranteed, indemnified, etc. by the debtor; and

(h) to the extent not otherwise included in this definition, obligations of the debtor under Currency Agreements and Interest Rate Agreements or any other kind of derivative

transaction entered into by the debtor or, if the agreement under which any such transaction is entered into requires netting of mutual liabilities, the liability of the debtor for the net amount;

The amount of Financial Indebtedness of any debtor at any date shall be the outstanding balance at such date of all unconditional obligations as described above and, with respect to contingent obligations, the maximum liability upon the occurrence of the contingency giving rise to the obligation, as determined in conformity with GAAP, **provided that** (i) the amount outstanding at any time of any Financial Indebtedness issued with an original issue discount is the face amount of such Financial Indebtedness less the remaining unamortized portion of such original issue discount of such Financial Indebtedness at such time as determined in conformity with GAAP, and (ii) Financial Indebtedness shall not include any liability for taxes;

"**Fiscal Year**" means, in relation to any person, each period of one (1) year commencing on January 1 of each year and ending on December 31 of such year in respect of which its accounts are or ought to be prepared;

"**Foreign Pension Plan**" means any plan, fund (including without limitation, any superannuation fund) or other similar program established or maintained outside the United States of America by any Security Party primarily for the benefit of its or their employees residing outside the United States of America, which plan, fund or other similar program provides, or results in, retirement income, a deferral of income in contemplation of retirement or payments to be made upon termination of employment, and which plan is not subject to ERISA or the Code;

"**GAAP**" means generally accepted accounting principles in the United States of America, including, without limitation, those set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as approved by a significant segment of the accounting profession; **provided** that the Security Parties may elect to apply International Financial Reporting Standards ("IFRS") accounting principles in lieu of GAAP and, upon any such election, references herein to GAAP shall thereafter be construed to mean IFRS (except as otherwise provided in this Agreement);

"**IACS**" means the International Association of Classification Societies;

"**Initial Charter**" means the charterparty dated May 26, 2020 between Borrower and the Initial Charterer, as such charterparty may be amended, supplemented or otherwise modified from time to time in accordance with the terms hereof;

"**Initial Charterer**" means the Parent Guarantor;

"**Insurances**" means in relation to the Ship:

(a) all policies and contracts of insurance, including entries of the Ship in any protection and indemnity or war risks association, effected in respect of the Ship, the Earnings or otherwise in relation to the Ship whether before, on or after the date of this Agreement; and

(b) all rights and other assets relating to, or derived from, any of the foregoing, including any rights to a return of a premium and any rights in respect of any claim whether or not the relevant policy, contract of insurance or entry has expired on or before the date of this Agreement;

"**Insurance Assignment**" means, in relation to the Ship, an assignment of the Insurances, in Agreed Form;

"**Interest Period**" has the meaning given in Clause 6.2;

"**Interest Rate**" has the meaning given in Clause 5.1;

"**Interest Rate Agreement**" means any interest rate protection agreement, interest rate future agreement, interest rate option agreement, interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedge agreement or other similar agreement or arrangement designed to protect a person or any of its subsidiaries against fluctuations in interest rates to or under which such person or any of its subsidiaries is a party or a beneficiary on the date hereof or becomes a party or a beneficiary hereafter;

"**IRS**" means the United States Internal Revenue Service or any successor taxing authority or agency of the United States government;

"**ISM Code**" means the International Safety Management Code (including the guidelines on its implementation), adopted by the International Maritime Organization, as the same may be amended or supplemented from time to time (and the terms "**safety management system**", "**Safety Management Certificate**" and "**Document of Compliance**" have the same meanings as are given to them in the ISM Code);

"**ISM Code Documentation**" includes, in respect of the Ship:

(a) the Document of Compliance and Safety Management Certificate issued pursuant to the ISM Code in relation to the Ship within the periods specified by the ISM Code;

(b) all other documents and data which are relevant to the safety management system and its implementation and verification which the Agent may require; and

(c) any other documents which are prepared or which are otherwise relevant to establish and maintain the Ship's compliance or the compliance of the Borrower or the relevant Approved Manager with the ISM Code which the Agent may require;

"**ISPS Code**" means the International Ship and Port Facility Security Code as adopted by the International Maritime Organization, as the same may be amended or supplemented from time to time;

"**ISPS Code Documentation**" includes:

(a) the ISSC; and

(b) all other documents and data which are relevant to the ISPS Code and its implementation and verification which the Agent may require;

"**ISSC**" means a valid and current International Ship Security Certificate issued under the ISPS Code;

"**Lending Office**" means, with respect to any Lender, the office of such Lender specified as its "Lending Office" under its name on Schedule 1 or in the relevant Transfer Certificate pursuant to which it became a Lender, or such other office of such Lender as such Lender may from time to time specify to the Borrower and the Agent;

"**Limited Guaranty**" means a "bad acts" guaranty in Agreed Form executed by each of the Limited Guarantors;

"**Limited Guarantors**" means Mr. Al Rajhi whose passport number is XH8844401 from the Sultanate of Oman, Mr. Al Habsi whose passport number is CK9299920 from the Sultanate of Oman and Mr. Ioannis Karageorgis whose passport number is AP0609009 from Greece;

"**Loan**" means the principal amount from time to time outstanding under this Agreement;

"**Major Casualty**" means, in relation to the Ship, any casualty to the Ship in respect of which the claim or the aggregate of the claims against all insurers, before adjustment for any relevant franchise or deductible, exceeds $250,000 or the equivalent in any other currency;

"**Majority Lenders**" means:

(a) before the Loan has been made, Lenders whose Commitments total 66.67% of the Total Commitments; and

(b) after the Loan has been made, Lenders whose Contributions total 66.67% of the Loan;

"**Margin Regulations**" means Regulations T, U and X issued by the Board of Governors of the United States Federal Reserve System and any successor regulations thereto, as in effect from time to time;

**"Margin Stock**" means "margin stock" or "margin securities" as defined in the Margin Regulations;

"**Market Value LTV Ratio**" means the ratio calculated by dividing the outstanding principal amount of the Loan by (i) the Fair Market Value of the Ship plus (ii) all amounts on deposit in the Collection Account representing the Minimum Liquidity Reserve, the Survey Reserve and the Working Capital Reserve;

"**Material Adverse Effect**" means mean any event, change or condition that, individually or taken as a whole has had or could reasonably be expected to have a material adverse effect (w) on the rights or remedies of the Creditor Parties, (x) on the ability of any Security Party to perform its obligations to the Creditor Parties or (y) on the property, assets, operations, liabilities, or condition (financial or otherwise) of any Security Party;

"**Maturity Date**" means, in relation to the Loan, the earlier of (i) the date falling 3 years from the Drawdown Date, and (ii) the date on which the Loan is accelerated pursuant to Clause 20.4;

"**Minimum Interest**" has the meaning given to it in Clause 8.10(c);

"**Mortgage**" means, in relation to the Ship, the first preferred ship mortgage on the Ship, in Agreed Form;

"**Multiemployer Plan**" means, at any time, a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which the Borrower or any subsidiary of it or any ERISA Affiliate has any liability or obligation to contribute or has within any of the six preceding plan years had any liability or obligation to contribute;

"**Non-indemnified Tax**" means:

(a) any tax on the net income of a Creditor Party (but not a tax on gross income or individual items of income), whether collected by deduction or withholding or otherwise, which is levied by a taxing jurisdiction which:

(i) is located in the country under whose laws such entity is formed (or in the case of a natural person is a country of which such person is a citizen); or

(ii) with respect to any Lender, is located in the country of its Lending Office; or

(iii) with respect to any Creditor Party other than a Lender, is located in the country from which such party has originated its participation in this transaction; or

(b) any FATCA Deduction made on account of a payment to a Party;

"**Note**" means a promissory note of the Borrower, payable to the order of a Lender, evidencing the aggregate indebtedness of the Borrower in respect of that Lender's Contribution under this Agreement, in Agreed Form;

"**Notifying Lender**" has the meaning given in Clause 24.1 or Clause 25.1 as the context requires;

"**Parent Guaranty**" means a guaranty in Agreed Form executed by the Parent Guarantor;

"***pari passu***", when used with respect to the ranking of any Financial Indebtedness of any person in relation to other Financial Indebtedness of such person, means that each such Financial Indebtedness:

(a) either (i) is not subordinated in right of payment to any other Financial Indebtedness of such person or (ii) is subordinate in right of payment to the same Financial Indebtedness of such person as is the other and is so subordinate to the same extent; and

(b) is not subordinate in right of payment to the other or to any Financial Indebtedness of such person as to which the other is not so subordinate;

"**Party**" means a Security Party or a Creditor Party.

"**PATRIOT Act**" means the United States Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001, as amended;

"**Payment Currency**" has the meaning given in Clause 22.4;

"**PBGC**" means the United States Pension Benefits Guarantee Corporation and its successors;

"**Permitted Security Interests**" means:

(a) Security Interests created by the Finance Documents;

(b) Security Interests for unpaid but not past due master's and crew's wages in accordance with usual maritime practice;

(c) Security Interests for salvage;

(d) Security Interests arising by operation of law for not more than two (2) months' prepaid hire under any charter or other contract of employment in relation to the Ship not otherwise prohibited by this Agreement or any other Finance Document; and

(e) Security Interests for master's disbursements incurred in the ordinary course of trading and any other Security Interests arising by operation of law or otherwise in the ordinary course of the operation, repair or maintenance of the Ship, **provided** such Security Interests do not secure amounts more than 30 days overdue (unless the overdue amount is being contested by the Borrower in good faith by appropriate steps).

"**Pertinent Document**" means:

(a) any Finance Document;

(b) any policy or contract of insurance contemplated by or referred to in Clause 13 or any other provision of this Agreement or another Finance Document;

(c) any other document contemplated by or referred to in any Finance Document; and

(d) any document which has been or is at any time sent by or to a Servicing Bank in contemplation of or in connection with any Finance Document or any policy, contract or document falling within paragraphs (b) or (c);

"**Pertinent Jurisdiction**", in relation to a company, means:

(a) the jurisdiction under the laws of which the company is incorporated or formed;

(b) a jurisdiction in which the company has the center of its main interests or in which the company's central management and control is or has recently been exercised;

(c) a jurisdiction in which the overall net income of the company is subject to corporation tax, income tax or any similar tax;

(d) a jurisdiction in which assets of the company (other than securities issued by, or loans to, related companies) having a substantial value are situated, in which the company maintains a branch or permanent place of business, or in which a Security Interest created by the company must or should be registered in order to ensure its validity or priority; or

(e) a jurisdiction the courts of which have jurisdiction to make a winding up, administration or similar order in relation to the company whether as a main or territorial or ancillary proceedings or which would have such jurisdiction if their assistance were requested by the courts of a country referred to in paragraphs (a) or (b) above;

"**Pertinent Matter**" means:

(a) any transaction or matter contemplated by, arising out of, or in connection with a Pertinent Document; or

(b) any statement relating to a Pertinent Document or to a transaction or matter falling within paragraph (a),

and covers any such transaction, matter or statement, whether entered into, arising or made at any time before the signing of this Agreement or on or at any time after that signing;

"**Plan**" means any employee benefit plan as defined in Section 3(3) of ERISA (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect to which the Borrower or any subsidiary of it or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4062 or Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA;

"**Potential Event of Default**" means an event or circumstance which, with the giving of any notice, the lapse of time, a determination of the Majority Lenders and/or the satisfaction of any other condition, would constitute an Event of Default;

"**Prohibited Person**" means any person (whether designated by name or by reason of being included in a class of persons) against whom Sanctions are directed;

"**Repayment Date**" means a date on which a repayment is required to be made under Clause 8;

"**Reportable Event**" means an event described in Section 4043(c) of ERISA with respect to a Plan that is subject to Title IV of ERISA other than those events as to which the 30-day notice period is waived under subsections 22, 23, 25, 27, or 28 of PBGC Regulation Section 4043;

"**Requisition Compensation**" includes all compensation or other moneys payable by reason of any act or event such as is referred to in paragraph (b) of the definition of "**Total Loss**";

"**Sanctions**" means any sanctions, embargoes, freezing provisions, prohibitions or other restrictions relating to trading, doing business, investment, exporting, financing or making assets available (or other activities similar to or connected with any of the foregoing):

(a) imposed by law, regulation or Executive Order of the United States, the European Union, the United Nations or the United Kingdom;

(b) otherwise imposed by any law or regulation or Executive Order applicable to any Creditor Party, or any Security Party, including without limitation laws or regulations or Executive Orders restricting loans to, investments in, or the export of assets to, foreign countries or entities doing business there;

**provided that** the laws and regulations described above shall be applicable only to the extent such laws and regulations are not inconsistent with the laws and regulations of the United States of America;

"**Scrap Value LTV Ratio**" means the ratio calculated by dividing the outstanding principal amount of the Loan by the sum of (i) the Fair Scrap Value of the Ship plus (ii) all amounts on deposit in the Collection Account representing the Minimum Liquidity Reserve, the Survey Reserve and the Working Capital Reserve;

"**Secured Liabilities**" means all liabilities which the Security Parties or any of them have, at the date of this Agreement or at any later time or times, under or in connection with any Finance Document or any judgment relating to any Finance Documents; and for this purpose, there shall be disregarded any total or partial discharge of these liabilities, or variation of their terms, which is effected by, or in connection with, any bankruptcy, liquidation, arrangement or other procedure under the insolvency laws of any country;

"**Security Interest**" means:

(a) a mortgage, encumbrance, charge (whether fixed or floating) or pledge, any maritime or other lien or privilege or any other security interest of any kind;

(b) the security rights of a plaintiff under an action *in rem*; and

(c) any arrangement entered into by a person (A) the effect of which is to place another person (B) in a position which is similar, in economic terms, to the position in which B would have been had he held a security interest over an asset of A; but this paragraph (c) does not apply to a right of set off or combination of accounts conferred by the standard terms of business of a bank or financial institution;

"**Security Party**" means the Borrower, the Parent Guarantor and any other person (except a Creditor Party or any Limited Guarantor) who, as a surety, guarantor, mortgagor, assignor or pledgor, as a party to any subordination or priorities arrangement, or in any similar capacity, executes a Finance Document;

"**Security Period**" means the period commencing on the date of this Agreement and ending on the date that:

(a) all amounts which have become due for payment by the Borrower or any other Security Party under the Finance Documents have been paid;

(b) no amount is owing or has accrued (without yet having become due for payment) under any Finance Document; and

(c) neither the Borrower nor any other Security Party has any future or contingent liability under Clause 21, 22 or 23 or any other provision of this Agreement or another Finance Document;

"**Seller**" means Valorous Shipping Company, a Liberian corporation, as seller under the Ship MOA;

"**Servicing Bank**" means the Agent or the Security Trustee;

"**Shares Pledge**" means a pledge of the Equity Interests of the Borrower, in Agreed Form;

"**Ship**" means the very large crude carrier named "DEWI MAESWARA" (to be renamed "OMAN PRIDE") with IMO Number 9153525 and registered in the name of Borrower on Liberian flag;

"**Ship MOA**" means the Memorandum of Agreement dated May 21, 2020 between the Seller and the Borrower as buyer in respect of the sale and purchase of the Ship, as amended by that certain Addendum, dated June 5, 2020, as such Memorandum of Agreement may be amended, supplemented or otherwise modified from time to time in accordance with the terms hereof;

"**Survey Reserve**" has the meaning specified in Clause 19.2(c);

"**Total Loss**" means in relation to the Ship:

(a) actual, constructive, compromised, agreed or arranged total loss of the Ship;

(b) any expropriation, confiscation, requisition or acquisition of the Ship, whether for full consideration, a consideration less than its proper value, a nominal consideration or without any consideration, which is effected by any government or official authority or by any person or persons claiming to be or to represent a government or official authority (excluding a requisition for hire for a fixed period not exceeding one (1) year without any right to an extension), unless it is within one (1) month redelivered to the full control of the Borrower; or

(c) any arrest, capture, seizure or detention of the Ship (including any hijacking or theft) unless redelivered to the full control of the Borrower within 30 days of such arrest, capture, seizure or detention;

"**TNI**" means Times Navigation Inc., a Marshall Islands corporation;

"**TNI MOA**" means the Memorandum of Agreement dated April 15, 2020 between the Ultimate Seller as seller and Seller as buyer in respect of the sale and purchase of the Ship, as such Memorandum of Agreement may be amended, supplemented or otherwise modified from time to time in accordance with the terms hereof (including each of the Addenda, dated May 12, 2020, June 5, 2020 and June 16, 2020);

"**Total Loss Date**" means in relation to the Ship:

(a) in the case of an actual loss of the Ship, the date on which it occurred or, if that is unknown, the date when the Ship was last heard of;

(b) in the case of a constructive, compromised, agreed or arranged total loss of the Ship, the earliest of:

(i) the date on which a notice of abandonment is given to the insurers; and

(ii) the date of any compromise, arrangement or agreement made by or on behalf of the Borrower with the Ship's insurers in which the insurers agree to treat the Ship as a total loss; and

(c) in the case of any other type of total loss, on the date (or the most likely date) on which it appears to the Agent that the event constituting the total loss occurred;

"**Transfer Certificate**" has the meaning given in Clause 27.2;

"**Transferee Lender**" has the meaning given in Clause 27.2;

"**Transferor Lender**" has the meaning given in Clause 27.2;

"**UCC**" means the Uniform Commercial Code of the State of New York;

"**Ultimate Seller**" has the meaning assigned such term in the preamble;

"**Vessel Operating Account**" means Account No. [redacted]0858 held with Hamburg Commercial Bank AG in the name of the Borrower to be used for the sole purpose of holding the Ship's operating expenses, or such other account approved by the Agent in writing; and

"**Voting Stock**" of any person as of any date means the Equity Interests of such person that are at the time entitled to vote in the election of the board of directors or similar governing body of such person.

**1.2 Construction of certain terms**. In this Agreement:

"**approved**" means, for the purposes of Clause 13, approved in writing by the Agent with the consent of the Majority Lenders;

"**asset**" includes every kind of property, asset, interest or right, including any present, future or contingent right to any revenues or other payment;

"**company**" includes any corporation, limited liability company, partnership, joint venture, unincorporated association, joint stock company and trust;

"**consent**" includes an authorization, consent, approval, resolution, license, exemption, filing, registration, notarization and legalization;

"**contingent liability**" means a liability which is not certain to arise and/or the amount of which remains unascertained;

"**document**" includes a deed, letter, Email or fax;

"**excess risks**" means, in relation to the Ship, the proportion of claims for general average, salvage and salvage charges not recoverable under the hull and machinery policies in respect of the Ship in consequence of its insured value being less than the value at which the Ship is assessed for the purpose of such claims;

"**expense**" means any kind of cost, charge or expense (including all legal costs, charges and expenses) and any applicable value added or other tax;

"**law**" includes any order or decree, any form of delegated legislation, any treaty or international convention and any statute, regulation or resolution of the United States of America, any state thereof, the Council of the European Union, the European Commission, the United Nations or its Security Council or any other Pertinent Jurisdiction;

"**legal or administrative action**" means any legal proceeding or arbitration and any administrative or regulatory action or investigation;

"**liability**" includes every kind of debt or liability (present or future, certain or contingent), whether incurred as principal or surety or otherwise;

"**months**" shall be construed in accordance with Clause 1.3;

"**obligatory insurances**" means, in relation to the Ship, all insurances effected, or which the Borrower is obliged to effect, under Clause 13 or any other provision of this Agreement or another Finance Document;

"**parent company**" has the meaning given in Clause 1.4;

"**person**" includes natural persons; any company; any state, political sub-division of a state and local or municipal authority; and any international organization;

"**policy**", in relation to any insurance, includes a slip, cover note, certificate of entry or other document evidencing the contract of insurance or its terms;

"**protection and indemnity risks**" means the usual risks covered by a protection and indemnity association that is a member of the International Group of P&I Clubs, including pollution risks and the proportion (if any) of any sums payable to any other person or persons in case of collision which are not recoverable under the hull and machinery policies by reason of the incorporation in them of clause 6 of the International Time Clauses (Hulls)(1/11/02 or 1/11/03) or clause 8 of the Institute Time Clauses (Hulls) (1/10/83) or the Institute Amended Running Down Clause (1/10/71) or any equivalent provision;

"**regulation**" includes any regulation, rule, official directive, request or guideline (either having the force of law or compliance with which is reasonable in the ordinary course of business of the party concerned) of any governmental body, intergovernmental or supranational, agency, department or regulatory, self-regulatory or other authority or organization;

"**subsidiary**" has the meaning given in Clause 1.4;

"**successor**" includes any person who is entitled (by assignment, novation, merger or otherwise) to any other person's rights under this Agreement or any other Finance Document (or any interest in those rights) or who, as administrator, liquidator or otherwise, is entitled to exercise those rights; and in particular references to a successor include a person to whom those rights (or any interest in those rights) are transferred or pass as a result of a merger, division, reconstruction or other reorganization of it or any other person;

"**tax**" includes any present or future tax, duty, impost, levy or charge of any kind which is imposed by any country, any state, any political sub-division of a state or any local or municipal authority or any other governmental authority authorized to levy such tax (including any such imposed in connection with exchange controls), and any related penalties, interest or fines; and

"**war risks**" includes war and allied perils, the risk of mines, terrorism, piracy, hijacking, confiscation, blocking and trapping, protection and indemnity war risks (with a separate limit not less than hull value) and all risks excluded by clause 29 of the Institute Hull Clauses (1/11/02 or 1/11/03) or clause 24 of the Institute Time clauses (Hulls) (1/11/1995) or clause 23 of the Institute Time Clauses (Hulls) (1/10/83) or any equivalent provision.

**1.3 Meaning of "month".** A period of one or more "**months**" ends on the day in the relevant calendar month numerically corresponding to the day of the calendar month on which the period started ("**the numerically corresponding day**"), but:

(a) on the Business Day following the numerically corresponding day if the numerically corresponding day is not a Business Day or, if there is no later Business Day in the same calendar month, on the Business Day preceding the numerically corresponding day; or

(b) on the last Business Day in the relevant calendar month, if the period started on the last Business Day in a calendar month or if the last calendar month of the period has no numerically corresponding day,

and "**month**" and "**monthly**" shall be construed accordingly.

**1.4 Meaning of "subsidiary".** A company (S) is a subsidiary of another company (P) if:

(a) a majority of the issued Equity Interests in S (or a majority of the issued Equity Interests in S which carry unlimited rights to capital and income distributions) are directly owned by P or are indirectly attributable to P; or

(b) P has direct or indirect control over a majority of the voting rights attaching to the issued Equity Interests of S; or

(c) P has the direct or indirect power to appoint or remove a majority of the directors (or equivalent) of S; or

(d) P otherwise has the direct or indirect power to ensure that the affairs of S are conducted in accordance with the wishes of P;

and any company of which S is a subsidiary is a parent company of S.

**1.5 General interpretation**. In this Agreement:

(a) references to, or to a provision of, a Finance Document or any other document are references to it as amended or supplemented, whether before the Effective Date or otherwise;

(b) references in Clause 1.1 to a document being in Agreed Form or in the form of an Appendix include references to that form with any modifications to that form which the Agent approves or reasonably requires with the consent of the Majority Lenders and which are acceptable to the Borrower;

(c) references to, or to a provision of, any law or regulation include any amendment, extension, re-enactment or replacement, whether made before the Effective Date or otherwise;

(d) words denoting the singular number shall include the plural and vice versa; and

(e) Clauses 1.1 to 1.5 apply unless the contrary intention appears.

**1.6 Headings.** In interpreting a Finance Document or any provision of a Finance Document, all clause, sub-clause and other headings in that and any other Finance Document shall be entirely disregarded.

**1.7 Accounting terms**. Unless otherwise specified herein, all accounting terms used in this Agreement and in the other Finance Documents shall be interpreted, and all financial statements and certificates and reports as to financial matters required to be delivered to any Creditor Party under this Agreement shall be prepared, in accordance with GAAP as from time to time in effect.

**1.8 Inferences regarding materiality**. To the extent that any representation, warranty, covenant or other undertaking of a Security Party in this Agreement or any other Finance Document is qualified by reference to those matters which are not reasonably expected to result in a "Material Adverse Effect" or language of similar import, no inference shall be drawn therefrom that any Creditor Party has knowledge or approves of any noncompliance by such Security Party with any law or regulation.

**2. FACILITY**

**2.1 Amount of facility.** Subject to the other provisions of this Agreement, the Lenders severally agree to make available to the Borrower a loan facility in an amount of up to the lesser of $16,575,000 and 65% of the Fair Market Value of the Ship.

**2.2 Lenders' participations in Advance.** Subject to the other provisions of this Agreement, each Lender shall participate in the Advance in the proportion which, as at the Drawdown Date, its Commitment bears to the Total Commitments.

**2.3 Purpose of Advance.** The Borrower undertakes with each Creditor Party to use the Advance only to partially finance the acquisition of the Ship pursuant to the Ship MOA.

2.4 **Cancellation of Total Commitments.** Any portion of the Total Commitments not disbursed to the Borrower shall be cancelled and terminated automatically on the expiration of the Availability Period.

**3. POSITION OF THE LENDERS**

3.1 **Interests several.** The rights of the Lenders under this Agreement are several.

3.2 **Individual right of action.** Each Lender shall be entitled to sue for any amount which has become due and payable by a Security Party to it under this Agreement without joining the Agent, the Security Trustee or any other Lender as additional parties in the proceedings.

3.3 **Proceedings requiring Majority Lender consent.** Except as provided in Clause 3.2, no Lender may commence proceedings against any Security Party in connection with a Finance Document without the prior written consent of the Majority Lenders.

3.4 **Obligations several.** The obligations of the Lenders under this Agreement are several; and a failure of a Lender to perform its obligations under this Agreement shall not result in:

(a) the obligations of the other Lenders being increased; nor

(b) any Security Party or any other Lender being discharged (in whole or in part) from its obligations under any Finance Document,

and in no circumstances shall a Lender have any responsibility for a failure of another Lender to perform its obligations under this Agreement.

**4. DRAWDOWN**

4.1 **Request for Advance.** Subject to the following conditions, the Borrower may request the Advance to be made by delivering to the Agent a completed Drawdown Notice not later than 11:00 a.m. (New York City time) three (3) Business Days prior to the intended Drawdown Date (as such notice period may be reduced by the Lenders in their sole discretion).

4.2 **Availability.** The conditions referred to in Clause 4.1 are that:

(a) the Drawdown Date must be a Business Day during the Availability Period;

(b) there shall be a single Advance and the amount of the Advance shall not exceed the lesser of $16,575,000 and 65% of the Fair Market Value of the Ship; and

(c) the applicable conditions precedent stated in Clause 9 hereof shall have been satisfied or waived as provided therein.

4.3 **Notification to Lenders of receipt of Drawdown Notice.** The Agent shall promptly notify the Lenders that it has received the Drawdown Notice and shall inform each Lender of:

(a) the amount of the Advance and the Drawdown Date; and

(b) the amount of that Lender's participation in the Advance.

4.4 **Drawdown Notice irrevocable.** The Drawdown Notice must be signed by an officer or a duly authorized attorney-in-fact of the Borrower and once served, the Drawdown Notice cannot be revoked or varied without the prior written consent of the Agent, acting on the authority of the Majority Lenders (such consent not to be unreasonably withheld).

4.5 **Lenders to make available Contributions.** Subject to the provisions of this Agreement, each Lender shall, before 10:00 a.m. (New York City time) on and with value on the Drawdown Date, make available to the Agent for the account of the Borrower the amount due from that Lender under Clause 2.2.

4.6 **Disbursement of Advance.** Subject to the provisions of this Agreement, the Agent shall on the Drawdown Date pay to the Borrower the amounts which the Agent receives from the Lenders under Clause 4.5 and that payment to the Borrower shall be made:

(a) to the account(s) which the Borrower specifies in the Drawdown Notice (and as agreed between the Borrower and the Agent in a funds flow memorandum); and

(b) in the like funds as the Agent received the payments from the Lenders.

4.7 **Disbursement of Advance to third party.** The payment by the Agent under Clause 4.6 to the account of a third party designated by the Borrower in the Drawdown Notice shall constitute the making of the Advance and the Borrower shall at that time become indebted, as principal and direct obligor, to each Lender in an amount equal to that Lender's Contribution.

4.8 **Promissory note**.

(a) The obligation of the Borrower to pay the principal of, and interest on, the Advance made by each Lender shall, if requested by such Lender, be evidenced by a Note, which shall be dated the date of the Drawdown Date.

(b) Each Lender shall record on its internal records the amount of its participation in the Advance and each payment in respect thereof, and shall, prior to any transfer of its Note, endorse thereon the outstanding principal amount of the Contributions evidenced thereby.

(c) The failure of any Lender to make any such endorsement shall not affect the obligation of the Borrower in respect of the Advance or the Loan nor affect the validity of any transfer by the Agent of the Note.

(d) On receipt of satisfactory evidence that the Note has been lost, mutilated or destroyed and on surrender of the remnants thereof, if any, the Borrower will promptly replace the Note, without charge to the Creditor Parties, with a similar Note. If such replacement Note replaces a lost Note it shall bear an endorsement to that effect. Any lost Note subsequently found shall be surrendered to the Borrower and cancelled. The Agent or the relevant Lender shall indemnify the Borrower for any losses, claims or damages resulting from the loss of such Note.

5. **INTEREST**

5.1 **Normal rate of interest.** Subject to the provisions of this Agreement, the rate of interest on the Loan in respect of an Interest Period shall be 12.0% per annum (the "**Interest Rate**").

5.2 **Payment of normal interest.** Subject to the provisions of this Agreement, interest on the Loan in respect of each Interest Period shall be paid by the Borrower on each Repayment Date.

**6. INTEREST PERIODS**

6.1 **Commencement of Interest Periods.** The first Interest Period applicable to the Advance shall commence on the Drawdown Date of such Advance and each subsequent Interest Period shall commence on the expiry of the preceding Interest Period.

6.2 **Duration of Interest Periods.** Each Interest Period shall be the period from one Repayment Date to the immediately following Repayment Date (each an "**Interest Period**").

**7. DEFAULT INTEREST**

7.1 **Payment of default interest on overdue amounts.** A Security Party shall pay interest in accordance with the following provisions of this Clause 7 on any amount payable by such Security Party under any Finance Document which the Agent, the Security Trustee or any other designated payee does not receive on or before the relevant date, that is:

(a) the date on which the Finance Documents provide that such amount is due for payment; or

(b) if a Finance Document provides that such amount is payable on demand, the date on which the demand is served; or

(c) if such amount has become immediately due and payable under Clause 20.4, the date on which it became immediately due and payable.

7.2 **Default rate of interest.** Interest shall accrue on an overdue amount from (and including) the relevant date until the date of actual payment (as well after as before judgment) at the rate of 18.0% per annum (or the highest rate that can be charged under applicable law).

7.3 **Intentionally omitted**.

7.4 **Intentionally omitted**.

7.5 **Payment of accrued default interest.** Subject to the other provisions of this Agreement, any interest due under this Clause shall be paid on the last day of the period by reference to which it was determined; and the payment shall be made to the Agent for the account of the Creditor Party to which the overdue amount is due.

7.6 **Compounding of default interest.** Any such interest which is not paid at the end of the period by reference to which it was determined shall thereupon be compounded.

**8. REPAYMENT AND PREPAYMENT**

**8.1 Amount of repayment installments.** The Borrower shall repay the Advance by twelve (12) quarterly consecutive installments of $750,000 on each Repayment Date and the remaining principal amount of the Advance shall be paid on the Maturity Date.

**8.2 Repayment Dates**.

(a) The first repayment installment shall be repaid on the date falling three (3) months after the Drawdown Date **provided** that the repayment installment dates may be adjusted by the Agent in consultation with the Borrower to coincide with the charter hire payment dates under the Initial Charter.

(b) Each subsequent repayment installment shall be repaid in quarterly intervals thereafter.

(c) The last installment shall be repaid on the Maturity Date.

(d) On each Repayment Date, the Lender shall apply amounts in the Collection Account (and the Borrower hereby provides to the Agent and the Account Bank all necessary consents thereto) in payment of the repayment installment and accrued interest thereon.

**8.3 Maturity Date.** On the Maturity Date, the Borrower shall additionally pay to the Agent for the account of the Creditor Parties all other sums then accrued or owing under any Finance Document.

**8.4 Intentionally omitted**.

**8.5 Voluntary prepayment.** Subject to the conditions set forth in Clause 8.6 and payment of Minimum Interest (if applicable), the Borrower may prepay the whole or any part of the Loan.

**8.6 Conditions for voluntary prepayment.** The conditions referred to in Clause 8.5 are that:

(a) a partial prepayment shall be not less than $500,000 or a multiple of $500,000;

(b) the Agent has received from the Borrower at least 10 Business Days' prior written notice specifying the amount to be prepaid and the date on which the prepayment is to be made; and

(c) the Borrower has provided evidence satisfactory to the Agent that any consent required by the Borrower or any other Security Party in connection with the prepayment has been obtained and remains in force, and that any regulation relevant to this Agreement which affects the Borrower or any other Security Party has been complied with (which may be satisfied by the Borrower certifying that no consents are required and that no regulations need to be complied with).

**8.7 Effect of notice of prepayment.** A prepayment notice may not be withdrawn or amended without the consent of the Agent, given with the authorization of the Majority Lenders (such consent not to be unreasonably withheld), and the amount specified in the prepayment notice shall become due and payable by the Borrower on the date for prepayment specified in the prepayment notice.

**8.8 Notification of notice of prepayment.** The Agent shall notify the Lenders promptly upon receiving a prepayment notice, and shall provide any Lender which so requests with a copy of any document delivered by the Borrower under Clause 8.6(c).

**8.9 Mandatory prepayment**.

(a) If the Ship is sold or becomes a Total Loss, the Borrower shall prepay the Loan in full and the Total Commitments shall be automatically cancelled:

(i) in the case of a sale, on or before the date on which the sale is completed by delivery of the Ship to the buyer; or

(ii) in the case of a Total Loss, on the earlier of the date falling 120 days after the Total Loss Date and the date of receipt by the Security Trustee of the proceeds of insurance relating to such Total Loss.

(b) If a Change of Control occurs, the Borrower shall prepay the Loan in full and the Total Commitments shall be automatically cancelled.

(c) The Borrower shall cause to be effected (and hereby consent to the Agent's withdrawal from the Collection Account in relation to) the Excess Cash Flow Sweep on each of the first four Repayment Dates pursuant to Clause 19.2(d)(iii).

**8.10 Amounts payable on prepayment.** A voluntary prepayment under Clause 8.5 and a mandatory prepayment under Clause 8.9 shall be made together with:

(a) accrued interest (and any other amount payable under Clause 22 or otherwise) in respect of the amount prepaid;

(b) if the prepayment is not made on the last day of an Interest Period, any sums payable under Clause 22.1(b); and

(c) in case of any prepayment (other than (i) regularly scheduled amortization and (ii) the Excess Cash Flow Sweep) during the period between the Drawdown Date and the first anniversary of the Drawdown Date, interest that would have accrued for one year on the principal amount of the Advance so prepaid (minus any interest actually paid previously to the Lenders on such principal amount) (such amount so calculated, "**Minimum Interest**");

**8.11 Application of partial prepayment.** Each partial prepayment shall be applied against the repayment installments specified in Clause 8.1 and the Balloon Repayment in inverse order of maturity.

**8.12 No reborrowing.** No amount prepaid may be reborrowed.

**9. CONDITIONS PRECEDENT**

**9.1 Documents, fees and no default.** Each Lender's obligation to contribute to the Advance is subject to the following conditions precedent:

(a) that, on or before the service of the Drawdown Notice, the Agent receives:

(i) the documents described in Part A of Schedule 3 in form and substance satisfactory to the Agent and its lawyers; and

(ii) such documentation and other evidence as is reasonably requested by the Agent or a Lender in order for each to carry out and be satisfied with the results of all necessary "know your customer" or other checks which it is required to carry out in relation to the transactions contemplated by this Agreement and the other Finance Documents, including without limitation obtaining, verifying and recording certain information and documentation that will allow the Agent and each of the Lenders to identify each Security Party in accordance with the requirements of the PATRIOT Act;

(b) that the Agent has received or is satisfied that it will receive on the Drawdown Date the documents described in Part B of Schedule 3 in form and substance satisfactory to it and its lawyers;

(c) that, on or before the Drawdown Date, the Agent receives the fees referred to in Clause 21.1 (which may be withheld from the Advance) and has received payment of the expenses referred to in Clause 21.2; and

(d) that both at the date of the Drawdown Notice and at the Drawdown Date:

(i) no Event of Default or Potential Event of Default has occurred or would result from the borrowing of the Advance;

(ii) the representations and warranties in Clause 10 and those of the Borrower or any other Security Party which are set out in the other Finance Documents (other than those relating to a specific date) would be true and not misleading if repeated on each of those dates with reference to the circumstances then existing;

(iii) there has been no material change in the consolidated financial condition, operations or business of the Borrower and the Parent Guarantor since the date on which the Borrower and/or the Parent Guarantor provided information concerning those topics to the Agent and/or any Lender;

(iv) there have been no material adverse global economic or political developments since the Effective Date;

(v) there has been no assignment of the Ship MOA by the Borrower before the Delivery Date of the Ship;

(vi) the Agent has received evidence that after giving effect to the funding of the Advance, sufficient funds are available to the Borrower to pay the purchase price of the Ship under the Ship MOA;

(e) that, if the Collateral Maintenance Ratios were applied immediately following the making of such Advance, the Borrower would not be required to provide additional Collateral or prepay part of the Loan under Clause 15; and

(f) that the Agent has received, and found to be acceptable to it, any further opinions, consents, agreements and documents in connection with the Finance Documents which the Agent may, with the authorization of the Majority Lenders, request by notice to the Borrower prior to the Drawdown Date.

**9.2 Waiver of conditions precedent.** Notwithstanding anything in Clause 9.1 to the contrary:

(a) except with respect to the circumstances described in Clause 9.2(b), if the Agent, with the consent of the Majority Lenders, permits the Advance to be borrowed before certain of the conditions referred to in Clause 9.1 are satisfied, the Borrowers shall ensure that such conditions are satisfied within ten (10) Business Days after the Drawdown Date (or such longer period as the Agent may specify); and

(b) only if required under the terms of an MOA or another contract for the acquisition of a Ship, the Advance may be made before the applicable conditions set forth in Clause 9.1 are satisfied and:

(i) each Lender agrees to fund its Contribution on a day not more than three (3) Business Days prior to the Delivery Date of the Ship; and

(ii) (x) the Agent may on the date on which the Advance is funded (or as soon thereafter as practicable) (A) preposition an amount equal to all or a portion of the principal amount of the Advance at a bank or other financial institution nominated by the Seller and/or the Ultimate Seller (the "**Seller's Bank**") satisfactory to the Agent, which funds shall be held at the Seller's Bank in the name and under the sole control of the Agent or one of its Affiliates and (B) issue a SWIFT MT 199 or other similar communication (each such communication, a "**Disbursement Authorization**") authorizing the release of such funds by the Seller's Bank on the relevant Delivery Date upon receipt of a Protocol of Delivery and Acceptance in respect of such Ship duly executed by the Seller and the relevant Borrower and countersigned by a representative of the Agent; or

(y) the Agent may on the date on which the Advance is funded (or as soon thereafter as practicable) preposition an amount equal to all or a portion of the principal amount of the Advance at a bank or other financial institution nominated by the Seller and/or the Ultimate Seller (the "**Escrow Bank**") pursuant to an escrow arrangement satisfactory to the Agent and the Lenders, and the funds so held in escrow shall be released by the Escrow Bank on the relevant Delivery Date upon receipt of a release instruction signed by the Agent,

**except that** if delivery of the Ship does not occur within one (1) Business Day after the scheduled Delivery Date (or such longer period of time that the Lenders may agree to in their discretion) (such date on which the funds are to be returned to the Lenders, the "**Funds Return Date**"), the funds held at the Seller's Bank or the Escrow Bank, as the case may be, shall be returned to the Agent for further distribution to the Lenders.

For the avoidance of doubt, the parties hereto acknowledge and agree that:

(i) the date on which the Lenders fund the Advance constitutes the Drawdown Date in respect of such Advance and all interest and fees thereon shall accrue from such date;

(ii) the Borrower acknowledges and agrees that fulfillment of conditions precedent set forth in Schedule 3 Part B that have been waived by the Lenders shall be required as a condition precedent to the countersignature by a representative of the Agent of the Protocol of Delivery and Acceptance referred to in Clause 9.2(b)(ii);

(iii) from the date the proceeds of the Advance are deposited at the Seller's Bank or the Escrow Bank, as the case may be, to the Delivery Date (or, if delivery of the Ship does not occur within the time prescribed in the Disbursement Authorization, the date on which the funds are returned to the Agent for further distribution to the Lenders), the Borrower shall be entitled to interest on the Advance at the applicable rate, if any, paid by the Seller's Bank or the Escrow Bank as the case may be for such deposited funds;

(iv) if the Ship is not delivered within the time prescribed in the Disbursement Authorization and the proceeds of the Advance are returned to the Agent and distributed to the Lenders, (i) the Borrowers shall pay all accrued interest and fees in respect of such returned proceeds on the date such proceeds are returned to the Agent and a break fee of $50,000 (which shall be fully earned, due and payable on such date) and (ii) the relevant available Commitment will be increased by an amount equal to the aggregate principal amount of the Loan proceeds so returned; and

(v) if the Borrower has instructed the Agent to convert the aggregate principal amount of the Advance borrowed into a currency other than Dollars for deposit with the Seller's Bank or the Escrow Bank, as the case may be, and the Ship is not delivered within the time prescribed in the Disbursement Authorization and the proceeds of the Advance are returned to the Agent for further distribution to the Lenders, the Agent shall convert the aggregate principal amount of funds so returned back into Dollars and if such funds are less than the Dollar amount of the aggregate principal amount of the Advance incurred on the Drawdown Date, the Borrower shall immediately repay the difference and, in any event, the Borrowers shall pay any and all fees, charges and expenses arising from such conversion.

**10. REPRESENTATIONS AND WARRANTIES**

**10.1 General.** The Borrower represents and warrants to each Creditor Party as of the Effective Date, the date of the Drawdown Notice, and on the first day of each Interest Period as follows.

**10.2 Status.** Each Security Party is:

(a) duly incorporated or formed and validly existing and in good standing under the law of its jurisdiction of incorporation or formation; and

(b) duly qualified and in good standing as a foreign company in each other jurisdiction in which it owns or leases property or in which the conduct of its business requires it to so qualify or be licensed except where, in each case, the failure to so qualify or be licensed and be in good standing could not reasonably be expected to have a Material Adverse Effect,

and there are no proceedings or actions pending or contemplated by any Security Party, or to the knowledge of the Borrower contemplated by any third party, seeking to adjudicate a Security Party as bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property.

**10.3 Company power; consents.** Each Security Party has the capacity and has taken all action, and no consent of any person is required, for:

(a) it to own or lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted;

(b) it to execute each Finance Document to which it is or is to become a party;

(c) it to comply with its obligations under each Finance Document to which it is or is to become a party;

(d) it to execute the Ship MOA to which it is a party, to purchase and pay for the Ship under the Ship MOA and register the Ship in its name under an Approved Flag;

(e) it to grant the Security Interests granted by it pursuant to the Finance Documents to which it is or is to become a party;

(f) the perfection or maintenance of the Security Interests created by the Finance Documents (including the first priority nature thereof); and

(g) the exercise by any Creditor Party of their rights under any of the Finance Documents or the remedies in respect of the Collateral pursuant to the Finance Documents to which it is a party,

except, in each case, for consents which have been duly obtained, taken, given or made and are in full force and effect.

**10.4 Consents in force.** All the consents referred to in Clause 10.3 remain in force and nothing has occurred which makes any of them liable to revocation.

**10.5 Title**.

(a) Each Security Party owns (i) in the case of owned real property, good and marketable fee title to and (ii) in the case of owned personal property, good and valid title to, or, in the case of leased real or personal property, valid and enforceable leasehold interests (as the case may be) in, all of its properties and assets, tangible and intangible, of any nature whatsoever, free and clear in each case of all Security Interests or claims, except for Permitted Security Interests.

(b) No Security Party has created or is contractually bound to create any Security Interest on or with respect to any of its assets, properties, rights or revenues, except for Permitted Security Interests, and except as provided in this Agreement no Security Party is restricted by contract, applicable law or regulation or otherwise from creating Security Interests on any of its assets, properties, rights or revenues.

(c) The Borrower has received (or will receive on the relevant Delivery Date) all deeds, assignments, waivers, consents, non-disturbance and attornment or similar agreements, bills of sale and other documents, and has duly effected (or will duly effect on the relevant Delivery Date) all recordings, filings and other actions necessary to establish, protect and perfect the Borrower's right, title and interest in and to the Ship and other properties and assets (or arrangements for such recordings, filings and other actions acceptable to the Agent shall have been made).

**10.6 Legal validity; effective first priority Security Interests.** Subject to any relevant insolvency laws affecting creditors' rights generally:

(a) the Finance Documents to which each Security Party is a party, constitute or, as the case may be, will constitute upon execution and delivery (and, where applicable, registration as provided for in the Finance Documents), such Security Party's legal, valid and binding obligations enforceable against it in accordance with their respective terms; and

(b) the Finance Documents to which each Security Party is a party, create or, as the case may be, will create upon execution and delivery (and, where applicable, registration as provided for in the Finance Documents), legal, valid and binding first priority Security Interests enforceable in accordance with their respective terms over all the assets to which they, by their terms, relate.

**10.7 No third party Security Interests.** Without limiting the generality of Clauses 10.5 and 10.6, at the time of the execution and delivery of each Finance Document:

(a) the relevant Security Party will have the right to create all the Security Interests which that Finance Document purports to create; and

(b) no third party (including the seller under the TNI MOA) will have any Security Interest (except for Permitted Security Interests) or any other interest, right or claim over, in or in relation to any asset to which any such Security Interest, by its terms, relates.

**10.8 No conflicts.** The execution and delivery of each Finance Document, the borrowing of each Advance, and compliance with each Finance Document, will not involve or lead to a contravention of:

(a) any law or regulation; or

(b) the constitutional documents of any Security Party; or

(c) any contractual or other obligation or restriction which is binding on any Security Party or any of its assets.

**10.9 Status of Secured Liabilities.** The Secured Liabilities constitute direct, unconditional and general obligations of each Security Party and rank (a) senior to all subordinated Financial Indebtedness and (b) not less than *pari passu* (as to priority of payment and as to security) with all other Financial Indebtedness of each Security Party.

**10.10 Taxes**.

(a) All payments which a Security Party is liable to make under the Finance Documents to which it is a party can properly be made without deduction or withholding for or on account of any tax payable under any law of any Pertinent Jurisdiction.

(b) Each Security Party has timely filed or has caused to be filed all tax returns and other reports that it is required by law or regulation to file in the United States or any Pertinent Jurisdiction, and has paid or caused to be paid all taxes, assessments and other similar charges that are due and payable in the United States or any Pertinent Jurisdiction, other than taxes and charges:

(i) which (A) are not yet due and payable or (B) are being contested in good faith by appropriate proceedings and for which adequate reserves have been established and as to which such failure to have paid such tax does not create any risk of sale, forfeiture, loss, confiscation or seizure of the Ship or of criminal liability; or

(ii) the non-payment of which could not reasonably be expected to have a Material Adverse Effect.

The charges, accruals, and reserves on the books of each Security Party respecting taxes are adequate in accordance with GAAP.

(c) No material claim for any tax has been asserted against a Security Party by any Pertinent Jurisdiction or other taxing authority other than claims that are included in the liabilities for taxes in the most recent balance sheet of such person or disclosed in the notes thereto, if any.

(d) The execution, delivery, filing and registration or recording (if applicable) of the Finance Documents and the consummation of the transactions contemplated thereby will not cause any of the Creditor Parties to be required to make any registration with, give any notice to, obtain any license, permit or other authorization from, or file any declaration, return, report or other document with any governmental authority in any Pertinent Jurisdiction.

(e) No taxes are required by any governmental authority in any Pertinent Jurisdiction to be paid with respect to or in connection with the execution, delivery, filing, recording,

performance or enforcement of any Finance Document, except any applicable stamp, registration or similar taxes in connection with the registration of the Mortgage under applicable law.

(f) The execution, delivery, filing, registration, recording, performance and enforcement of the Finance Documents by any of the Creditor Parties will not cause such Creditor Party to be subject to taxation under any law or regulation of any governmental authority in any Pertinent Jurisdiction of any Security Party.

(g) It is not necessary for the legality, validity, enforceability or admissibility into evidence of this Agreement or any other Finance Document that any stamp, registration or similar taxes be paid on or in relation to this Agreement or any of the other Finance Documents in any Pertinent Jurisdiction of a Security Party.

**10.11 No default.** No Event of Default or Potential Event of Default has occurred or would result from the borrowing of the Advance.

**10.12 Information.** All financial statements, information and other data furnished by or on behalf of a Security Party to any of the Creditor Parties:

(a) was true and accurate at the time it was given;

(b) such financial statements, if any, have been prepared in accordance with GAAP and accurately and fairly represent the financial condition of such Security Party as of the date or respective dates thereof and the results of operations of such Security Party for the period or respective periods covered by such financial statements;

(c) there are no other facts or matters the omission of which would have made or make any such information false or misleading;

(d) there has been no material adverse change in the financial condition, operations or business of any Security Party since the date on which such information was provided other than as previously disclosed to the Agent in writing; and

(e) none of the Security Parties has any contingent obligations, liabilities for taxes or other outstanding financial obligations which are material in the aggregate except as disclosed in such statements, information and data.

**10.13 No litigation.** No legal or administrative action involving a Security Party or a Limited Guarantor (including any action relating to any alleged or actual breach of the ISM Code, the ISPS Code, any Environmental Law or any Sanctions) has been commenced or taken by any person, or, to the Borrower's knowledge, is likely to be commenced or taken.

**10.14 Intellectual property.** Except for those with respect to which the failure to own or license could not reasonably be expected to have a Material Adverse Effect, each Security Party owns or has the right to use all patents, trademarks, permits, service marks, trade names, copyrights, franchises, formulas, licenses and other rights with respect thereto, and have obtained assignment of all licenses and other rights of whatsoever nature, that are material to its business as currently contemplated without any conflict with the rights of others.

**10.15 ISM Code and ISPS Code compliance.** The Borrower has obtained or will obtain or will cause to be obtained all necessary ISM Code Documentation and ISPS Code Documentation in connection with the Ship and its operation and will be or will cause the Ship and the Approved Manager to be in full compliance with the ISM Code and the ISPS Code.

**10.16 Validity and completeness of Ship MOA, TNI MOA and Initial Charter**.

(a) The Ship MOA constitutes valid, binding and enforceable obligations of the Borrower in accordance with its terms and:

(i) the copy of such MOA delivered to the Agent before the date of this Agreement is a true and complete copy;

(ii) no amendments or additions to such MOA have been agreed nor has the Borrower party thereto or Seller waived any of their respective rights under such MOA.

(b) The TNI MOA constitutes valid, binding and enforceable obligations of TNI in accordance with its terms and:

(i) the copy of such MOA delivered to the Agent before the date of this Agreement is a true and complete copy;

(ii) no amendments or additions to such MOA have been agreed nor has the Borrower party thereto or Seller waived any of their respective rights under such MOA; and

(iii) there are no Security Interest, right, claim or any other interest over, in or in relation to the Ship granted to or capable of arising in favor of the seller or any other party under the TNI MOA.

(c) The Approved Management Agreement constitutes valid, binding and enforceable obligations of the Approved Manager in accordance with its terms, and the guaranty provided by TNI in relation thereto constitutes valid, binding and enforceable obligations of TNI in accordance with its terms.

(d) The Initial Charter constitutes valid, binding and enforceable obligations of the Borrower party thereto in accordance with its terms and:

(i) The copy of the Initial Charter delivered to the Agent before the date of this Agreement is a true and complete copy; and

(ii) No amendments or additions to the Initial Charter have been agreed nor has the Borrower party thereto or the Initial Charterer waived any of their respective rights under the Initial Charter.

**10.17 No rebates etc.** There is no agreement or understanding to allow or pay any rebate, premium, commission, discount or other benefit or payment (howsoever described) to the Guarantor or any

of its subsidiaries or Affiliates, the Seller or any third party in connection with the Ship MOA, other than as provided in such MOA and disclosed to the Agent in writing.

**10.18 Compliance with law; Environmentally Sensitive Material.** Except to the extent the following could not reasonably be expected to have a Material Adverse Effect:

(a) the operations and properties of each of the Security Parties comply with all applicable laws and regulations, including without limitation Environmental Laws, all necessary Environmental Permits have been obtained and are in effect for the operations and properties of each of the Security Parties and each of the Security Parties is in compliance in all material respects with all such Environmental Permits; and

(b) none of the Security Parties has been notified in writing by any person that it or any of its subsidiaries or Affiliates is potentially liable for the remedial or other costs with respect to treatment, storage, disposal, release, arrangement for disposal or transportation of any Environmentally Sensitive Material, except for costs incurred in the ordinary course of business with respect to treatment, storage, disposal or transportation of such Environmentally Sensitive Material.

**10.19 Ownership structure**.

(a) The Parent Guarantor owns beneficially and of record 100.0% of the Equity Interests of the Borrower as of the date of this Agreement.

(b) All of the Equity Interests of the Borrower has been validly issued, are free and clear of all Security Interests (except for Permitted Security Interests) and are owned beneficially and of record by the Parent Guarantor.

(c) None of the Equity Interests of the Borrower are subject to any existing option, warrant, call, right, commitment or other agreement of any character to which the Borrower is a party requiring, and there are no Equity Interests of the Borrower outstanding which upon conversion or exchange would require, the issuance, sale or transfer of any additional Equity Interests of the Borrower or other Equity Interests convertible into, exchangeable for or evidencing the right to subscribe for or purchase Equity Interests of the Borrower.

**10.20 ERISA**.

(a) None of the Security Parties or any ERISA Affiliate is a party to a Plan or a Multiemployer Plan and none of the Security Parties is a party to a Foreign Pension Plan.

(b) The execution and delivery of this Agreement and the consummation of the transactions hereunder will not involve any "prohibited transaction" for purposes of Section 406 of ERISA or Section 4975 of the Code.

(c) No ERISA Termination Event has occurred in the year prior to the date of execution of this Agreement.

(d) No ERISA Funding Event exists or has occurred in the year prior to the date of execution of this Agreement.

**10.21 Margin stock.** The Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying Margin Stock or for any other purpose in violation of the Margin Regulations and no proceeds of the Advance will be used to buy or carry any Margin Stock or to extend credit to others for the purpose of buying or carrying any Margin Stock.

**10.22 Investment company, public utility, etc**. The Borrower is not:

(a) an "investment company," or an "affiliated person" of, or "promoter" or "principal underwriter" for, an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended or subject to regulation thereunder; or

(b) a "public utility" within the meaning of the United States Federal Power Act of 1920, as amended.

**10.23 Sanctions**.

(a) No Security Party, no director, officer or subsidiary of a Security Party, and to the knowledge of the Borrower, no employee, agent, affiliate or joint venture of a Security Party, is a Prohibited Person, is owned or controlled by, or acting directly or indirectly on behalf of or for the benefit of, a Prohibited Person, or owns or control a Prohibited Person;

(b) No proceeds of the Advance shall be made available, directly or, to the knowledge of the Borrower, indirectly, to or for the benefit of a Prohibited Person or otherwise shall be, directly or, to the knowledge of the Borrower, indirectly, applied in a manner or for a purpose prohibited by Sanctions.

**10.24 No money laundering.** Without prejudice to the generality of Clause 2.3, in relation to the borrowing by the Borrower of the Advance, the performance and discharge of its obligations and liabilities under the Finance Documents, and the transactions and other arrangements affected or contemplated by the Finance Documents to which the Borrower is a party, the Borrower confirms that:

(a) it is acting for its own account;

(b) it will use the proceeds of such Advance for its own benefit, under its full responsibility and exclusively for the purposes specified in this Agreement; and

(c) the foregoing will not involve or lead to a contravention of any law, official requirement or other regulatory measure or procedure implemented to combat "money laundering" (as defined in Article 1 of Directive 2005/60/EC of the European Parliament and of the Council) and comparable United States federal and state laws, including without limitation the PATRIOT Act and the Bank Secrecy Act.

**10.25 Ship.** As of the Drawdown Date (after taking into account the closing sequence previously agreed with the Agent), the Ship will be:

(a) in the sole and absolute ownership of the Borrower and duly registered in its name under the law of an Approved Flag, unencumbered save and except for the Mortgage thereon in favor of the Security Trustee recorded against it and Permitted Security Interests;

(b) seaworthy for hull and machinery insurance warranty purposes and in every way fit for its intended service;

(c) insured in accordance with the provisions of this Agreement and the requirements hereof in respect of such insurances will have been complied with;

(d) in class in accordance with the provisions of this Agreement and the requirements hereof in respect of such classification will have been complied with; and

(e) managed by an Approved Manager pursuant to an Approved Management Agreement.

**10.26 Place of business.** For purposes of the UCC, each Security Party has only one place of business located at, or, if it has more than one place of business, the chief executive office from which it manages the main part of its business operations and conducts its affairs is located at Muscat, Ghala, Al Nadha Towers 2, 5th Floor, Office No.1, Oman.

**10.27 Solvency.** In the case of each of the Borrower and the Parent Guarantor:

(a) the sum of its assets at a fair valuation does and will exceed its liabilities, including, to the extent they are reportable as such in accordance with GAAP, contingent liabilities;

(b) the present fair market saleable value of its assets is not and shall not be less than the amount that will be required to pay its probable liability on its then existing debts, including, to the extent they are reportable as such in accordance with GAAP, contingent liabilities, as they mature;

(c) it does not and will not have unreasonably small working capital with which to continue its business; and

(d) it has not incurred, does not intend to incur and does not believe it will incur, debts beyond its ability to pay such debts as they mature.

**10.28 Borrower's business.** From the date of its incorporation until the date hereof, the Borrower has not conducted any business other than in connection with, or for the purpose of, owning and operating the Ship.

**10.29 Intentionally omitted**.

**10.30 Immunity; enforcement; submission to jurisdiction; choice of law**.

(a) Each Security Party is subject to civil and commercial law with respect to its obligations under the Finance Documents, and the execution, delivery and performance by each Security Party of the Finance Documents to which it is a party constitute private and commercial acts rather than public or governmental acts.

(b) No Security Party or any of its properties has any immunity from suit, court jurisdiction, attachment prior to judgment, attachment in aid of execution of a judgment, set-off, execution of a judgment or from any other legal process in relation to any Finance Document.

(c) It is not necessary under the laws of any Security Party's jurisdiction of incorporation or formation, in order to enable any Creditor Party to enforce its rights under any Finance Document or by reason of the execution of any Finance Document or the performance by any Security Party of its obligations under any Finance Document, that such Creditor Party should be licensed, qualified or otherwise entitled to carry on business in such Security Party's jurisdiction of incorporation or formation.

(d) Other than the recording of the Mortgage in accordance with the laws of the Approved Flag and such filings as may be required in a Pertinent Jurisdiction in respect of certain of the Finance Documents, and the payment of fees consequent thereto, it is not necessary for the legality, validity, enforceability or admissibility into evidence of this Agreement or any other Finance Document that any of them or any document relating thereto be registered, filed recorded or enrolled with any court or authority in any Pertinent Jurisdiction.

(e) The execution, delivery, filing, registration, recording, performance and enforcement of the Finance Documents by any of the Creditor Parties will not cause such Creditor Party to be deemed to be resident, domiciled or carrying on business in any Pertinent Jurisdiction of any Security Party or subject to taxation under any law or regulation of any governmental authority in any Pertinent Jurisdiction of any Security Party.

(f) Under the law of each Security Party's jurisdiction of incorporation or formation, the choice of the law of New York to govern this Agreement and the other Finance Documents to which New York law is applicable is valid and binding.

(g) The submission by the Security Parties to the jurisdiction of the New York State courts and the U.S. Federal court sitting in New York County pursuant to Clause 32.2(a) is valid and binding and not subject to revocation, and service of process effected in the manner set forth in Clause 32.2(d) will be effective to confer personal jurisdiction over the Security Parties in such courts.

**10.31 Repetition**.

The representations and warranties set out in this Clause 10 are deemed to be repeated both on the date of the Drawdown Notice and on the first day of each Interest Period.

**11. GENERAL AFFIRMATIVE AND NEGATIVE COVENANTS**

**11.1 Affirmative covenants.** From the Drawdown Date until the Total Commitments have terminated and all amounts payable hereunder have been paid in full each Security Party undertakes with each Creditor Party to comply or cause compliance with the following provisions of this Clause 11.1 except as the Agent, with the consent of the Majority Lenders, may approve from time to time in writing, such approval not to be unreasonably withheld:

(a) **Performance of obligations.** Each Security Party shall duly observe and perform its obligations under each Finance Document and each Charter to which it is or is to become a party.

(b) **Notification of defaults (etc).** Each Security Party shall promptly notify the Agent, upon becoming aware of the same, of:

(i) the occurrence of an Event of Default or of any Potential Event of Default or any other event (including any litigation) which might adversely affect any Security Party's ability to perform its obligations under a Charter and each Finance Document to which it is or is to become a party;

(ii) any damage or injury caused by or to the Ship in excess of $250,000; and

(iii) any violation of Sanctions.

(c) **Confirmation of no default.** The Borrower will, within two (2) Business Days after service by the Agent of a written request, serve on the Agent a notice which is signed by an officer or a duly authorized person of the Borrower and which states that:

(i) no Event of Default or Potential Event of Default has occurred; or

(ii) no Event of Default or Potential Event of Default has occurred, except for a specified event or matter, of which all material details are given.

The Agent may serve requests under this Clause 11.1(c) from time to time but only if asked to do so by a Lender or Lenders having Contributions exceeding 10% of the Loan or (if the Advance has not been made) Commitments exceeding 10% of the Total Commitments, and this Clause 11.1(c) does not affect the Borrower's obligations under Clause 11.1(b).

(d) **Notification of litigation and Security Interests.** The Borrower will provide the Agent with details of any legal or administrative action involving the Borrower, any other Security Party or any Limited Guarantor, the Approved Manager or the Ship, the Earnings or the Insurances as soon as such action is instituted or it becomes apparent to the Borrower that it is likely to be instituted, unless it is clear that the legal or administrative action cannot be considered material in the context of any Finance Document. The Borrower will provide the Agent with details of any Security Interests on the Ship or any other Collateral (whether imposed by operation of law or by affirmative acts) to the extent such Security Interests secure or support (or purport to secure or support) obligations in an amount in excess of $500,000.

(e) **Provision of further information.** The Borrower will, as soon as practicable after receiving the request, provide the Agent with any additional financial or other information relating to:

(i) the Borrower or the Parent Guarantor;

(ii) any other matter relevant to, or to any provision of, a Finance Document; or

(iii) any actual or alleged violation of Sanctions (whether by any Security Party, an Approved Manager or any respective Affiliate thereof); or

which may be reasonably requested by the Agent, the Security Trustee or any Lender at any time.

(f) **Books of record and account; separate accounts.**

(i) Each of the Borrower and the Parent Guarantor shall keep separate and proper books of record and account in which full and materially correct entries shall be made of all financial transactions and the assets and business of the Borrower and the Parent Guarantor in accordance with GAAP, and the Agent shall have the right to examine the books and records of the Borrower and the Parent Guarantor wherever the same may be kept from time to time as it sees fit, in its sole reasonable discretion, or to cause an examination to be made by a firm of accountants selected by it, **provided that** any examination shall be done without undue interference with the day to day business operations of the Borrower or the Parent Guarantor.

(ii) The Borrower shall keep separate accounts and shall not co-mingle assets with each or any other person other.

(g) **Financial reports.** Each of the Borrower and the Parent Guarantor shall cause to be prepared and to be delivered to the Agent:

(i) as soon as practicable, but not later than 120 days after the end of its Fiscal Year, audited financial statements in respect of each of (x) the Borrower, (y) the Parent Guarantor and (z) TNI for such Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, certified as having been audited by an Acceptable Accounting Firm, and it is agreed that such financial statements of the Parent Guarantor and TNI shall be consolidated but include consolidating information that explains in reasonable detail the financial results of other companies (or in the case of the Parent Guarantor, divisions) in the consolidated group;

(ii) within 45 days after the end of each quarter of its Fiscal Year, unaudited financial statements in respect of each such fiscal quarter of each of (x) the Borrower, (y) the Parent Guarantor and (z) TNI all in reasonable detail and including the quarterly cash flow statement and prepared in accordance with GAAP, certified as having been reviewed by its chief financial officer (or equivalent), and it is agreed that such financial statements of the Parent Guarantor and TNI shall be consolidated but include consolidating information that explains in reasonable detail the financial results of other companies (or in the case of the Parent Guarantor, divisions) in the consolidated group;

(iii) within 30 days after the end of each calendar month, unaudited financial statements in respect of each of the Borrower, the Parent Guarantor (covering at least its core petroleum business) and TNI for such calendar month, all in reasonable detail and including the monthly cash flow statement and prepared in accordance with GAAP, certified as having been reviewed by its chief financial officer (or equivalent);

(iv) as soon as practicable, but not later than three (3) Business Days after the delivery thereof by the bank, a copy of the monthly account statement of the Vessel Operating Account;

(v) together with the financial statements delivered in (i) and (ii) above, a Compliance Certificate; and

(vi) a copy of any financial information required by the terms of a Charter to be delivered to the Borrower by the charterer party thereto without undue delay.

(h) **Appraisals of Fair Market Value and Scrap Value.** The Borrower shall promptly pay the Agent on its demand for appraisal reports obtained by the Agent setting forth the Fair Market Value or the Scrap Value of the Ship for (i) testing of the Collateral Maintenance Ratios on each Testing Date under Clause 15.2 and (ii) if an Event of Default has occurred and is continuing, as often as requested by the Agent.

(i) **Taxes.** Each Security Party shall prepare and timely file all tax returns required to be filed by it and pay and discharge all taxes imposed upon it or in respect of any of its property and assets before the same shall become in default, as well as all lawful claims (including, without limitation, claims for labor, materials and supplies) which, if unpaid, might become a Security Interest upon the Collateral or any part thereof, except in each case, for any such taxes as are being contested in good faith by appropriate proceedings and for which adequate reserves have been established.

(j) **Consents.** Each Security Party shall obtain or cause to be obtained, maintain in full force and effect and comply with the conditions and restrictions (if any) imposed in connection with, every consent and do all other acts and things which may from time to time be necessary or required for the continued due performance of all of its obligations under each Finance Document to which it is or is to become a party, and shall deliver a copy of all such consents to the Agent promptly upon its request.

(k) **Compliance with applicable law and material contracts.** Each Security Party shall comply with all applicable federal, state, local and foreign laws, ordinances, rules, orders and regulations now in force or hereafter enacted, including, without limitation, all Sanctions, all Environmental Laws and regulations relating thereto and all of its material contractual obligations.

(l) **Existence.** Each Security Party shall do or cause to be done all things necessary to preserve and keep in full force and effect its existence in good standing under the laws of its jurisdiction of incorporation or formation.

(m) **Conduct of business**.

(i) The Borrower shall conduct business only in connection with, or for the purpose of, owning, managing, chartering and operating the Ship.

(ii) Each Security Party shall conduct business in its own name and observe all corporate and other formalities required by its constitutional documents.

(n) **Properties**.

(i) Each Security Party shall maintain and preserve all of its properties that are used or useful in the conduct of its business in good working order and condition, ordinary wear and tear excepted.

(ii) Each Security Party shall obtain and maintain good and marketable title or the right to use or occupy all real and personal properties and assets (including intellectual property) reasonably required for the conduct of its business.

(iii) Each Security Party shall maintain and protect its intellectual property and conduct its business and affairs without infringement of or interference with any intellectual property of any other person in any material respect and shall comply in all material respects with the terms of its licenses.

(o) **Loan proceeds.** The Borrower shall use the proceeds of the Advance solely to partially finance the acquisition of the Ship.

(p) **Change of place of business.** The Borrower shall notify the Agent promptly of any change in the location of the place of business where the Borrower or any other Security Party conducts its affairs and keeps its records.

(q) **Pollution liability.** Each Security Party shall take, or cause to be taken, such actions as may be reasonably required to mitigate potential liability to it arising out of pollution incidents or as may be reasonably required to protect the interests of the Creditor Parties with respect thereto.

(r) **Subordination of loans.** Each Security Party shall cause all loans made to it by any Affiliate, parent or subsidiary and all sums and other obligations (financial or otherwise) owed by it to any Affiliate, parent or subsidiary to be fully subordinated to all Secured Liabilities pursuant to a subordination agreement in Agreed Form providing that such loans and other obligations shall be subject and subordinate to the prior payment in full of the Secured Liabilities.

(s) **Sanctions.** Each Security Party shall ensure that:

(i) it is not owned or controlled by, or acting directly or indirectly on behalf of or for the benefit of, a Prohibited Person and does not own or control a Prohibited Person;

(ii) no proceeds of the Advance shall be made available, directly or indirectly to or for the benefit of a Prohibited Person or otherwise shall be, directly or indirectly, applied in a manner or for a purpose prohibited by Sanctions; and

(iii) no payment in connection with a Finance Document shall be funded directly or indirectly out of proceeds derived from any Prohibited Person or any action which is in breach of Sanctions.

(t) **Money laundering.** Each Security Party shall to the best of its knowledge and ability comply, and cause each of its subsidiaries to comply, with any applicable law, official requirement or other regulatory measure or procedure implemented to combat "money laundering" (as defined in Article 1 of Directive 2005/60/EC of the European Parliament and of the Council) and comparable United States federal and state laws, including without limitation the PATRIOT Act and the Bank Secrecy Act.

(u) **ERISA.** Promptly upon

(i) the occurrence of any ERISA Termination Event;

(ii) the occurrence or existence of any ERISA Funding Event; or

(iii) the occurrence with respect to a Plan of a Reportable Event,

each Security Party shall furnish or cause to be furnished to the Agent, with copies for each of the Lenders, written notice thereof and the action, if any, which the relevant Security Party has taken and proposes to take with respect thereto.

(v) **Information provided to be accurate.** All financial and other information which is provided in writing by or on behalf of any Security Party under or in connection with any Finance Document shall be true and not misleading and shall not omit any material fact or consideration.

(w) **Member and creditor notices.** Each Security Party shall send the Agent, at the same time as they are dispatched, copies of all communications which are dispatched to its (i) members or any class of them or (ii) creditors generally.

(x) **Maintenance of Security Interests**. Each Security Party shall:

(i) at its own cost, do all that it reasonably can to ensure that any Finance Document validly creates the obligations and the Security Interests which it purports to create; and

(ii) without limiting the generality of paragraph (i), at its own cost, promptly register, file, record or enroll any Finance Document with any court or authority in all Pertinent Jurisdictions, pay any stamp, registration or similar tax in all Pertinent Jurisdictions in respect of any Finance Document, give any notice or take any other step which, in the opinion of the Majority Lenders, is or has become necessary or desirable for any Finance Document to be valid, enforceable or admissible in evidence or to ensure or protect the priority of any Security Interest which it creates.

(y) **"Know your customer" checks**. If:

(i) the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation made after the Effective Date;

(ii) any change in the status of the Borrower or any other Security Party after the Effective Date; or

(iii) a proposed assignment or transfer by a Lender of any of its rights and obligations under this Agreement to a party that is not a Lender prior to such assignment or transfer,

obliges the Agent or any Lender (or, in the case of paragraph (iii), any prospective new Lender) to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, each Security Party shall promptly upon the request of the Agent or the Lender concerned supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Agent (for itself or on behalf of any Lender) or the Lender concerned (for itself or, in the case of the event described in paragraph (iii), on behalf of any prospective new Lender) in order for the Agent, the Lender concerned or, in the case of the event described in paragraph (iii), any prospective new Lender to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Finance Documents.

(z) **Further assurances.** From time to time, at its expense, each Security Party shall duly execute and deliver to the Agent such further documents and assurances as the Majority Lenders or the Agent may reasonably request to effectuate the purposes of this Agreement, the other Finance Documents or obtain the full benefit of any of the Collateral.

(aa) **Post-Closing Undertaking**. Each Security Party shall take, or shall cause to be taken, such actions described in that certain letter agreement dated as of the date hereof relating to the post-closing obligations of such Security Party within the time period specified therein.

**11.2 Negative covenants.** From the Drawdown Date until the Total Commitments have terminated and all amounts payable hereunder have been paid in full each Security Party undertakes with each Creditor Party to comply or cause compliance with the following provisions of this Clause 11.2 except as the Agent, with the consent of the Majority Lenders, may approve from time to time in writing, such approval not to be unreasonably withheld:

(a) **Security Interests.** The Borrower shall not create, assume or permit to exist any Security Interest whatsoever upon any of its properties or assets, whether now owned or hereafter acquired, except for Permitted Security Interests. The Parent Guarantor shall not create, assume or permit to exist any Security Interest whatsoever in or upon the Borrower's Equity Interests.

(b) **Sale of assets; merger.** No Security Party shall sell, transfer or lease all or substantially all of its properties and assets, or enter into any transaction of merger or consolidation or liquidate, windup or dissolve itself (or suffer any liquidation or dissolution) **provided that** the Borrower may sell the Ship pursuant to the terms of this Agreement.

(c) **No contracts other than in ordinary course.** The Borrower shall not enter into any transactions or series of related transactions with third parties other than in the ordinary course of its business.

(d) **Affiliate transactions.** No Security Party shall enter into any transaction or series of related transactions, whether or not in the ordinary course of business, with any Affiliate other than on terms and conditions substantially as favorable to the Borrower as would be obtainable by it at the time in a comparable arm's-length transaction with a person other than an Affiliate.

(e) **Change of business.** No Security Party shall change the nature of its business or commence any business other than it is now conducted.

(f) **Change of Control; Negative pledge.** No Security Party shall permit any act, event or circumstance that would result in a Change of Control, nor any pledge or assignment of its Equity Interests except in favor of the Security Trustee to secure the Secured Liabilities.

(g) **Increases in capital.** The Borrower shall not create any new Equity Interests that are not subject to a Security Interest securing the Secured Liabilities.

(h) **Financial Indebtedness; Trade payables**.

(i) The Borrower shall not incur any Financial Indebtedness other than in respect of the Loan; and

(ii) The Borrower shall not incur trade credit exceeding a total of $500,000 on the Ship (other than any amounts that may be owed to any installer or manufacturer of scrubbers on the Ship approved by the Lenders under Clause 14.5) at any time.

(i) **Dividends.** The Borrower shall not declare or pay any dividends or return any capital to its equity holders or authorize or make any other distribution, payment or delivery of property or cash to its equity holders, or redeem, retire, purchase or otherwise acquire, directly or indirectly, for value, any interest of any class or series of its Equity Interests (or acquire any rights, options or warrants relating thereto but not including convertible debt) now or hereafter outstanding, or repay any subordinated loans to equity holders or set aside any funds for any of the foregoing purposes.

**provided** that dividends or other distributions may be made by the Borrower pursuant to Clause 19.2(d)(iv) so long as before and after giving effect to such dividend or other distribution, no Event of Default will have occurred and be continuing.

(j) **No amendment to Ship MOAs or Charters**.

(i) the Borrower shall not agree to any amendment or supplement to, or waive or fail to enforce, the Ship MOA or any of its provisions.

(ii) the Borrower shall not agree to any amendment or supplement to, or waive or fail to enforce, a Charter or any of its material provisions.

(k) **Loans and investments.** The Borrower shall not make any loan or advance to, make any investment in, or enter into any working capital maintenance or similar agreement with respect to any person, whether by acquisition of Equity Interests or indebtedness, by loan, guarantee or otherwise.

(l) **Acquisition of capital assets.** The Borrower shall not acquire any capital assets (including any vessel other than the Ship) by purchase, charter or otherwise.

(m) **Sale and leaseback.** The Borrower shall not enter into any arrangements, directly or indirectly, with any person whereby it shall sell or transfer any of its property, whether real or personal, whether now owned or hereafter acquired, if it, at the time of such sale or disposition, intends to lease or otherwise acquire the right to use or possess (except by purchase) such property or like property for a substantially similar purpose.

(n) **Changes to Fiscal Year and accounting policies.** No Security Party shall change its Fiscal Year or make or permit any change in accounting policies affecting (i) the presentation of financial statements or (ii) reporting practices, except in either case in accordance with GAAP or pursuant to the requirements of applicable laws or regulations.

(o) **Jurisdiction of incorporation or formation; Amendment of constitutional documents.** No Security Party shall change the jurisdiction of its incorporation or formation or amend its constitutional documents.

(p) **Sale of Ship.** The Borrower shall not consummate the sale of its Ship without paying or causing to be paid all amounts due and owing under this Agreement and the other Finance Documents prior to or simultaneously with the consummation of such sale.

(q) **Change of location.** No Security Party shall change the location of its chief executive office or the office where its corporate records are kept or open any new office for the conduct of its business on less than thirty (30) days prior written notice to the Agent.

**12. FINANCIAL COVENANTS**

**12.1 General**. From the Drawdown Date until the Total Commitments have terminated and all amounts payable hereunder have been paid in full the Borrower undertakes with each Creditor Party to comply or cause compliance with the following provisions of this Clause 12 except as the Agent, with the consent of the Majority Lenders, may approve from time to time in writing, such approval not to be unreasonably withheld.

**12.2 Minimum Liquidity Reserve**. The Borrower shall ensure that an amount not less than $1,000,000 (the "**Minimum Liquidity Reserve**") is held in the Collection Account at all times **provided** that such amount may, with the prior written consent of the Agent, be used to satisfy the Borrower's quarterly scheduled principal and interest payment obligations to the extent the Borrower does not otherwise have the funds to satisfy such obligations, so long as the Minimum Liquidity Reserve is replenished within thirty (30) days.

**12.3 Working Capital Reserve**. The Borrower shall ensure that an amount not less than $600,000 (the "**Working Capital Reserve**") is held in the Collection Account at all times **provided** that such amount may, with the prior written consent of the Agent, be used for working capital purposes

that are not covered by operating revenues for any reason, so long as the Working Capital Reserve is replenished within thirty (30) days.

## 13. MARINE INSURANCE COVENANTS

**13.1 General.** From the Drawdown Date until the Total Commitments have terminated and all amounts payable hereunder have been paid in full, the Borrower undertakes with each Creditor Party to comply or cause compliance with the following provisions of this Clause 13 except as the Agent, with the consent of the Majority Lenders, may approve from time to time in writing, such approval not to be unreasonably withheld.

**13.2 Maintenance of obligatory insurances.** The Borrower shall keep the Ship insured at its expense against:

(a) fire and usual marine risks (including hull and machinery, hull interest and excess risks);

(b) war risks; and

(c) protection and indemnity risks.

**13.3 Terms of obligatory insurances.** The Borrower shall affect such insurances in respect of the Ship:

(a) in Dollars;

(b) in the case of fire and usual marine risks and war risks, in an amount on an agreed value basis at least the greater of:

(i) 120% of the Loan; and

(ii) the Fair Market Value of the Ship;

**provided that**, not less than 80% of the agreed value basis shall be on a hull and machinery basis, while the remaining part of the insured value may be taken out by way of hull and/or freight interest insurance cover.

(c) in the case of oil pollution liability risks, for an aggregate amount equal to the highest level of cover from time to time available under basic protection and indemnity club entry and in the international marine insurance market (in the case of oil pollution liability risks, currently $1,000,000,000);

(d) in relation to protection and indemnity risks in respect of the full tonnage of the Ship;

(e) on approved terms; and

(f) through approved brokers and with approved insurance companies and/or underwriters or, in the case of war risks and protection and indemnity risks, in approved war risks and protection and indemnity risks associations that are members of the International Group of P&I Clubs, such approval not to be unreasonably withheld.

**13.4 Further protections for the Creditor Parties.** In addition to the terms set out in Clause 13.3, the Borrower shall procure that the obligatory insurances affected by it shall:

(a) subject always to paragraph (b), name the Borrower as the sole named assured unless the interest of every other named assured is limited:

(i) in respect of any obligatory insurances for hull and machinery and war risks;

(A) to any provable out-of-pocket expenses that it has incurred and which form part of any recoverable claim on underwriters; and

(B) to any third party liability claims where cover for such claims is provided by the policy (and then only in respect of discharge of any claims made against it); and

(ii) in respect of any obligatory insurances for protection and indemnity risks, to any recoveries it is entitled to make by way of reimbursement following discharge of any third party liability claims made specifically against it;

and every other named assured has undertaken in writing to the Security Trustee (in such form as it requires) that any deductible shall be apportioned between the Borrower and every other named assured in proportion to the aggregate claims made or paid by each of them and that it shall do all things necessary and provide all documents, evidence and information to enable the Security Trustee to collect or recover any moneys which at any time become payable in respect of the obligatory insurances;

(b) whenever the Security Trustee requires, name (or be amended to name) the Security Trustee as additional named assured for its rights and interests, warranted no operational interest and with full waiver of rights of subrogation against the Security Trustee, but with respect to all policies other than insurances for protection and indemnity risks, without the Security Trustee thereby being liable to pay (but having the right to pay) premiums, calls or other assessments in respect of such insurance;

(c) name the Security Trustee as mortgagee and loss payee with such directions for payment as the Security Trustee may specify;

(d) provide that all payments by or on behalf of the insurers under the obligatory insurances to the Security Trustee shall be made without set-off, counterclaim or deductions or condition whatsoever;

(e) provide that the obligatory insurances shall be primary without right of contribution from other insurances which may be carried by the Security Trustee or any other Creditor Party; and

(f) provide that the Security Trustee may make proof of loss if the Borrower fails to do so.

**13.5 Renewal of obligatory insurances**. The Borrower shall:

(a) at least 21 days before the expiry of any obligatory insurance:

(i) notify the Security Trustee of the brokers (or other insurers) and any protection and indemnity or war risks association through or with whom the Borrower proposes to renew that obligatory insurance and of the proposed terms of renewal; and

(ii) obtain the Majority Lenders' approval to the matters referred to in paragraph (i);

(b) at least 14 days before the expiry of any obligatory insurance, renew that obligatory insurance in accordance with the Majority Lenders' approval pursuant to paragraph (a); and

(c) procure that the approved brokers and/or the war risks and protection and indemnity associations with which such a renewal is effected shall promptly after the renewal notify the Security Trustee in writing of the terms and conditions of the renewal.

**13.6 Copies of policies; letters of undertaking.** The Borrower shall ensure that all approved brokers provide the Security Trustee with pro forma copies of all policies and cover notes relating to the obligatory insurances which they are to affect or renew and of a letter or letters or undertaking in a form required by the Majority Lenders and including undertakings by the approved brokers that:

(a) they will have endorsed on each policy, immediately upon issue, a loss payable clause and a notice of assignment in accordance with the requirements of the Insurance Assignment for the Ship;

(b) they will hold such policies, and the benefit of such insurances, to the order of the Security Trustee in accordance with the said loss payable clause;

(c) they will advise the Security Trustee immediately of any material change to the terms of the obligatory insurances or if they cease to act as brokers;

(d) they will notify the Security Trustee, not less than 14 days before the expiry of the obligatory insurances, in the event of their not having received notice of renewal instructions from the Borrower or its agents and, in the event of their receiving instructions to renew, they will promptly notify the Security Trustee of the terms of the instructions; and

(e) they will not set off against any sum recoverable in respect of a claim relating to the Ship under such obligatory insurances any premiums or other amounts due to them or any other person whether in respect of the Ship or otherwise, they waive any lien on the policies, or any sums received under them, which they might have in respect of such premiums or other amounts, and they will not cancel such obligatory insurances by reason of non-payment of such premiums or other amounts, and will arrange for a separate policy to be issued in respect of the Ship forthwith upon being so requested by the Security Trustee.

**13.7 Copies of certificates of entry.** The Borrower shall ensure that any protection and indemnity and/or war risks associations in which the Ship is entered provides the Security Trustee with:

(a) a certified copy of the certificate of entry for the Ship;

(b) a letter or letters of undertaking in such form as may be required by the Majority Lenders; and

(c) a certified copy of each certificate of financial responsibility for pollution by oil or other Environmentally Sensitive Material issued by the relevant certifying authority in relation to the Ship.

**13.8 Deposit of original policies.** The Borrower shall ensure that all policies relating to obligatory insurances are deposited with the approved brokers through which the insurances are effected or renewed.

**13.9 Payment of premiums.** The Borrower shall punctually pay all premiums or other sums payable in respect of the obligatory insurances and produce all relevant receipts when so required by the Security Trustee.

**13.10 Guarantees.** The Borrower shall ensure that any guarantees required by a protection and indemnity or war risks association are promptly issued and remain in full force and effect.

**13.11 Compliance with terms of insurances.** The Borrower shall not do nor omit to do (nor permit to be done or not to be done) any act or thing which would or might render any obligatory insurance invalid, void, voidable or unenforceable or render any sum payable under an obligatory insurance repayable in whole or in part; and, in particular:

(a) the Borrower shall take all necessary action and comply with all requirements which may from time to time be applicable to the obligatory insurances, and (without limiting the obligation contained in Clause 13.6(c)) ensure that the obligatory insurances are not made subject to any exclusions or qualifications to which the Security Trustee has not given its prior approval;

(b) the Borrower shall not make any changes relating to the classification or Classification Society or manager or operator of the Ship unless approved by the underwriters of the obligatory insurances; and

(c) the Borrower shall not employ the Ship, nor allow it to be employed, otherwise than in conformity with the terms and conditions of the obligatory insurances, without first obtaining the consent of the insurers and complying with any requirements (as to extra premium or otherwise) which the insurers specify.

**13.12 Alteration to terms of insurances.** The Borrower shall not either make or agree to any alteration to the terms of any obligatory insurance nor waive any right relating to any obligatory insurance.

**13.13 Settlement of claims.** The Borrower shall not settle, compromise or abandon any claim under any obligatory insurance for Total Loss or for a Major Casualty without the consent of the Security Trustee, and if so requested by the Security Trustee, shall do all things necessary and provide all documents, evidence and information to enable the Security Trustee to collect or recover any moneys which at any time become payable in respect of the obligatory insurances.

**13.14 Provision of copies of communications.** The Borrower shall provide the Security Trustee, at the time of each such communication, copies of all written communications between the Borrower and:

(a) the approved brokers;

(b) the approved protection and indemnity and/or war risks associations; and

(c) the approved insurance companies and/or underwriters, which relate directly or indirectly to:

(i) the Borrower's obligations relating to the obligatory insurances including, without limitation, all requisite declarations and payments of additional premiums or calls; and

(ii) any credit arrangements made between the Borrower and any of the persons referred to in paragraphs (a) or (b) relating wholly or partly to the effecting or maintenance of the obligatory insurances.

**13.15 Provision of information.** In addition, the Borrower shall promptly provide the Security Trustee (or any persons which it may designate) with any information which the Security Trustee (or any such designated person) requests for the purpose of:

(a) obtaining or preparing any report from an independent marine insurance broker as to the adequacy of the obligatory insurances effected or proposed to be effected, which may be obtained by the Security Trustee on the Effective Date and at any time there has been a material alteration to the terms of the insurances; and/or

(b) effecting, maintaining or renewing any such insurances as are referred to in Clause 13.16 or dealing with or considering any matters relating to any such insurances;

and the Borrower shall, forthwith upon demand, indemnify the Security Trustee in respect of all fees and other expenses incurred by or for the account of the Security Trustee in connection with any such report as is referred to in paragraph (a).

**13.16 Mortgagee's interest, additional perils insurances.** The Security Trustee shall be entitled from time to time to effect, maintain and renew (i) mortgagee's interest marine insurance, and/or (ii) mortgagee's interest additional perils insurance in such amounts (not to exceed 110% of the Total Commitments), on such terms, through such insurers and generally in such manner as the Security Trustee may from time to time consider appropriate and the Borrower shall upon demand fully pay, reimburse or indemnify the Security Trustee in respect of all premiums and other expenses which are incurred in connection with or with a view to effecting, maintaining or renewing any such insurance or dealing with, or considering, any matter arising out of any such insurance.

**13.17 Review of insurance requirements.** The Security Trustee may and, on instruction of the Majority Lenders, shall review, at the expense of the Borrower, the requirements of this Clause 13 from time to time in order to take account of any changes in circumstances after the date of this Agreement which are, in the reasonable opinion of the Agent or the Majority Lenders significant and capable of affecting the relevant Security Party or the Ship and its insurance (including,

without limitation, changes in the availability or the cost of insurance coverage or the risks to which the relevant Security Party may be subject.)

**13.18 Modification of insurance requirements.** The Security Trustee shall notify the Borrower of any proposed modification under Clause 13.17 to the requirements of this Clause 13 which the Security Trustee may or, on instruction of the Majority Lenders, shall reasonably consider appropriate in the circumstances and such modification shall take effect on and from the date it is notified in writing to the Borrower as an amendment to this Clause 13 and shall bind the Borrower accordingly.

**13.19 Compliance with instructions.** The Security Trustee shall be entitled (without prejudice to or limitation of any other rights which it may have or acquire under any Finance Document) to require the Ship to remain at any safe port or to proceed to and remain at any safe port designated by the Security Trustee until the relevant Security Party implements any amendments to the terms of the obligatory insurances and any operational changes required as a result of a notice served under Clause 13.18.

**14. SHIP COVENANTS**

**14.1 General.** From the Drawdown Date until the Total Commitments have terminated and all amounts payable hereunder have been paid in full, the Borrower undertakes with each Creditor Party to comply or cause compliance with the following provisions of this Clause 14 except as the Agent, with the consent of the Majority Lenders, may approve from time to time in writing, such approval not to be unreasonably withheld.

**14.2 Ship's name and registration**. The Borrower shall:

(a) keep the Ship registered in its name under the law of an Approved Flag;

(b) not do, omit to do or allow to be done anything as a result of which such registration might be cancelled or imperiled; and

(c) not change the name or port of registry on which the Ship was registered when it became subject to the Mortgage.

**14.3 Repair and classification.** The Borrower shall keep the Ship in a good and safe condition and state of repair:

(a) consistent with first-class ship ownership and management practice;

(b) so as to maintain the highest class for the Ship with the Classification Society, free of overdue recommendations and adverse notations; and

(c) so as to comply with all laws and regulations applicable to vessels registered under the law of the Approved Flag on which the Ship is registered or to vessels trading to any jurisdiction to which the Ship may trade from time to time, including but not limited to the ISM Code and the ISPS Code.

Without limiting the foregoing, the Borrower shall use commercially reasonable efforts to cause the Approved Manager to comply with all applicable international and domestic regulations pertaining to the operation of the Ship, including but not limited to the ISM Code and the ISPS Code.

**14.4 Classification Society instructions and undertaking.** The Borrower shall instruct the Classification Society referred to in Clause 14.3(b) (and procure that the Classification Society undertakes with the Security Trustee):

(a) to send to the Security Trustee, following receipt of a written request from the Security Trustee, certified true copies of all original class records held by the Classification Society in relation to the Ship;

(b) to allow the Security Trustee (or its agents), at any time and from time to time, to inspect the original class and related records of the Borrower and the Ship either (i) electronically (through the Classification Society directly or by way of indirect access via the Borrower's account manager and designating the Security Trustee as a user or administrator of the system under its account) or (ii) in person at the offices of the Classification Society, and to take copies of them electronically or otherwise;

(c) to notify the Security Trustee immediately in writing if the Classification Society:

(i) receives notification from the Borrower or any other person that the Ship's Classification Society is to be changed; or

(ii) becomes aware of any facts or matters which may result in or have resulted in a condition of class or a recommendation, or a change, suspension, discontinuance, withdrawal or expiry of the Ship's class under the rules or terms and conditions of the Borrower's or the Ship's membership of the Classification Society;

(d) following receipt of a written request from the Security Trustee:

(i) to confirm that the Borrower is not in default of any of its contractual obligations or liabilities to the Classification Society and, without limiting the foregoing, that it has paid in full all fees or other charges due and payable to the Classification Society; or

(ii) if the Borrower is in default of any of its contractual obligations or liabilities to the Classification Society, to specify to the Security Trustee in reasonable detail the facts and circumstances of such default, the consequences of such default, and any remedy period agreed or allowed by the Classification Society.

**14.5 Modification.** The Borrower shall not make any modification or repairs to, or replacement of, the Ship or equipment installed on the Ship which would materially alter the structure, type or performance characteristics of the Ship or materially reduce its value. In addition, the Borrower shall not enter into financing for, or purchase or install, scrubber equipment for the Ship without the prior written consent of the Lenders, such consent not be unreasonably withheld but conditional upon any financing for the installation of scrubber equipment being fully subordinated

to the lien of the Mortgage on the Ship in form and substance satisfactory to the Lenders in their reasonable discretion.

**14.6 Removal of parts.** The Borrower shall not remove any material part of the Ship, or any item of equipment installed on, the Ship unless the part or item so removed is forthwith replaced by a suitable part or item which is in the same condition as or better condition than the part or item removed, is free from any Security Interest or any right in favor of any person other than the Security Trustee and becomes on installation on the Ship, the property of the Borrower and subject to the security constituted by the Mortgage, **provided that** the Borrower may install and remove equipment owned by a third party if the equipment can be removed without any risk of damage to the Ship.

**14.7 Surveys.** The Borrower, at its sole expense, shall submit the Ship regularly to all periodical or other surveys which may be required for classification purposes and provide the Security Trustee, at the Borrower's sole expense, with copies of all survey reports, and no such survey shall be delayed without the prior written consent of the Agent.

**14.8 Inspection.** The Borrower shall permit the Agent to inspect its books and records and the Security Trustee (by surveyors or other persons appointed by it for that purpose at the cost of the Borrower) to board the Ship at all reasonable times but in each case not more than one time per each calendar quarter (or more frequently if there has been a Major Casualty) to inspect its condition or to satisfy themselves about proposed or executed repairs and shall afford all proper facilities for such inspections. Without limiting the foregoing, the Security Trustee may review the Ship's operating records, including class records, maintenance and repair records, and insurance records, at any time during the Security Period.

**14.9 Prevention of and release from arrest.** The Borrower shall promptly discharge:

(a) all liabilities which give or may give rise to maritime or possessory liens on or claims enforceable against the Ship, the Earnings or the Insurances;

(b) all taxes, dues and other amounts charged in respect of the Ship, the Earnings or the Insurances; and

(c) all other accounts payable whatsoever in respect of the Ship, the Earnings or the Insurances,

and, forthwith upon receiving notice of the arrest of the Ship, or of its detention in exercise or purported exercise of any lien or claim, the Borrower shall procure its release by providing bail or otherwise as the circumstances may require.

**14.10 Compliance with laws etc**. The Borrower shall:

(a) comply, or procure compliance with, all laws or regulations:

(i) relating to its business generally; or

(ii) relating to the ownership, employment, operation and management of the Ship,

including but not limited to the ISM Code, the ISPS Code, all Environmental Laws and all Sanctions;

(b) without limiting the generality of paragraph (a) above, the Borrower shall not employ the Ship nor allow its employment in any manner contrary to any laws or regulations, including but not limited to the ISM Code, the ISPS Code, all Environmental Laws and all Sanctions, nor allow its employment by or for the direct or, to the knowledge of the Borrower, indirect benefit of any Prohibited Person, or in any trade which could expose any Security Party or any Creditor Party to enforcement proceedings or any other consequences under Sanctions; and

(c) in the event of hostilities in any part of the world (whether war is declared or not), not cause or permit the Ship to enter or trade to any zone which is declared a war zone by any government or by the Ship's war risks insurers unless the prior written consent of the Majority Lenders has been given and the Borrower has (at its expense) effected any special, additional or modified insurance cover which the Majority Lenders may require.

**14.11 Provision of information.** The Borrower shall promptly provide the Security Trustee with any information which the Majority Lenders reasonably request regarding:

(a) the Ship, its employment, position and engagements;

(b) the Earnings and payments and amounts due to the Ship's master and crew;

(c) any expenses incurred, or likely to be incurred, in connection with the operation, maintenance or repair of the Ship and any payments made in respect of the Ship;

(d) any towages and salvages; and

(e) the Borrower's, the Approved Manager's and the Ship's compliance with the ISM Code and the ISPS Code,

and, upon the Security Trustee's request, provide copies of any charter and charter guarantee relating to the Ship and copies of the Borrower's or the Approved Manager's Document of Compliance.

**14.12 Notification of certain events.** The Borrower shall immediately notify the Security Trustee by fax or Email, confirmed forthwith by letter, of:

(a) any casualty which is or is likely to be or to become a Major Casualty;

(b) any occurrence as a result of which the Ship has become or is, by the passing of time or otherwise, likely to become a Total Loss;

(c) any requirement or condition made by any insurer or classification society or by any competent authority which is not immediately complied with;

(d) any arrest or detention of the Ship, any exercise or purported exercise of any Security Interest on the Ship or the Earnings or any requisition of the Ship for hire;

(e) any intended dry docking of the Ship;

(f) any Environmental Claim made against the Borrower or in connection with the Ship, or any Environmental Incident;

(g) any claim for breach of the ISM Code or the ISPS Code being made against the Borrower, an Approved Manager or otherwise in connection with the Ship; or

(h) any act, omission or event that causes or, with the passage of time or giving of notice, will cause, a breach of any Charter or any material interruption in the performance whether or the same constitutes a default under a Charter by any party to a Charter;

(i) any other matter, event or incident, actual or threatened, the effect of which will or could lead to the ISM Code or the ISPS Code not being complied with;

and the Borrower shall keep the Security Trustee advised in writing on a regular basis and in such detail as the Security Trustee shall require of the Borrower's, the Approved Manager's or any other person's response to any of those events or matters.

**14.13 Restrictions on chartering, appointment of managers etc**. The Borrower shall not:

(a) let the Ship on demise charter for any period;

(b) enter into any time or consecutive voyage charter in respect of the Ship for a term which exceeds, or which by virtue of any optional extensions may exceed, 12 months (excluding, for the avoidance of doubt, the charter for the Ship entered into in accordance with Clause 14.14) or enter into any pool agreement, in each case, without the consent of the Majority Lenders;

(c) charter the Ship otherwise than on bona fide arm's length terms at the time when the Ship is fixed;

(d) appoint a technical manager of the Ship other than an Approved Manager or agree to any alteration to the terms of an Approved Management Agreement;

(e) de-activate or lay up the Ship;

(f) change the Classification Society; or

(g) charter in any vessel from a third party.

**14.14 Employment.** The Borrower shall cause the Ship to be employed under the Initial Charter or another charter with a charterer acceptable to the Lenders and on such other terms and conditions as the Lenders may approve. The Ship shall be docked or moored at the Port of Muscat, Oman and permitted only to navigate in the immediate environs, unless the Agent otherwise approves in writing **provided** that the Ship may sail to other ports in Oman with prior written notice to the Agent and so long as such sailing does not affect the effectiveness of coverage of obligatory insurances.

**14.15 Earnings Assignment; Copies of Charters; Charter Assignment.** Provided that all approvals necessary under Clause 14.13 have been previously obtained, the Borrower shall:

(a) in respect of any time charter of the Ship for a term which is less 12 months, execute and deliver to the charterer a notice of the Earnings Assignment in the form required under the Earnings Assignment;

(b) furnish promptly to the Agent a true and complete copy of any charter for the Ship, all other documents related thereto and a true and complete copy of each material amendment or other modification thereof; and

(c) in respect of any Charter, execute and deliver to the Agent a Charter Assignment and use reasonable commercial efforts to cause the charterer to execute and deliver to the Security Trustee a consent and acknowledgement to such Charter Assignment in the form required thereby.

**14.16 Notice of Mortgage.** The Borrower shall keep the Mortgage registered against the Ship as a valid first preferred mortgage, carry on board the Ship a certified copy of the Mortgage and place and maintain in a conspicuous place in the navigation room and the Master's cabin of the Ship a framed printed notice stating that the Ship is mortgaged by the Borrower to the Security Trustee.

**14.17 Sharing of Earnings.** The Borrower shall not enter into any agreement or arrangement for the sharing of any Earnings.

**14.18 ISPS Code.** The Borrower shall comply with the ISPS Code and in particular, without limitation, shall:

(a) procure that the Ship and the company responsible for the Ship's compliance with the ISPS Code comply with the ISPS Code; and

(b) maintain for the Ship an ISSC; and

(c) notify the Agent immediately in writing of any actual or threatened withdrawal, suspension, cancellation or modification of the ISSC.

**14.19 Vessel Tracking Device**. The Ship shall be equipped with one or more fully functional location tracking devices, and the Borrower shall grant the Agent digital access to such devices to monitor the Ship's location.

## 15. COLLATERAL MAINTENANCE RATIOS

**15.1 General.** From the Drawdown Date until the Total Commitments have terminated and all amounts payable hereunder have been paid in full, the Borrower undertakes with each Creditor Party to comply with the following provisions of this Clause 15 except as the Agent, with the consent of the Majority Lenders, may approve from time to time in writing, such approval not to be unreasonably withheld.

**15.2** **Collateral Maintenance Ratios.** The Borrower shall ensure on each date that is five (5) Business Days prior to each Repayment Date (a "**Testing Date**") by procuring from an Approved Broker valuations of the Fair Market Value and the Scrap Value of the Ship showing that:

(a) The Market Value LTV Ratio is not greater than 65% at all times, and

(b) The Scrap Value LTV Ratio is not greater than:

(i) 120% on or prior to the third Repayment Date;

(ii) 80% thereafter until the fourth Repayment Date;

(iii) 75% thereafter until the fifth Repayment Date;

(iv) 70% thereafter until the sixth Repayment Date;

(v) 65% thereafter until the seventh Repayment Date;

(vi) 60% thereafter until the eighth Repayment Date;

(vii) 55% thereafter until the ninth Repayment Date;

(viii) 50% thereafter until the tenth Repayment Date;

(ix) 45% thereafter until the eleventh Repayment Date;

(x) 40% thereafter.

**15.3** **Prepayment**. If there is a shortfall under Clause 15.2, the Borrower shall prepay such part (at least) of the Loan as will eliminate any shortfall on the Repayment Date that falls immediately after the relevant Testing Date.

**15.4** **Intentionally omitted**.

**15.5** **Valuations binding.** Any valuation under Clause 15.3 or 15.4 shall be binding and conclusive as regards the Borrower, as shall be any valuation which the Majority Lenders make of any additional Collateral which does not consist of or include a Security Interest.

**15.6** **Provision of information.** The Borrower shall promptly provide the Agent and any Approved Broker or other expert acting under Clause 15.4 with any information which the Agent or the Approved Broker or other expert may request for the purposes of the valuation; and, if the Borrower fail to provide the information by the date specified in the request, the valuation may be made on any basis and assumptions which the Approved Broker or the Majority Lenders (or the expert appointed by them) consider prudent.

**15.7** **Payment of valuation expenses.** Without prejudice to the generality of the Borrower's obligations under Clauses 21.2, 21.3 and 22.3, the Borrower shall, on demand, pay the Agent the amount of the fees and expenses of any Approved Broker or other expert instructed by the Agent under this Clause 15 and all legal and other expenses incurred by any Creditor Party in connection with any matter arising out of this Clause 15.

**15.8 Application of prepayment.** Clause 8 shall apply in relation to any prepayment pursuant to Clause 15.3.

**16. INTENTIONALLY OMITTED**

**17. PAYMENTS AND CALCULATIONS**

**17.1 Currency and method of payments.** All payments to be made by the Lenders or by the Security Parties under a Finance Document shall be made to the Agent or to the Security Trustee, in the case of an amount payable to it:

(a) by not later than 11:00 a.m. (New York City time) on the due date;

(b) in same day Dollar funds settled through the New York Clearing House Interbank Payments System (or in such other Dollar funds and/or settled in such other manner as the Agent shall specify as being customary at the time for the settlement of international transactions of the type contemplated by this Agreement);

(c) in the case of an amount payable by a Lender to the Agent or by another Security Party to the Agent or any Lender, to the account of the Agent, (the "**Agent Account**") with the following account details:

East West Bank
Old Hill Partners Inc.
ABA# [redacted]0-381
Acct# [redacted]9162

or to such other account with such other bank as the Agent may from time to time notify to the Borrower, the other Security Parties and the other Creditor Parties; and

(d) in the case of an amount payable to the Security Trustee, to such account as it may from time to time notify to the Borrower and the other Creditor Parties.

**17.2 Payment on non-Business Day.** If any payment by a Security Party under a Finance Document would otherwise fall due on a day which is not a Business Day, such payment shall be made on the immediately preceding Business Day.

**17.3 Basis for calculation of periodic payments.** All interest and any other payments under any Finance Document which are of an annual or periodic nature shall accrue from day to day and shall be calculated on the basis of the actual number of days elapsed and a 360-day year.

**17.4 Distribution of payments to Creditor Parties**. Subject to Clauses 17.5, 17.6 and 17.7:

(a) any amount received by the Agent under a Finance Document for distribution or remittance to a Lender or the Security Trustee shall be made available by the Agent to that Lender or, as the case may be, the Security Trustee by payment, with funds having the same value as the funds received, to such account as the Lender or the Security Trustee may have notified to the Agent not less than five (5) Business Days previously; and

(b) amounts to be applied in satisfying amounts of a particular category which are due to the Lenders generally shall be distributed by the Agent to each Lender pro rata to the amount in that category which is due to it.

**17.5 Permitted deductions by Agent.** Notwithstanding any other provision of this Agreement or any other Finance Document, the Agent may, before making an amount available to a Lender, deduct and withhold from that amount any sum which is then due and payable to the Agent from that Lender under any Finance Document or any sum which the Agent is then entitled under any Finance Document to require that Lender to pay on demand.

**17.6 Agent only obliged to pay when monies received.** Notwithstanding any other provision of this Agreement or any other Finance Document, the Agent shall not be obliged to make available to the Borrower or any Lender any sum which the Agent is expecting to receive for remittance or distribution to the Borrower or that Lender until the Agent has satisfied itself that it has received that sum.

**17.7 Refund to Agent of monies not received.** If and to the extent that the Agent makes available a sum to the Borrower or a Lender, without first having received that sum, the Borrower or (as the case may be) the Lender concerned shall, on demand:

(a) refund the sum in full to the Agent; and

(b) pay to the Agent the amount (as certified by the Agent) which will indemnify the Agent against any funding or other loss, liability or expense incurred by the Agent as a result of making the sum available before receiving it.

**17.8 Agent may assume receipt.** Clause 17.7 shall not affect any claim which the Agent has under the law of restitution, and applies irrespective of whether the Agent had any form of notice that it had not received the sum which it made available.

**17.9 Creditor Party accounts.** Each Creditor Party shall maintain accounts showing the amounts owing to it by the Borrower and each other Security Party under the Finance Documents and all payments in respect of those amounts made by the Borrower and any other Security Party.

**17.10 Agent's memorandum account.** The Agent shall maintain a memorandum account showing the amounts advanced by the Lenders and all other sums owing to the Agent, the Security Trustee and each Lender from the Borrower and each other Security Party under the Finance Documents and all payments in respect of those amounts made by the Borrower and any other Security Party.

**17.11 Accounts prima facie evidence.** If any accounts maintained under Clauses 17.9 and 17.10 show an amount to be owing by the Borrower or any other Security Party to a Creditor Party, those accounts shall be prima facie evidence that that amount is owing to that Creditor Party.

**18. APPLICATION OF RECEIPTS**

**18.1 Normal order of application.** Except as any Finance Document may otherwise provide, any sums which are received or recovered by any Creditor Party under or by virtue of any Finance Document shall be applied:

(a) FIRST: in or towards satisfaction of any amounts then due and payable under the Finance Documents in the following order and proportions:

(i) *first*, in or towards satisfaction pro rata of all amounts then due and payable to the Creditor Parties under the Finance Documents other than those amounts referred to at paragraphs (ii) and (iii) (including, but without limitation, all amounts payable by the Borrower under Clauses 21, 22 and 23 of this Agreement or by the Borrower or any other Security Party under any corresponding or similar provision in any other Finance Document);

(ii) *second*, in or towards satisfaction pro rata of any and all amounts of interest or default interest then due and payable to the Creditor Parties under the Finance Documents; and

(iii) *third*, in or towards satisfaction pro rata of any principal then due and payable to the Creditor Parties under the Finance Documents;

(b) SECOND: in retention of an amount equal to any amount not then due and payable under any Finance Document but which the Agent, by notice to the Borrower and the other Creditor Parties, states in its opinion will or may become due and payable in the future and, upon those amounts becoming due and payable, in or towards satisfaction of them in accordance with the provisions of Clause 18.1(a); and

(c) THIRD: any surplus shall be paid to the Borrower or to any other person appearing to be entitled to it.

**18.2 Variation of order of application.** The Agent may, with the authorization of the Majority Lenders, by notice to the Borrower, the other Security Parties and the other Creditor Parties provide for a different manner of application from that set out in Clause 18.1 either as regards a specified sum or sums or as regards sums in a specified category or categories.

**18.3 Notice of variation of order of application.** The Agent may give notices under Clause 18.2 from time to time; and such a notice may be stated to apply not only to sums which may be received or recovered in the future, but also to any sum which has been received or recovered on or after the third Business Day before the date on which the notice is served.

**18.4 Appropriation rights overridden.** This Clause 18 and any notice which the Agent gives under Clause 18.2 shall override any right of appropriation possessed, and any appropriation made, by the Borrower or any other Security Party.

**18.5 Payments in excess of Contribution**.

(a) If any Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off, counterclaim or otherwise) in excess of its Contribution, such Lender shall forthwith purchase from the other Lenders such participation in their respective Contributions as shall be necessary to share the excess payment ratably with each of them, **provided that** if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and such Lender shall repay to the purchasing Lender the purchase price to the

extent of such recovery together with an amount equal to such Lender's ratable share (according to the proportion of (a) the amount of such Lender's required repayment to (b) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered.

(b) The Borrower agrees that any Lender so purchasing a participation from another Lender pursuant to this Clause 18.5 may, to the fullest extent permitted by law, exercise all of its rights of payment (including the right of set-off) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.

(c) Notwithstanding paragraphs (a) and (b) of this Clause 18.5, any Lender which shall have commenced or joined (as a plaintiff) in an action or proceeding in any court to recover sums due to it under any Finance Document and pursuant to a judgment obtained therein or a settlement or compromise of that action or proceeding shall have received any amount, such Lender shall not be required to share any proportion of that amount with a Lender which has the legal right to, but does not, join such action or proceeding or commence and diligently prosecute a separate action or proceeding to enforce its rights in the same or another court.

(d) Each Lender exercising or contemplating exercising any rights giving rise to a receipt or receiving any payment of the type referred to in this Clause 18.5 or instituting legal proceedings to recover sums owing to it under this Agreement shall, as soon as reasonably practicable thereafter, give notice thereof to the Agent who shall give notice to the other Lenders.

**19. ACCOUNTS**

**19.1 General.** From the Drawdown Date until the Total Commitments have terminated and all amounts payable hereunder have been paid in full, the Borrower undertakes with each Creditor Party to comply or cause compliance with the following provisions of this Clause 19 except as the Agent, with the consent of the Majority Lenders, may approve from time to time in writing, such approval not to be unreasonably withheld.

**19.2 Collection Account**.

(a) The Borrower represents and warrants that the Collection Account has been opened and operational and that the Borrower does not have any other bank account, other than the Vessel Operating Account. The Borrower shall, within five (5) Business Days of the Drawdown Date, provide the Agent with access to such account on a read-only basis.

(b) The Borrower undertakes to ensure that (i) all Earnings of the Ship and the Borrower shall be paid to the Collection Account and (ii) all of the operating expenses of the Ship shall be paid exclusively from such Earnings paid into the Collection Account (which shall be disbursed by the Agent to the Vessel Operating Account pursuant to sub-section (c) hereof).

(c) All amounts on deposit in the Collection Account shall be used (with the prior consent and written instruction by the Agent) in the following priorities:

(i) the service fees owed to the Account Bank;

(ii) the ordinary operating expenses of the Ship (not to exceed $6,500 per day);

(iii) the interest payments under this Agreement;

(iv) the scheduled principal payments under this Agreement;

(v) the "Monitoring Fee" or any other fees payable to Old Hill Partners Inc. under the Fee Letters and any other amount payable to Creditor Parties under the Finance Documents;

(vi) for each of the first three Repayment Dates only, $333,334 for the anticipated cost of $1,000,000 special survey and drydocking of the Ship (to be expended for those purposes about July 1, 2021) (such amount on deposit in the aggregate, the "**Survey Reserve**");

(vii) all reasonable and documented expenses related to repairs, up-gradings, water ballast treatment, and other customary and documented expenses necessary for maintaining the operating condition of the Ship at high standards; and

(viii) the vessel management service fee in the amount of $1,000 per day payable to the Approved Manager.

(d) Prior to each Repayment Date, the Agent, in accordance with its internal process, shall provide the Borrower with a notice of remittance calculating all amounts payable to the Creditor Parties on such Repayment Date, including Excess Cash Flow, making reasonable assumptions and taking into account any "true up" necessary to adjust for the final amount from the prior period. Amounts so calculated by the Agent shall be conclusive absent manifest error.

On each Repayment Date, Excess Cash Flow so calculated by the Agent shall be applied (and the Borrower hereby agree to such application and provides to the Account Bank and the Agent its prior consent thereto as necessary) in the following order:

(i) **first**, to replenish, as necessary, the Working Capital Reserve;

(ii) **second**, to replenish, as necessary, the Minimum Liquidity Reserve (including for the purposes of curing the shortfall under Clause 15.2);

(iii) **third,** in respect of the first four Repayment Dates, the entire remaining amount of Excess Cash Flow for the relevant period to be applied in prepayment of the Loan (such prepayment, "**Excess Cash Flow Sweep**"); and

(iv) **fourth**,

(A) if there is an Event of Default that is continuing, to prepay the Loan in an amount equal to the remaining amount of Excess Cash Flow; or

(B) if there is no Event of Default that is continuing, to be paid to the Borrower.

**19.3 Location of accounts.** The Borrower shall promptly:

(a) comply with any requirement of the Agent as to the location or re-location of the Collection Account (or any of them), and without limiting the foregoing, the Borrower agrees to segregate the Collection Account from the banking platform on which their other accounts are located or designated; and

(b) execute any documents which the Agent specifies to create or maintain in favor of the Security Trustee a Security Interest over (and/or rights of set-off, consolidation or other rights in relation to) the Collection Account.

**19.4 Borrower's obligations unaffected.** The provisions of this Clause 19 do not affect:

(a) the liability of the Borrower to make payments of principal and interest on the due dates; or

(b) any other liability or obligation of the Borrower or any other Security Party under any Finance Document.

**20. EVENTS OF DEFAULT**

**20.1 Events of Default.** An Event of Default occurs if:

(a) the Borrower or any other Security Party fails to pay when due any sum payable under a Finance Document or under any document relating to a Finance Document or, only in the case of sums payable on demand, within five (5) Business Days after the date when first demanded; or

(b) any breach occurs of any of Clauses 8.9, 8.10, 9.2, 11, 12, 13, 14.4, 15.3 or 19; or

(c) any breach by the Borrower or any other Security Party occurs of any provision of a Finance Document (other than a breach covered by paragraphs (a), (b), (d), (e) or (n) of this Clause 20.1) which, in the opinion of the Majority Lenders, is capable of remedy, and such default continues unremedied for 10 Business Days after written notice from the Agent requesting action to remedy the same; or

(d) subject to any applicable grace period specified in a Finance Document, any breach by the Borrower or any other Security Party occurs of any provision of a Finance Document (other than a breach falling within paragraphs (a), (b), (c) or (e) of this Clause 20.1); or

(e) any representation, warranty or statement made or repeated by, or by an officer or director of, the Borrower or any other Security Party in a Finance Document or in the

Drawdown Notice or any other notice or document relating to a Finance Document is untrue or misleading in any material respect when it is made or repeated; or

(f) an event of default, or an event or circumstance which, with the giving of any notice, the lapse of time or both would constitute an event of default, has occurred on the part of a Security Party under any contract or agreement (other than the Finance Documents) to which such Security Party is a party and the value of which is or exceeds $250,000 in the case of the Borrower, and such event of default has not been cured within any applicable grace period;

(g) any Financial Indebtedness of a Security Party in excess of $250,000 in the case of the Borrower is not paid when due (or if there is a grace period, within such grace period) or, only in the case of sums payable on demand, when first demanded, except for any such Financial Indebtedness which is being contested by such Security Party in good faith and through appropriate proceedings and in a manner that does not involve any risk of sale, forfeiture, loss, confiscation or seizure of the Ship; or

(h) any Security Party shall generally not pay its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or

(i) any proceeding shall be instituted by or against any Security Party or Limited Guarantor or the Approved Manager seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property, and solely in the case of an involuntary proceeding:

(i) such proceeding shall remain undismissed or unstayed for a period of 45 days; or

(ii) any of the actions sought in such involuntary proceeding (including, without limitation, the entry of an order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for, it or for any substantial part of its property) shall occur; or

(j) all or a material part of the undertakings, assets, rights or revenues of, or shares or other ownership interest in, any Security Party are seized, nationalized, expropriated or compulsorily acquired by or under authority of any government; or

(k) a creditor attaches or takes possession of, or a distress, execution, sequestration or process (each an **"action"**) is levied or enforced upon or sued out against, a material part of the undertakings, assets, rights or revenues (the **"assets"**) of any Security Party in relation to a claim by such creditor which, in the reasonable opinion of the Majority Lenders, is likely to materially and adversely affect the ability of such Security Party to perform all or any of its obligations under or otherwise to comply with the terms of any Finance Document to which it is a party and such Security Party does not procure that such action is lifted, released or expunged within 20 Business Days of such action being (i) instituted and (ii) notified to such Security Party; or

(l) any judgment or order for the payment of money individually or in the aggregate in excess of $500,000 (exclusive of any amounts fully covered by insurance (less any applicable deductible) and as to which the insurer has acknowledged its responsibility to cover such judgment or order) shall be rendered against a Security Party and such judgment shall not have been vacated or discharged or stayed or bonded pending appeal within 30 days after the entry thereof or enforcement proceedings shall have been commenced by any creditor upon such judgment or order; or

(m) any Security Party ceases or suspends or threatens to cease or suspend the carrying on of its business, or a part of its business which, in the opinion of the Majority Lenders, is material in the context of this Agreement, except in the case of a sale or a proposed sale of the Ship by the Borrower; or

(n) it becomes unlawful or impossible:

(i) for any Security Party to discharge any liability under a Finance Document or to comply with any other obligation which the Majority Lenders consider material under a Finance Document;

(ii) for the Agent, the Security Trustee or the Lenders to exercise or enforce any right under, or to enforce any Security Interest created by, a Finance Document; or

(o) any consent necessary to enable the Borrower to own, operate or charter the Ship or to enable the Borrower or any other Security Party to comply with any provision which the Majority Lenders consider material of a Finance Document or a Charter is not granted, expires without being renewed, is revoked or becomes liable to revocation or any condition of such a consent is not fulfilled; or

(p) any provision of a Finance Document which the Majority Lenders consider material proves to have been or becomes invalid or unenforceable, or a Security Interest created by a Finance Document proves to have been or becomes invalid or unenforceable or such a Security Interest proves to have ranked after, or loses its priority to, another Security Interest or any other third-party claim or interest; or

(q) a Security Party, an Approved Manager or TNI or any respective subsidiary thereof or any of their respective directors or officers becomes a Prohibited Person or any Security Party, Approved Manager or TNI or its respective subsidiary fails to comply with any Sanctions applicable to it; or

(r) the security constituted by a Finance Document is in any way imperiled or in jeopardy; or

(s) there occurs or develops, in the reasonable opinion of the Majority Lenders, a Material Adverse Effect; or

(t) the results of any survey or inspection of the Ship pursuant to Clause 14.7 or 14.8 are deemed unsatisfactory by the Majority Lenders in their sole, reasonable discretion after giving due consideration to the type and age of the Ship and whether such results adversely affect the Ship's Fair Market Value or safe operation, unless such survey or

inspection is revised to the satisfaction of the Majority Lenders within 60 days of the date that a copy of the original inspection is delivered by the Borrower to the Agent; or

(u) any Security Party or any subsidiary of any Security Party or any of their respective directors or officers becomes a Restricted Party; or

(v) the Ship suffers a Major Casualty and has not been repaired in a timely and proper manner within 30 days;

(w) the Ship is not delivered to the Initial Charterer under the Initial Charter by June 30, 2020;

(x) there occurs any "Event of Default" or similar event under any Charter, or any cancellation or termination of any Charter prior to its stated expiration date; or

(y) there occurs any "Event of Default" or similar event or breach of any term or obligation by the Approved Manager under the Approved Management Agreement.

**20.2 Actions following an Event of Default.** On, or at any time after, the occurrence of an Event of Default:

(a) the Agent may, and if so instructed by the Majority Lenders, the Agent shall:

(i) serve on the Borrower a notice stating that the Commitments and all other obligations of each Lender to the Borrower under this Agreement are cancelled; and/or

(ii) serve on the Borrower a notice stating that the Loan, together with accrued interest and all other amounts accrued or owing under this Agreement and the other Finance Documents are immediately due and payable or are due and payable on demand, **provided that** in the case of an Event of Default under either of Clauses 20.1(h) or (i), the Loan and all accrued interest and other amounts accrued or owing under this Agreement and the other Finance Documents shall be deemed immediately due and shall automatically become payable without notice or demand therefor; and/or

(iii) take any other action which, as a result of the Event of Default or any notice served under paragraph (i) or (ii), the Agent and/or the Lenders are entitled to take under any Finance Document or any applicable law; and/or

(b) the Security Trustee may, and if so instructed by the Agent, acting with the authorization of the Majority Lenders, the Security Trustee shall, take any action which, as a result of the Event of Default or any notice served under paragraph (a) (i) or (ii), the Security Trustee, the Agent and/or the Lenders are entitled to take under any Finance Document or any applicable law to enforce the Security Interests created by this Agreement and any other Finance Document (including, without limitation, applying all amounts in the Collection Account in repayment of the Advance, selling the Ship, replacing the Approved Manager and proceeding against the Parent Guarantor under the Parent Guaranty and any Limited Guarantor under each Limited Guaranty) in any manner available to it and in such sequence as the Security Trustee may, in its absolute discretion, determine.

**20.3 Termination of Commitments.** On the service of a notice under Clause 20.2(a)(i), the Commitments and all other obligations of each Lender to the Borrower under this Agreement shall be cancelled provided, that in the case of an Event of Default under either of Clauses 20.1(h) or (i), the Total Commitments shall be automatically cancelled.

**20.4 Acceleration of Loan.** On the service of a notice under Clause 20.2(a)(ii) or, upon an Event of Default under either of Clauses 20.1(h) or (i) automatically, all of the Loan, together with accrued interest and all other amounts accrued or owing from the Borrower or any other Security Party under this Agreement and every other Finance Document shall become immediately due and payable.

**20.5 Multiple notices; action without notice.** The Agent may serve notices under Clauses 20.2(a)(i) and (ii) simultaneously or on different dates and it and/or the Security Trustee may take any action referred to in Clause 20.2 if no such notice is served or simultaneously with or at any time after the service of both or either of such notices.

**20.6 Notification of Creditor Parties and Security Parties.** The Agent shall send to each Lender, the Security Trustee and each Security Party a copy of the text of any notice which the Agent serves on the Borrower under Clause 20.2. Such notice shall become effective when it is served on the Borrower, and no failure or delay by the Agent to send a copy or the text of the notice to any other person shall invalidate the notice or provide the Borrower or any Security Party with any form of claim or defense.

**20.7 Creditor Party rights unimpaired.** Nothing in this Clause shall be taken to impair or restrict the exercise of any right given to individual Lenders under a Finance Document or the general law; and, in particular, this Clause is without prejudice to Clause 3.1.

**20.8 Exclusion of Creditor Party liability.** No Creditor Party, and no receiver or manager appointed by the Security Trustee, shall have any liability to any Security Party:

(a) for any loss caused by an exercise of rights under, or enforcement of a Security Interest created by, a Finance Document or by any failure or delay to exercise such a right or to enforce such a Security Interest; or

(b) as mortgagee in possession or otherwise, for any income or principal amount which might have been produced by or realized from any asset comprised in such a Security Interest or for any reduction (however caused) in the value of such an asset,

**provided that** nothing in this Clause 20.8 shall exempt a Creditor Party or a receiver or manager from liability for losses shown to have been directly and mainly caused by the gross negligence or the willful misconduct of such Creditor Party's own officers and employees or (as the case may be) such receiver's or manager's own partners or employees.

**21. FEES AND EXPENSES**

**21.1 Fee Letter.** The Borrower shall pay all fees payable under any Fee Letter.

**21.2** **Costs of negotiation, preparation etc.** Whether or not any Advance is made by the Lenders, the Borrower shall pay to the Agent on its demand the amount of all expenses (including all legal fees) incurred by the Agent, the Security Trustee and any Lender in connection with the due diligence, negotiation, preparation, execution or registration of any Finance Document or any related document or with any transaction contemplated by a Finance Document or a related document, including, without limitation, the reasonable fees and disbursements of such Creditor Party's legal counsel and any local counsel retained by them.

**21.3** **Costs of variations, amendments, enforcement etc.** The Borrower shall pay to the Agent, on the Agent's demand, for the account of the Creditor Party concerned, the amount of all expenses (including all legal fees) incurred by a Creditor Party in connection with:

(a) any amendment or supplement to a Finance Document, or any proposal for such an amendment to be made;

(b) any consent or waiver by the Lenders, the Majority Lenders or the Creditor Party concerned under or in connection with a Finance Document, or any request for such a consent or waiver;

(c) the valuation of any Collateral provided or offered under Clause 15 or any other matter relating to such Collateral; or

(d) any step taken by the Security Trustee or a Lender with a view to the protection, exercise or enforcement of any right or Security Interest created by a Finance Document or for any similar purpose (including costs, fees and expenses of lawyers, advisors, surveyors, accountants, investment bankers and other professionals engaged to assist Creditor Parties in connection therewith). There shall be recoverable under paragraph (d) the full amount of all legal expenses, whether or not such as would be allowed under rules of court or any taxation or other procedure carried out under such rules.

**21.4** **Documentary taxes.** The Borrower shall promptly pay any tax payable on or by reference to any Finance Document, and shall, on the Agent's demand, fully indemnify each Creditor Party against any claims, expenses, liabilities and losses resulting from any failure or delay by the Borrower to pay such a tax.

**21.5** **Certification of amounts.** A notice which is signed by an officer of a Creditor Party, which states that a specified amount, or aggregate amount, is due to that Creditor Party under this Clause 21 and which indicates (without necessarily specifying a detailed breakdown) the matters in respect of which the amount, or aggregate amount, is due shall be prima facie evidence that the amount, or aggregate amount, is due.

## 22. INDEMNITIES

**22.1** **Indemnities regarding borrowing and repayment of Loan.** The Borrower shall fully indemnify the Agent and each Lender on the Agent's demand and the Security Trustee on its demand in respect of all claims, expenses, liabilities and losses which are made or brought against or incurred by that Creditor Party, or which that Creditor Party reasonably and with due diligence estimates that it will incur, as a result of or in connection with:

(a) the Advance not being borrowed on the date specified in the Drawdown Notice for any reason other than a default by the Lender claiming the indemnity;

(b) the receipt or recovery of all or any part of the Loan or an overdue sum otherwise than on the last day of an Interest Period or other relevant period;

(c) any failure (for whatever reason) by the Borrower or any other Security Party to make payment of any amount due under a Finance Document on the due date or, if so payable, on demand (after giving credit for any default interest paid by the Borrower on the amount concerned under Clause 7); or

(d) the occurrence of an Event of Default or a Potential Event of Default and/or the acceleration of repayment of the Loan under Clause 20.

It is understood that the indemnities provided in this Clause 22.1 shall not apply to any claim cost or expense which is a tax levied by a taxing authority on the indemnified party (which taxes are subject to indemnity solely as provided in Clause 23 below) but shall apply to any other costs associated with any tax which is not a Non-indemnified Tax.

**22.2 Breakage costs.** Without limiting its generality, Clause 22.1 covers any claim, expense, liability or loss, including a loss of a prospective profit, incurred by a Lender:

(a) in liquidating or employing deposits from third parties acquired or arranged to fund or maintain all or any part of its Contribution and/or any overdue amount (or an aggregate amount which includes its Contribution or any overdue amount); and

(b) in terminating, or otherwise in connection with, any interest and/or currency swap or any other transaction entered into (whether with another legal entity or with another office or department of the Lender concerned) to hedge any exposure arising under this Agreement or that part which the Lender concerned determines is fairly attributable to this Agreement of the amount of the liabilities, expenses or losses (including losses of prospective profits) incurred by it in terminating, or otherwise in connection with, a number of transactions of which this Agreement is one.

**22.3 Miscellaneous indemnities.** The Borrower shall fully indemnify each Creditor Party severally on their respective demands in respect of all claims, expenses, liabilities and losses which may be made or brought against or incurred by a Creditor Party, in any country, as a result of or in connection with:

(a) any action taken, or omitted or neglected to be taken, under or in connection with any Finance Document by the Agent, the Security Trustee or any other Creditor Party or by any receiver appointed under a Finance Document; or

(b) any other Pertinent Matter,

other than claims, expenses, liabilities and losses which are shown to have been directly and mainly caused by the dishonesty or willful misconduct or gross negligence of the officers or employees of the Creditor Party concerned.

Without prejudice to its generality, this Clause 22.3 covers any claims, expenses, liabilities and losses which arise, or are asserted, under or in connection with any law relating to safety at sea, the ISM Code, the ISPS Code or any Environmental Law, or as a consequence of any facsimile or Email communication purporting to originate from any Security Party to any Creditor Party being made or delivered fraudulently or without proper authorization.

**22.4** **Currency indemnity.** If any sum due from the Borrower or any other Security Party to a Creditor Party under a Finance Document or under any order or judgment relating to a Finance Document has to be converted from the currency in which the Finance Document provided for the sum to be paid (the "**Contractual Currency**") into another currency (the "**Payment Currency**") for the purpose of:

(a) making or lodging any claim or proof against the Borrower or any other Security Party, whether in its liquidation, any arrangement involving it or otherwise; or

(b) obtaining an order or judgment from any court or other tribunal; or

(c) enforcing any such order or judgment,

the Borrower shall indemnify the Creditor Party concerned against the loss arising when the amount of the payment actually received by that Creditor Party is converted at the available rate of exchange into the Contractual Currency.

In this Clause 22.4, the "**available rate of exchange**" means the rate at which the Creditor Party concerned is able at the opening of business (London time) on the Business Day after it receives the sum concerned to purchase the Contractual Currency with the Payment Currency.

This Clause 22.4 creates a separate liability of the Borrower which is distinct from its other liabilities under the Finance Documents and which shall not be merged in any judgment or order relating to those other liabilities.

**22.5** **Certification of amounts.** A notice which is signed by an officer of a Creditor Party, which states that a specified amount, or aggregate amount, is due to that Creditor Party under this Clause 22 and which indicates (without necessarily specifying a detailed breakdown) the matters in respect of which the amount, or aggregate amount, is due shall be prima facie evidence that the amount, or aggregate amount, is due.

**22.6** **Sums deemed due to a Lender.** For the purposes of this Clause 22, a sum payable by the Borrower to the Agent or the Security Trustee for distribution to a Lender shall be treated as a sum due to that Lender.

## 23. NO SET-OFF OR TAX DEDUCTION; TAX INDEMNITY; FATCA

**23.1** **No deductions.** All amounts due from a Security Party under a Finance Document shall be paid:

(a) without any form of set-off, cross-claim or condition; and

(b) free and clear of any tax deduction except a tax deduction which such Security Party is required by law to make.

**23.2 Grossing-up for taxes.** If a Security Party is required by law to make a tax deduction from any payment:

(a) such Security Party shall notify the Agent as soon as it becomes aware of the requirement;

(b) such Security Party shall pay the tax deducted to the appropriate taxation authority promptly, and in any event before any fine or penalty arises; and

(c) except if the deduction is for collection or payment of a Non-indemnified Tax of a Creditor Party, the amount due in respect of the payment shall be increased by the amount necessary to ensure that each Creditor Party receives and retains (free from any liability relating to the tax deduction) a net amount which, after the tax deduction, is equal to the full amount which it would otherwise have received.

**23.3 Evidence of payment of taxes.** Within one (1) month after making any tax deduction, the relevant Security Party shall deliver to the Agent documentary evidence satisfactory to the Agent that the tax had been paid to the appropriate taxation authority.

**23.4 Tax credits**. A Creditor Party which receives for its own account a repayment or credit in respect of tax on account of which the Borrower has made an increased payment under Clause 23.2 shall pay to the Borrower a sum equal to the proportion of the repayment or credit which that Creditor Party allocates to the amount due from the Borrower in respect of which the Borrower made the increased payment, **provided that**:

(a) the Creditor Party shall not be obliged to allocate to this transaction any part of a tax repayment or credit which is referable to a class or number of transactions;

(b) nothing in this Clause 23.4 shall oblige a Creditor Party to arrange its tax affairs in any particular manner, to claim any type of relief, credit, allowance or deduction instead of, or in priority to, another or to make any such claim within any particular time;

(c) nothing in this Clause 23.4 shall oblige a Creditor Party to make a payment which would leave it in a worse position than it would have been in if the Borrower had not been required to make a tax deduction from a payment; and

(d) any allocation or determination made by a Creditor Party under or in connection with this Clause 23.4 shall be conclusive and binding on the Borrower and the other Creditor Parties.

**23.5 Indemnity for taxes.** The Borrower hereby indemnifies and agrees to hold each Creditor Party harmless from and against all taxes other than Non-indemnified Taxes levied on such Creditor Party (including, without limitation, taxes imposed on any amounts payable under this Clause 23.5) paid or payable by such person, whether or not such taxes or other taxes were correctly or legally asserted. Such indemnification shall be paid within 10 days from the date on which such Creditor Party makes written demand therefore specifying in reasonable detail the nature and amount of such taxes or other taxes.

**23.6 Exclusion from indemnity and gross-up for taxes.** The Borrower shall not be required to indemnify any Creditor Party for a tax pursuant to Clause 23.5, or to pay any additional amounts to any Creditor Party pursuant to Clause 23.2, to the extent that the tax is collected by withholding on payments (a "**Withholding**") and is levied by a Pertinent Jurisdiction of the payer and:

(a) the person claiming such indemnity or additional amounts was not an original party to this agreement and under applicable law (after taking into account relevant treaties and assuming that such person has provided all forms it may legally and truthfully provided) on the date such person became a party to this Agreement a Withholding would have been required on such payment **provided that** this exclusion shall not apply to the extent such Withholding does not exceed the Withholding that would have been applicable if such payment had been made to the person from whom such person acquired its rights under the Agreement and this exclusion shall not apply to the extent that such Withholding exceeds the amount of Withholding that would have been required under the law in effect on the date such person became a party to this Agreement; or

(b) the person claiming such indemnity or additional amounts is a Lender who has changed its Lending Office and under applicable law (after taking into account relevant treaties and assuming that such Lender has provided all forms it may legally and truthfully provide) on the date such Lender changed its Lending Office Withholding would have been required on such payment **provided that** this exclusion shall not apply to the extent such Withholding does not exceed the Withholding that would have been applicable to such payment if such Lender had not changed its Lending Office and this exclusion shall not apply to the extent that the Withholding exceeds the amount of Withholding that would have been required under the law in effect immediately after such Lender changed its Lending Office; or

(c) in the case of a Lender, to the extent that Withholding would not have been required on such payment if such Lender has complied with its obligations to deliver certain tax form pursuant to Section 23.7 below.

**23.7 FATCA Information**

(a) Subject to paragraph (c) below, each Party shall, within ten Business Days of a reasonable request by another Party:

(i) confirm to that other Party whether it is:

(A) a FATCA Exempt Party; or

(B) not a FATCA Exempt Party; and

(ii) supply to that other Party such forms (including IRS Form W-8 or Form W-9 or any successor or substitute form, as applicable), documentation and other information relating to its status under FATCA as that other Party reasonably requests for the purposes of that other Party's compliance with FATCA.

(b) If a Party confirms to another Party pursuant to paragraph (a) above that it is a FATCA Exempt Party or provides an IRS Form W-8 or W-9 showing that it is a FATCA Exempt Party

and it subsequently becomes aware that it is not, or has ceased to be a FATCA Exempt Party, or that the IRS Form has ceased to be accurate or valid, that Party shall notify that other Party or provide a revised IRS Form, as applicable, reasonably promptly.

(c) Paragraph (a) above shall not oblige any Creditor Party to do anything which would or might in its reasonable opinion constitute a breach of:

(i) any law or regulation;

(ii) any fiduciary duty; or

(iii) any duty of confidentiality;

**provided that** nothing in this paragraph shall excuse any Creditor Party from providing a true, complete and correct IRS Form W-8 or W-9 (or any successor or substitute form where applicable). Any information provided on such IRS Form W-8 or W-9 (or any successor or substitute forms) shall not be treated as confidential information of such party for purposes of this paragraph.

(d) If a Party fails to confirm its status or to supply forms, documentation or other information requested in accordance with paragraph (a) above (including, for the avoidance of doubt, where paragraph (c) above applies), then such Party shall be treated for the purposes of the Finance Documents as if it is not a FATCA Exempt Party until such time as the Party in question provides the requested confirmation, forms, documentation or other information.

**23.8 FATCA Deduction**

(a) Each Party may make any FATCA Deduction as it reasonably determines is required to be made by FATCA, and any payment required in connection with that FATCA Deduction, and no Party shall be required to increase any payment in respect of which it makes such a FATCA Deduction or otherwise compensate the recipient of the payment for that FATCA Deduction.

(b) Each Party shall promptly, upon becoming aware that it must make a FATCA Deduction (or that there is any change in the rate or the basis of such FATCA Deduction) notify the Party to whom it is making the payment and, in addition, shall notify the Borrower and the Agent, and the Agent shall notify the other Creditor Parties.

(c) If a FATCA Deduction is made as a result of any Creditor Party failing to be a FATCA Exempt Party, such Party shall indemnify each other Creditor Party against any loss, cost or expense to it resulting from such FATCA Deduction.

**24. ILLEGALITY, ETC**

**24.1 Illegality.** If it becomes unlawful in any applicable jurisdiction for a Lender (the "**Notifying Lender**") to perform any of its obligations as contemplated by this Agreement or to fund or maintain its participation in any Advance:

(a) the Notifying Lender shall promptly notify the Agent upon becoming aware of that event;

(b) upon the Agent notifying the Borrower and the other Creditor Parties, the Commitment of the Notifying Lender will be immediately cancelled; and

(c) the Borrower shall repay the Notifying Lender's participation in each Advance on the last day of the Interest Period for each Advance occurring after the Agent has notified the Borrower or, if earlier, the date specified by the Notifying Lender in the notice delivered to the Agent (being no earlier than the last day of any applicable grace period permitted by law).

**24.2** **Mitigation**. If circumstances arise which would result in a notification under Clause 24.1 then, without in any way limiting the obligations of the Borrower under Clause 24.1, the Notifying Lender shall use reasonable commercial efforts to transfer its obligations, liabilities and rights under this Agreement and the Finance Documents to another office or financial institution not affected by the circumstances but the Notifying Lender shall not be under any obligation to take any such action if, in its opinion, to do would or might:

(a) have a Material Adverse Effect; or

(b) involve it in any activity which is unlawful or prohibited or any activity that is contrary to, or inconsistent with, any regulation; or

(c) involve it in any expense (unless indemnified to its satisfaction) or tax disadvantage.

**25. INCREASED COSTS**

**25.1** **Increased costs.** This Clause 25 applies if a Lender (the "**Notifying Lender**") notifies the Agent that the Notifying Lender considers that as a result of:

(a) the introduction or alteration after the date of this Agreement of a law or an alteration after the date of this Agreement in the manner in which a law is interpreted or applied (disregarding any effect which relates to the application to payments under this Agreement of a Non-indemnified Tax); or

(b) complying with any regulation (including any which relates to capital adequacy or liquidity controls or which affects the manner in which the Notifying Lender allocates capital resources to its obligations under this Agreement) which is introduced, or altered, or the interpretation or application of which is altered, after the date of this Agreement,

the Notifying Lender (or a parent company of it) has incurred or will incur an "**increased cost**".

Notwithstanding anything herein to the contrary, the Dodd-Frank Wall Street Reform and Consumer Protection Act, and all requests, rules, guidelines and directives promulgated thereunder, are deemed to have been introduced or adopted after the date hereof, regardless of the date enacted or adopted.

**25.2 Meaning of "increased costs".** In this Clause 25, "**increased costs**" means, in relation to a Notifying Lender:

(a) an additional or increased cost incurred as a result of, or in connection with, the Notifying Lender having entered into, or being a party to, this Agreement or having taken an assignment of rights under this Agreement, of funding or maintaining its Commitment or Contribution or performing its obligations under this Agreement, or of having outstanding all or any part of its Contribution or other unpaid sums;

(b) a reduction in the amount of any payment to the Notifying Lender under this Agreement or in the effective return which such a payment represents to the Notifying Lender or on its capital;

(c) an additional or increased cost of funding all or maintaining all or any of the advances comprised in a class of advances formed by or including the Notifying Lender's Contribution or (as the case may require) the proportion of that cost attributable to the Contribution; or

(d) a liability to make a payment, or a return foregone, which is calculated by reference to any amounts received or receivable by the Notifying Lender under this Agreement;

but not an item attributable to a change in the rate of tax on the overall net income of the Notifying Lender (or a parent company of it) or an item covered by the indemnity for tax in Clause 23 or a FATCA Deduction.

For the purposes of this Clause 25.2 the Notifying Lender may in good faith allocate or spread costs and/or losses among its assets and liabilities (or any class of its assets and liabilities) on such basis as it considers appropriate.

**25.3 Notification to Borrower of claim for increased costs.** The Agent shall promptly notify the Borrower and the other Security Parties of the notice which the Agent received from the Notifying Lender under Clause 25.1.

**25.4 Payment of increased costs.** The Borrower shall pay to the Agent, on the Agent's demand, for the account of the Notifying Lender the amounts which the Agent from time to time notifies the Borrower that the Notifying Lender has specified to be necessary to compensate the Notifying Lender for the increased cost.

**25.5 Notice of prepayment.** If the Borrower is not willing to continue to compensate the Notifying Lender for the increased cost under Clause 25.4, the Borrower may give the Agent not less than 14 days' notice of their intention to prepay the Notifying Lender's Contribution.

**25.6 Prepayment; termination of Commitment.** A notice under Clause 25.5 shall be irrevocable; the Agent shall promptly notify the Notifying Lender of the Borrower's notice of intended prepayment; and:

(a) on the date on which the Agent serves that notice, the Commitment of the Notifying Lender shall be cancelled; and

(b) on the date specified in its notice of intended prepayment, the Borrower shall prepay (without premium or penalty but subject to any applicable prepayment fee under Clause 8.10(c)) the Notifying Lender's Contribution, together with accrued interest thereon at the Interest Rate.

**25.7 Application of prepayment.** Clause 8.11 shall apply in relation to the prepayment.

**26. SET-OFF**

**26.1 Application of credit balances.** Upon the occurrence and during the continuance of an Event of Default, each Creditor Party may without prior notice:

(a) apply any balance (whether or not then due) which at any time stands to the credit of any account in the name of the Borrower at any office in any country of that Creditor Party in or towards satisfaction of any sum then due from the Borrower to that Creditor Party under any of the Finance Documents; and

(b) for that purpose:

(i) break, or alter the maturity of, all or any part of a deposit of the Borrower;

(ii) convert or translate all or any part of a deposit or other credit balance into Dollars; and

(iii) enter into any other transaction or make any entry with regard to the credit balance which the Creditor Party concerned considers appropriate.

**26.2 Existing rights unaffected.** No Creditor Party shall be obliged to exercise any of its rights under Clause 26.1; and those rights shall be without prejudice and in addition to any right of set-off, combination of accounts, charge, lien or other right or remedy to which a Creditor Party is entitled (whether under the general law or any document).

**26.3 Sums deemed due to a Lender.** For the purposes of this Clause 26, a sum payable by the Borrower to the Agent or the Security Trustee for distribution to, or for the account of, a Lender shall be treated as a sum due to that Lender; and each Lender's proportion of a sum so payable for distribution to, or for the account of, the Lenders shall be treated as a sum due to such Lender.

**26.4 No Security Interest.** This Clause 26 gives the Creditor Parties a contractual right of set-off only, and does not create any Security Interest over any credit balance of the Borrower.

**27. TRANSFERS AND CHANGES IN LENDING OFFICES**

**27.1 Transfer by Borrower.** The Borrower may not, without the consent of the Agent, given on the instructions of all the Lenders, transfer any of its rights, liabilities or obligations under any Finance Document.

**27.2 Transfer by a Lender.** Subject to Clause 27.4, a Lender (the "**Transferor Lender**") may at any time, without needing the consent of the Borrower or any other Security Party, at the Transferor Lender's sole expense, cause:

(a) its rights in respect of all or part of its Contribution; or

(b) its obligations in respect of all or part of its Commitment; or

(c) a combination of (a) and (b),

to be (in the case of its rights) transferred to, or (in the case of its obligations) assumed by, any bank or financial institution or trust, fund or other entity (a "**Transferee Lender**") which is not an Affiliate of the Borrower, by delivering to the Agent a completed certificate in the form set out in Schedule 4 with any modifications approved or required by the Agent (a "**Transfer Certificate**") executed by the Transferor Lender and the Transferee Lender.

Notwithstanding the foregoing, any rights and obligations of the Transferor Lender in its capacity as Agent or Security Trustee shall be determined in accordance with Clause 31.

**27.3 Transfer Certificate, delivery and notification.** As soon as reasonably practicable after a Transfer Certificate is delivered to the Agent, it shall (unless it has reason to believe that the Transfer Certificate may be defective):

(a) sign the Transfer Certificate on behalf of itself, the Borrower, the other Security Parties, the Security Trustee and each of the other Lenders;

(b) on behalf of the Transferee Lender, send to the Borrower and each other Security Party letters or faxes notifying them of the Transfer Certificate and attaching a copy of it;

(c) send to the Transferee Lender copies of the letters or faxes sent under paragraph (b),

but the Agent shall only be obliged to execute a Transfer Certificate delivered to it by the Transferor Lender and the Transferee Lender once it is satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations to the transfer to that Transferee Lender.

**27.4 Effective Date of Transfer Certificate.** A Transfer Certificate becomes effective on the date, if any, specified in the Transfer Certificate as its effective date, **provided that** it is signed by the Agent under Clause 27.3 on or before that date.

**27.5 No transfer without Transfer Certificate.** Except as provided in Clause 27.17, no assignment or transfer of any right or obligation of a Lender under any Finance Document is binding on, or effective in relation to, the Borrower, any other Security Party, the Agent or the Security Trustee unless it is effected, evidenced or perfected by a Transfer Certificate.

**27.6 Lender re-organization; waiver of Transfer Certificate.** If a Lender enters into any merger, de-merger or other reorganization as a result of which all its rights or obligations vest in a successor, the Agent may, if it sees fit, by notice to the successor and the Borrower and the Security Trustee waive the need for the execution and delivery of a Transfer Certificate and, upon service of the Agent's notice, the successor shall become a Lender with the same Commitment and Contribution as were held by the predecessor Lender.

**27.7 Effect of Transfer Certificate.** The effect of a Transfer Certificate is as follows:

(a) to the extent specified in the Transfer Certificate, all rights and interests (present, future or contingent) which the Transferor Lender has under or by virtue of the Finance Documents are assigned to the Transferee Lender absolutely, free of any defects in the Transferor Lender's title and of any rights or equities which the Borrower or any other Security Party had against the Transferor Lender;

(b) the Transferor Lender's Commitment is discharged to the extent specified in the Transfer Certificate;

(c) the Transferee Lender becomes a Lender with the Contribution previously held by the Transferor Lender and a Commitment of an amount specified in the Transfer Certificate;

(d) the Transferee Lender becomes bound by all the provisions of the Finance Documents which are applicable to the Lenders generally, including those about pro-rata sharing and the exclusion of liability on the part of, and the indemnification of, the Agent and the Security Trustee and, to the extent that the Transferee Lender becomes bound by those provisions (other than those relating to exclusion of liability), the Transferor Lender ceases to be bound by them;

(e) any part of the Loan which the Transferee Lender advances after the Transfer Certificate's effective date ranks in point of priority and security in the same way as it would have ranked had it been advanced by the transferor, assuming that any defects in the transferor's title and any rights or equities of the Borrower or any other Security Party against the Transferor Lender had not existed;

(f) the Transferee Lender becomes entitled to all the rights under the Finance Documents which are applicable to the Lenders generally, including but not limited to those relating to the Majority Lenders and those under Clause 21, and to the extent that the Transferee Lender becomes entitled to such rights, the Transferor Lender ceases to be entitled to them; and

(g) in respect of any breach of a warranty, undertaking, condition or other provision of a Finance Document or any misrepresentation made in or in connection with a Finance Document, the Transferee Lender shall be entitled to recover damages by reference to the loss incurred by it as a result of the breach or misrepresentation, irrespective of whether the original Lender would have incurred a loss of that kind or amount.

The rights and equities of the Borrower or any other Security Party referred to above include, but are not limited to, any right of set off and any other kind of cross-claim.

**27.8 Maintenance of register of Lenders.** During the Security Period the Agent shall maintain a register in which it shall record the name, Commitment, Contribution and administrative details (including the lending office) from time to time of each Lender holding a Transfer Certificate and the effective date (in accordance with Clause 27.4) of the Transfer Certificate; and the Agent shall make the register available for inspection by any Lender, the Security Trustee and the Borrower during normal banking hours, subject to receiving at least three (3) Business Days' prior notice.

**27.9 Reliance on register of Lenders.** The entries on that register shall, in the absence of manifest error, be conclusive in determining the identities of the Lenders and the amounts of their Commitments and Contributions and the effective dates of Transfer Certificates and may be relied upon by the Agent and the other parties to the Finance Documents for all purposes relating to the Finance Documents.

**27.10 Authorization of Agent to sign Transfer Certificates.** The Borrower, the Security Trustee and each Lender irrevocably authorizes the Agent to sign Transfer Certificates on its behalf.

**27.11 Registration fee.** In respect of any Transfer Certificate, the Agent shall be entitled to recover a registration fee of $3,000 from the Transferor Lender or (at the Agent's option) the Transferee Lender.

**27.12 Sub-participation; subrogation assignment.** A Lender may sub-participate all or any part of its rights and/or obligations under or in connection with the Finance Documents without the consent of, or any notice to, the Borrower, any other Security Party, the Agent or the Security Trustee; and the Lenders may assign, in any manner and terms agreed by the Majority Lenders, the Agent and the Security Trustee, all or any part of those rights to an insurer or surety who has become subrogated to them.

**27.13 Disclosure of information.** A Lender may disclose to a potential Transferee Lender or sub-participant any information which the Lender has received in relation to the Borrower, any other Security Party or their affairs under or in connection with any Finance Document, unless the information is clearly of a confidential nature; provided that such Lender has taken commercially reasonable efforts to ensure that any person to whom such Lender passes any information in accordance with the terms of this Clause 27.13 undertakes to maintain the confidentiality of such information.

**27.14 Change of lending office.** A Lender may change its lending office by giving notice to the Agent and the change shall become effective on the later of:

(a) the date on which the Agent receives the notice; and

(b) the date, if any, specified in the notice as the date on which the change will come into effect.

**27.15 Notification.** On receiving such a notice, the Agent shall notify the Borrower and the Security Trustee; and, until the Agent receives such a notice, it shall be entitled to assume that a Lender is acting through the lending office of which the Agent last had notice.

**27.16 Intentionally omitted**.

**27.17 Security over Lenders' rights.** In addition to the other rights provided to Lenders under this Clause 27, each Lender may without consulting with or obtaining consent from the Borrower or any other Security Party, at any time charge, assign or otherwise create a Security Interest in or over (whether by way of collateral or otherwise) all or any of its rights under any Finance Document to secure obligations of that Lender including, without limitation:

(a) any charge, assignment or other Security Interest to secure obligations to a federal reserve or central bank; and

(b) in the case of any Lender which is a fund, any charge, assignment or other Security Interest granted to any holders (or trustee or representatives of holders) of obligations owed, or securities issued, by that Lender as security for those obligations or securities;

except that no such charge, assignment or Security Interest shall:

(i) release a Lender from any of its obligations under the Finance Documents or substitute the beneficiary of the relevant charge, assignment or Security Interest for the Lender as a party to any of the Finance Documents; or

(ii) require any payments to be made by the Borrower or any other Security Party or grant to any person any more extensive rights than those required to be made or granted to the relevant Lender under the Finance Documents.

**28. VARIATIONS AND WAIVERS**

**28.1 Variations, waivers etc. by Majority Lenders.** Subject to Clause 28.2, a document shall be effective to vary, waive, suspend or limit any provision of a Finance Document, or any Creditor Party's rights or remedies under such a provision or the general law, only if the document is signed, or specifically agreed to by fax or Email, by the Borrower, by the Agent on behalf and with the approval of the Majority Lenders, by the Agent and the Security Trustee in their own rights, and, if the document relates to a Finance Document to which a Security Party is party, by that Security Party.

**28.2 Variations, waivers etc. requiring agreement of all Lenders.** As regards the following, Clause 28.1 applies as if the words "by the Agent on behalf and with the approval of the Majority Lenders" were replaced by the words "by or on behalf and with the approval of every Lender":

(a) a reduction in the Interest Rate;

(b) a postponement to the date for, or a reduction in the amount of, any payment of principal, interest, fees or other sum payable under this Agreement or the Note;

(c) an increase in any Lender's Commitment;

(d) a change to the definition of "**Majority Lenders**";

(e) a change to Clause 11.2 or this Clause 28;

(f) any release of, or material variation to, a Security Interest, guarantee, indemnity or subordination arrangement set out in a Finance Document; and

(g) any other change or matter as regards which this Agreement or another Finance Document expressly provides that each Lender's consent is required.

**28.3** **Variations, waivers etc. relating to the Servicing Banks.** An amendment or waiver that relates to the rights or obligations of the Agent or the Security Trustee under Clause 31 may not be effected without the consent of the Agent or the Security Trustee.

**28.4** **Exclusion of other or implied variations.** Except for a document which satisfies the requirements of Clauses 28.1, 28.2 or 28.3, no document, and no act, course of conduct, failure or neglect to act, delay or acquiescence on the part of the Creditor Parties or any of them (or any person acting on behalf of any of them) shall result in the Creditor Parties or any of them (or any person acting on behalf of any of them) being taken to have varied, waived, suspended or limited, or being precluded (permanently or temporarily) from enforcing, relying on or exercising:

(a) a provision of this Agreement or another Finance Document; or

(b) an Event of Default; or

(c) a breach by the Borrower or another Security Party of an obligation under a Finance Document or the general law; or

(d) any right or remedy conferred by any Finance Document or by the general law,

and there shall not be implied into any Finance Document any term or condition requiring any such provision to be enforced, or such right or remedy to be exercised, within a certain or reasonable time.

**29.** **NOTICES**

**29.1** **General.** Unless otherwise specifically provided, any notice under or in connection with any Finance Document shall be given by letter, electronic mail ("**Email**") or fax and references in the Finance Documents to written notices, notices in writing and notices signed by particular persons shall be construed accordingly.

**29.2** **Addresses for communications.** A notice by letter, Email or fax shall be sent:

(a) to the Borrower:

NIMR INTERNATIONAL L.L.C
Muscat, Ghala, Al Nadha Towers 2
5th Floor, Office No.1
PO Box 254, PC 111
Oman
Tel: +968 24 503003
email: shipping@nimr.com

(b) to a Lender:

At the address below its name in Schedule 1 or (as the case may require) in the relevant Transfer Certificate.

(c) to the Agent or the Security Trustee:

Old Hill Partners Inc.

1120 Boston Post Road, 2nd Floor
Darien, CT 06820
Attention: John C. Howe
E-mail: Jhowe@oldhill.com
Telephone: 203-656-3004

or to such other address as the relevant party may notify the Agent or, if the relevant party is the Agent or the Security Trustee, the Borrower, the Lenders and the Security Parties.

**29.3 Effective date of notices.** Subject to Clauses 29.4 and 29.5:

(a) a notice which is delivered personally or posted shall be deemed to be served, and shall take effect, at the time when it is delivered;

(b) a notice which is sent by Email shall be deemed to be served, and shall take effect, at the time when it is actually received in readable form; and

(c) a notice which is sent by fax shall be deemed to be served, and shall take effect, two (2) hours after its transmission is completed.

**29.4 Service outside business hours.** However, if under Clause 29.3 a notice would be deemed to be served:

(a) on a day which is not a business day in the place of receipt; or

(b) on such a business day, but after 5:00 p.m. local time,

the notice shall (subject to Clause 29.5) be deemed to be served, and shall take effect, at 9:00 a.m. on the next day which is such a business day.

**29.5 Illegible notices.** Clauses 29.3 and 29.4 do not apply if the recipient of a notice notifies the sender within one (1) hour after the time at which the notice would otherwise be deemed to be served that the notice has been received in a form which is illegible in a material respect.

**29.6 Valid notices.** A notice under or in connection with a Finance Document shall not be invalid by reason that its contents or the manner of serving it do not comply with the requirements of this Agreement or, where appropriate, any other Finance Document under which it is served if:

(a) the failure to serve it in accordance with the requirements of this Agreement or other Finance Document, as the case may be, has not caused any party to suffer any significant loss or prejudice; or

(b) in the case of incorrect and/or incomplete contents, it should have been reasonably clear to the party on which the notice was served what the correct or missing particulars should have been.

**29.7 Electronic communication between the Agent and a Lender.** Any communication to be made between the Agent and a Lender under or in connection with the Finance Documents may be made by Email or other electronic means, if the Agent and the relevant Lender:

(a) agree that, unless and until notified to the contrary, this is to be an accepted form of communication;

(b) notify each other in writing of their Email address and/or any other information required to enable the sending and receipt of information by that means; and

(c) notify each other of any change to their respective Email addresses or any other such information supplied to them.

Any electronic communication made between the Agent and a Lender will be effective only when actually received in readable form and, in the case of any electronic communication made by a Lender to the Agent, only if it is addressed in such a manner as the Agent shall specify for this purpose.

**29.8 English language.** Any notice under or in connection with a Finance Document shall be in English.

**29.9 Meaning of "notice".** In this Clause 29, "**notice**" includes any demand, consent, authorization, approval, instruction, waiver or other communication.

**30. SUPPLEMENTAL**

**30.1 Rights cumulative, non-exclusive.** The rights and remedies which the Finance Documents give to each Creditor Party are:

(a) cumulative;

(b) may be exercised as often as appears expedient; and

(c) shall not, unless a Finance Document explicitly and specifically states so, be taken to exclude or limit any right or remedy conferred by any law.

**30.2 Severability of provisions.** If any provision of a Finance Document is or subsequently becomes void, unenforceable or illegal, that shall not affect the validity, enforceability or legality of the other provisions of that Finance Document or of the provisions of any other Finance Document.

**30.3 Counterparts.** A Finance Document may be executed in any number of counterparts.

**30.4 Binding Effect.** This Agreement shall become effective on the Effective Date and thereafter shall be binding upon and inure to the benefit of each of the parties hereto and their respective successors and assigns.

**31. THE SERVICING BANKS**

**31.1 Appointment and Granting**.

(a) **The Agent**. Each of the Lenders appoints and authorizes (with a right of revocation) the Agent to act as its agent hereunder and under any of the other Finance Documents with such powers as are specifically delegated to the Agent by the terms of this Agreement

and of any of the other Finance Documents, together with such other powers as are reasonably incidental thereto.

(b) **The Security Trustee**.

(i) **Authorization of Security Trustee**. Each of the Lenders and the Agent appoints and authorizes (with a right of revocation) the Security Trustee to act as security trustee hereunder and under the other Finance Documents (other than the Notes) with such powers as are specifically delegated to the Security Trustee by the terms of this Agreement and such other Finance Documents, together with such other powers as are reasonably incidental thereto.

(ii) **Granting Clause**. To secure the payment of all sums of money from time to time owing to the Lenders under the Finance Documents, and the performance of the covenants of the Borrower and any other Security Party herein and therein contained, and in consideration of the premises and of the covenants herein contained and of the extensions of credit by the Lenders, the Security Trustee does hereby declare that it will hold as such trustee in trust for the benefit of the Lenders and the Agent, from and after the execution and delivery thereof, all of its right, title and interest as mortgagee in, to and under the Mortgage and its right, title and interest as assignee and secured party under the other Finance Documents (the right, title and interest of the Security Trustee in and to the property, rights and privileges described above, from and after the execution and delivery thereof, and all property hereafter specifically subjected to the Security Interest of the indenture created hereby and by the Finance Documents by any amendment hereto or thereto are herein collectively called the "**Estate**"); TO HAVE AND TO HOLD the Estate unto the Security Trustee and its successors and assigns forever, BUT IN TRUST, NEVERTHELESS, for the equal and proportionate benefit and security of the Lenders and the Agent and their respective successors and assigns without any priority of any one over any other, UPON THE CONDITION that, unless and until an Event of Default under this Agreement shall have occurred and be continuing, the relevant Security Party shall be permitted, to the exclusion of the Security Trustee, to possess and use the Ships. IT IS HEREBY COVENANTED, DECLARED AND AGREED that all property subject or to become subject hereto is to be held, subject to the further covenants, conditions, uses and trusts hereinafter set forth, and each Security Party, for itself and its respective successors and assigns, hereby covenants and agrees to and with the Security Trustee and its successors in said trust, for the equal and proportionate benefit and security of the Lenders and the Agent as hereinafter set forth.

(iii) **Acceptance of Trusts**. The Security Trustee hereby accepts the trusts imposed upon it as Security Trustee by this Agreement, and the Security Trustee covenants and agrees to perform the same as herein expressed and agrees to receive and disburse all monies constituting part of the Estate in accordance with the terms hereof.

**31.2 Scope of Duties**. Neither the Agent nor the Security Trustee (which terms as used in this sentence and in Clause 31.5 hereof shall include reference to their respective affiliates and their own

respective and their respective affiliates' officers, directors, employees, agents and attorneys-in-fact):

(a) shall have any duties or responsibilities except those expressly set forth in this Agreement and in any of the Finance Documents, and shall not by reason of this Agreement or any of the Finance Documents be (except, with respect to the Security Trustee, as specifically stated to the contrary in this Agreement) a trustee for a Lender;

(b) shall be responsible to the Lenders for any recitals, statements, representations or warranties contained in this Agreement or in any of the Finance Documents, or in any certificate or other document referred to or provided for in, or received by any of them under, this Agreement or any of the other Finance Documents, or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any of the other Finance Documents or any other document referred to or provided for herein or therein or for any failure by a Security Party or any other person to perform any of its obligations hereunder or thereunder or for the location, condition or value of any property covered by any Security Interest under any of the Finance Documents or for the creation, perfection or priority of any such Security Interest;

(c) shall be required to initiate or conduct any litigation or collection proceedings hereunder or under any of the Finance Documents unless expressly instructed to do so in writing by the Majority Lenders; or

(d) shall be responsible for any action taken or omitted to be taken by it hereunder or under any of the Finance Documents or under any other document or instrument referred to or provided for herein or therein or in connection herewith or therewith, except for its own gross negligence or willful misconduct. Each of the Security Trustee and the Agent may employ agents and attorneys-in-fact and neither the Security Trustee nor the Agent shall be responsible for the negligence or misconduct of any such agents or attorneys-in-fact selected by it in good faith. Each of the Security Trustee and the Agent may deem and treat the payee of a Note as the holder thereof for all purposes hereof unless and until a written notice of the assignment or transfer thereof shall have been filed with the Agent.

**31.3** **Reliance**. Each of the Security Trustee and the Agent shall be entitled to rely upon any certification, notice or other communication (including any thereof by telephone, telex, telefacsimile, telegram or cable) believed by it to be genuine and correct and to have been signed or sent by or on behalf of the proper person or persons, and upon advice and statements of legal counsel, independent accountants and other experts selected by the Security Trustee or the Agent, as the case may be. As to any matters not expressly provided for by this Agreement or any of the other Finance Documents, each of the Security Trustee and the Agent shall in all cases be fully protected in acting, or in refraining from acting, hereunder or thereunder in accordance with instructions signed by the Majority Lenders, and such instructions and any action taken or failure to act pursuant thereto shall be binding on all of the Lenders.

**31.4** **Knowledge.** Neither the Security Trustee nor the Agent shall be deemed to have knowledge or notice of the occurrence of a Potential Event of Default or Event of Default (other than, in the case of the Agent, the non-payment of principal of or interest on the Loan or actual knowledge thereof) unless each of the Security Trustee and the Agent has received notice from a Lender or

the Borrower specifying such Potential Event of Default or Event of Default and stating that such notice is a "Notice of Default". If the Agent receives such a notice of the occurrence of such Potential Event of Default or Event of Default, the Agent shall give prompt notice thereof to the Security Trustee and the Lenders (and shall give each Lender prompt notice of each such non-payment). Subject to Clause 31.8 hereof, the Security Trustee and the Agent shall take such action with respect to such Potential Event of Default or Event of Default or other event as shall be directed by the Majority Lenders, except that, unless and until the Security Trustee and the Agent shall have received such directions, each of the Security Trustee and the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Potential Event of Default or Event of Default or other event as it shall deem advisable in the best interest of the Lenders.

**31.5 Security Trustee and Agent as Lenders**. Each of the Security Trustee and the Agent (and any successor acting as Security Trustee or Agent, as the case may be) in its individual capacity as a Lender hereunder shall have the same rights and powers hereunder as any other Lender and may exercise the same as though it were not acting as the Security Trustee or the Agent, as the case may be, and the term "Lender" or "Lenders" shall, unless the context otherwise indicates, include each of the Security Trustee and the Agent in their respective individual capacities. Each of the Security Trustee and the Agent (and any successor acting as Security Trustee and Agent, as the case may be) and their respective affiliates may (without having to account therefor to a Lender) accept deposits from, lend money to and generally engage in any kind of banking, trust or other business with the Borrower and any of their subsidiaries or affiliates as if it were not acting as the Security Trustee or the Agent, as the case may be, and each of the Security Trustee and the Agent and their respective affiliates may accept fees and other consideration from the Borrower for services in connection with this Agreement or otherwise without having to account for the same to the Lenders.

**31.6 Indemnification of Security Trustee and Agent.** The Lenders severally agree, ratably in accordance with the aggregate principal amount of each Lender's Contribution in the Loan, to indemnify each of the Agent and the Security Trustee (to the extent not reimbursed under other provisions of this Agreement, but without limiting the obligations of the Borrower under said other provisions) for any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind and nature whatsoever which may be imposed on, incurred by or asserted against the Security Trustee or the Agent in any way relating to or arising out of this Agreement or any of the other Finance Documents or any other documents contemplated by or referred to herein or therein or the transactions contemplated hereby (including, without limitation, the costs and expenses which the Borrower is to pay hereunder, but excluding, unless an Event of Default has occurred and is continuing, normal administrative costs and expenses incident to the performance of their respective agency duties hereunder) or the enforcement of any of the terms hereof or thereof or of any such other documents, except that no Lender shall be liable for any of the foregoing to the extent they arise from the gross negligence or willful misconduct of the party to be indemnified.

**31.7 Reliance on Security Trustee or Agent.** Each Lender agrees that it has, independently and without reliance on the Security Trustee, the Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own credit analysis of the Borrower and decision to enter into this Agreement and that it will, independently and without reliance upon the Security Trustee, the Agent or any other Lender, and based on such documents and

information as it shall deem appropriate at the time, continue to make its own analysis and decisions in taking or not taking action under this Agreement or any of the Finance Documents. None of the Security Trustee or the Agent shall be required to keep itself informed as to the performance or observance by the Borrower of this Agreement or any of the Finance Documents or any other document referred to or provided for herein or therein or to inspect the properties or books of the Borrower. Except for notices, reports and other documents and information expressly required to be furnished to the Lenders by the Security Trustee or the Agent hereunder, neither the Security Trustee nor the Agent shall have any duty or responsibility to provide a Lender with any credit or other information concerning the affairs, financial condition or business of the Borrower or any subsidiaries or affiliates thereof which may come into the possession of the Security Trustee, the Agent or any of their respective affiliates.

**31.8 Actions by Security Trustee and Agent.** Except for action expressly required of the Security Trustee or the Agent hereunder and under the other Finance Documents, each of the Security Trustee and the Agent shall in all cases be fully justified in failing or refusing to act hereunder and thereunder unless it shall receive further assurances to its satisfaction from the Lenders of their indemnification obligations under Clause 31.6 against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.

**31.9 Resignation and Removal.** Subject to the appointment and acceptance of a successor Security Trustee or Agent (as the case may be) as provided below, each of the Security Trustee and the Agent may resign at any time by giving notice thereof to the Lenders and the Borrower, and the Security Trustee or the Agent may be removed at any time with or without cause by the Majority Lenders by giving notice thereof to the Agent, the Security Trustee, the Lenders and the Borrower. Upon any such resignation or removal, the Majority Lenders shall have the right to appoint a successor Security Trustee or Agent, as the case may be. If no successor Security Trustee or Agent, as the case may be, shall have been so appointed by the Lenders or, if appointed, shall not have accepted such appointment within 30 days after the retiring Security Trustee's or Agent's, as the case may be, giving of notice of resignation or the Majority Lenders' removal of the retiring Security Trustee or Agent, as the case may be, then the retiring Security Trustee or Agent, as the case may be, may, on behalf of the Lenders, appoint a successor Security Trustee or Agent. Upon the acceptance of any appointment as Security Trustee or Agent hereunder by a successor Security Trustee or Agent, such successor Security Trustee or Agent, as the case may be, shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Security Trustee or Agent, as the case may be, and the retiring Security Trustee or Agent shall be discharged from its duties and obligations hereunder. After any retiring Security Trustee or Agent's resignation or removal hereunder as Security Trustee or Agent, as the case may be, the provisions of this Clause 31 shall continue in effect for its benefit in respect of any actions taken or omitted to be taken by it while it was acting as the Security Trustee or the Agent, as the case may be.

**31.10 Release of Collateral.** Without the prior written consent of the Majority Lenders, neither the Security Trustee nor the Agent will consent to any modification, supplement or waiver under any of the Finance Documents nor without the prior written consent of all of the Lenders release any Collateral or otherwise terminate any Security Interest under the Finance Documents, except that no such consent is required, and each of the Security Trustee and the Agent is authorized, to release any Security Interest covering property if the Secured Liabilities have been paid and

performed in full or which is the subject of a disposition of property permitted hereunder or to which the Lenders have consented.

**32. LAW AND JURISDICTION**

**32.1 Governing law.** THIS AGREEMENT AND THE OTHER FINANCE DOCUMENTS (EXCEPT AS OTHERWISE PROVIDED IN A FINANCE DOCUMENT) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ITS CONFLICT OF LAW PRINCIPLES.

**32.2 Consent to Jurisdiction**.

(a) Each Security Party hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York County, and any appellate court thereof, in any action or proceeding arising out of or relating to this Agreement or any of the other Finance Documents to which such Security Party is a party or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State Court or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b) Nothing in this Clause 32.2 shall affect the right of a Creditor Party to bring any action or proceeding against a Security Party or its property in the courts of any other jurisdictions where such action or proceeding may be heard.

(c) Each Security Party hereby irrevocably and unconditionally waives to the fullest extent it may legally and effectively do so:

(i) any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Finance Document to which it is a party in any New York State or Federal court and the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court; and

(ii) any immunity from suit, the jurisdiction of any court in which judicial proceedings may at any time be commenced with respect to this Agreement or any other Finance Document or from any legal process with respect to itself or its property (including without limitation attachment prior to judgment, attachment in aid of execution of judgment, set-off, execution of a judgment or any other legal process), and to the extent that in any such jurisdiction there may be attributed to such person such an immunity (whether or not claimed), such person hereby irrevocably agrees not to claim such immunity.

(d) Each of the Borrower and the Parent Guarantor hereby irrevocably designates, appoints, authorizes and empowers Corporation Service Company, with offices currently located at 1180 Avenue of the Americas, Suite 210, New York, NY 10036-8401, as its designee,

appointee and agent to receive and accept for and on its behalf, and in respect of its property, service of any and all legal process, summons, notices and documents which may be served in any such action or proceeding. If for any reason such designee, appointee and agent shall cease to be available to act as such, the Borrower and the Parent Guarantor agree to designate a new designee appointee and agent in New York, New York on the terms and for the purposes of this provision satisfactory to the Agent provided that any failure on the part of the Borrower or the Parent Guarantor to comply with the foregoing provisions shall not in any way prejudice or limit the service of process or summons in any other manner described in this Clause 32 or otherwise permitted by law.

**32.3** **Creditor Party rights unaffected.** Nothing in this Clause 32 shall exclude or limit any right which any Creditor Party may have (whether under the law of any country, an international convention or otherwise) with regard to the bringing of proceedings, the service of process, the recognition or enforcement of a judgment or any similar or related matter in any jurisdiction.

**32.4** **Meaning of "proceedings".** In this Clause 32, "**proceedings**" means proceedings of any kind, including an application for a provisional or protective measure.

**33. WAIVER OF JURY TRIAL**

**33.1** **WAIVER.** THE SECURITY PARTIES AND THE CREDITOR PARTIES MUTUALLY AND IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**34. PATRIOT ACT NOTICE**

**34.1** **PATRIOT Act Notice.** Each of the Agent and the Lenders hereby notifies each Security Party that pursuant to the requirements of the PATRIOT Act and the policies and practices of the Agent and each Lender, the Agent and each of the Lenders is required to obtain, verify and record certain information and documentation that identifies each Security Party, which information includes the name and address of each Security Party and such other information that will allow the Agent and each of the Lenders to identify each Security Party in accordance with the PATRIOT Act.

**35. CONFIDENTIALITY**

**35.1** Subject to the provisions of Clause 35.2, each Lender agrees that it will not disclose without the prior consent of the Borrower (other than to its officers, directors, employees, auditors, advisors or counsel or to another Lender if the Lender or such Lender's holding or parent company or board of trustees in its sole discretion determines that any such party should have access to such information; **provided** such Persons shall be subject to the provisions of this Clause 35.1 to the same extent as such Lender) any confidential, non-public or proprietary information with respect to the Borrower or any of its Subsidiaries which is now or in the future furnished to the Lender by the Borrower or any Security Party pursuant to this Agreement or any other Finance Document; provided that any Lender may disclose any such information (i) as has become generally available to the public other than by virtue of a breach of this Clause 35.1 by the respective Lender, (ii) as may be required or requested by any municipal, state or Federal regulatory body (or self-regulatory organization) having or claiming to have jurisdiction over such Lender or to the Federal Reserve Board or the Federal Deposit Insurance Corporation or similar organizations (whether in

the United States or elsewhere) or their successors, (iii) as may be required or requested in respect to any summons or subpoena or in connection with any litigation, (iv) in order to comply with any law, order, regulation or ruling applicable to such Lender, (v) to the Agent or the Security Trustee, (vi) to any auditor or professional financial or legal advisor of such Lender employed in the normal course of its business, (vii) to any branch, Affiliate or Subsidiary of such Lender or to the parent company, shareholders, investors, head office or regional office of such Lender, or any officers, directors, trustees, employees, representatives and agents of any of the foregoing, in connection with the transactions contemplated herein, (viii) to any prospective or actual transferee or participant in connection with any contemplated transfer or participation of any of the Notes or Commitments or any interest therein by such Lender, (ix) in connection with the exercise of any remedies hereunder or under any other Finance Document or any action or proceeding relating to this Agreement or any other Finance Document or the enforcement of rights hereunder or thereunder or (x) to the extent such information (a) becomes publicly available other than as a result of a breach of this Clause 35.1 by such Lender, (b) becomes available to the Agent, any Lender or any of their respective Affiliates or any officers, directors, trustees, employees, representatives and agents of any of the foregoing from a source other than the Borrower or its Subsidiaries provided that any such Person does not have actual knowledge that such source is breaching an obligation of confidentiality in providing such information to such Person, or (c) is independently developed by an Agent, any Lender, any of their respective Affiliates or any officers, directors, trustees, employees, representatives and agents of any of the foregoing without use of, or by persons without access to, such confidential information. In addition, the Agent and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to the Agents and the Lenders in connection with the administration of this Agreement, the other Finance Documents, and the Commitments.

**35.2** Each Security Party hereby acknowledges and agrees that each Lender may share with any of its Affiliates any such confidential information related to any Security Party or any of its respective Subsidiaries (including, without limitation, any nonpublic customer information regarding the creditworthiness of any Security Party or its respective Subsidiaries); **provided** such Persons shall be subject to the provisions of this Clause 35 to the same extent as such Lender.

**35.3** Each Security Party agrees that it will not disclose without the prior written consent of the Agent (other than to its officers, directors, employees, auditors, advisors or counsel) any confidential, non-public or proprietary information with respect to the Advance, any Fee Letter and other terms of the Finance Documents.

[SIGNATURE PAGE FOLLOWS ON NEXT PAGE]

**EXECUTION PAGE**

WHEREFORE, the parties hereto have caused this Loan Agreement to be executed as of the date first above written.

BRAVERY MARITIME CORPORATION,
as Borrower

By: Mohmed Al Hebsi
Name:
Title: SOLE DIRECTOR

NIMR INTERNATIONAL LLC,
as Parent Guarantor

By: Mohmed Al Hebsi
Name:
Title: SOLE DIRECTOR

OLD HILL PARTNERS INC.,
as Agent and Security Trustee

By: ______________________
Name: John C. Howe
Title: President

OHP II LP
as Lender

By: OLD HILL PARTNERS INC., General Partner

By: ______________________
Name: John C. Howe
Title: President

Howe Acres, LLC
as Lender

By: ______________________
Name: John C. Howe
Title: Manager

OHP Ltd.
as Lender

By: ______________________
Name: John C. Howe
Title: Director

**SCHEDULE 1**

**LENDERS AND COMMITMENTS**

| Lender | Lending Office | Commitment |
|---|---|---|
| OHP II LP<br><br>Address for Notices:<br>1120 Boston Post Road<br>2nd Floor<br>Darien, CT 06820<br>Attention: John C. Howe<br>Email: Jhowe@oldhill.com<br>Tel: 203-656-3004 | 1120 Boston Post Road,<br>2nd Floor<br>Darien, CT 06820 | $10,000,000 |
| Howe Acres, LLC<br><br>Address for Notices:<br>1120 Boston Post Road<br>2nd Floor<br>Darien, CT 06820<br>Attention: John C. Howe<br>Email: Jhowe@oldhill.com<br>Tel: 203-656-3004 | 1120 Boston Post Road,<br>2nd Floor<br>Darien, CT 06820 | $5,000,000 |
| OHP Ltd.<br><br>Address for Notices:<br>1120 Boston Post Road<br>2nd Floor<br>Darien, CT 06820<br>Attention: John C. Howe<br>Email: Jhowe@oldhill.com<br>Tel: 203-656-3004 | 1120 Boston Post Road,<br>2nd Floor<br>Darien, CT 06820 | $1,575,000 |

**SCHEDULE 2**

**DRAWDOWN NOTICE**

OLD HILL PARTNERS INC., as Agent
1120 Boston Post Road, 2nd Floor
Darien, CT 06820
Attention: John C. Howe

June __, 2020

**DRAWDOWN NOTICE**

1. We refer to the loan agreement dated as of June 16, 2020 (the "**Loan Agreement**") among ourselves, as Borrower, the Lenders referred to therein, and yourselves as Agent and as Security Trustee in connection with a facility of up to US$16,575,000. Terms defined in the Loan Agreement have their defined meanings when used in this Drawdown Notice.

2. We request to borrow as follows:

(a) Amount: Total of US$[●];

(b) Drawdown Date: [●]; and

(c) Payment instructions:

[●]

3. We represent and warrant that:

(a) no Event of Default or Potential Event of Default has occurred or would result from the borrowing of the Advance;

(b) the representations and warranties in Clause 10 and those of any other Security Party which are set out in the other Finance Documents are true and not misleading as of the date of this Drawdown Notice and will be true and not misleading as of the Drawdown Date, in each case with reference to the circumstances then existing;

(c) there has not been any material change in the consolidated financial condition, operations or business prospects of the Borrower since the date on which the Borrower provided information concerning those topics to the Agent and/or any Lender or any Material Adverse Effect; and

(d) if the Collateral Maintenance Ratio were applied immediately following the making of the Advance, the Borrower would not be required to provide additional Collateral or prepay part of the Loan under Clause 15.

4. This notice cannot be revoked without the prior written consent of the Majority Lenders.

5. We authorize you to deduct the outstanding fees and expenses referred to in Clause 21 from the amount of the Loan.

____________________________

Name
Title
for and on behalf of
Bravery Maritime Corporation, as Borrower

**SCHEDULE 3**

**CONDITION PRECEDENT DOCUMENTS**

**PART A**

The following are the documents referred to in Clause 9.1(a)(i):

1. A duly executed original of this Agreement.

2. A copy of each of the Ship MOA and the TNI MOA (and all addenda and supplements thereto), in form and substance acceptable to the Agent and certified as of a date reasonably near the date of the Drawdown Notice by an officer, an authorized person or an attorney-in-fact of the Borrower party thereto as being a true and correct copy thereof.

3. A copy of the Initial Charter (and all addenda and supplements thereto), in form and substance acceptable to the Agent and certified as of a date reasonably near the date of the Drawdown Notice by an officer, an authorized person or an attorney-in-fact of the Borrower party thereto as being a true and correct copy thereof.

4. Copies of certificates dated as of a date reasonably near the date of the Drawdown Notice, certifying that each of the Security Parties is duly incorporated or formed and in good standing under the laws of its jurisdiction of incorporation or formation.

5. Copies of the constitutional documents and each amendment thereto of each of the Security Parties, certified as of a date reasonably near the date of the Drawdown Notice by an authorized person of such party as being a true and correct copy thereof.

6. Copies of the resolutions of (if applicable) the directors (or equivalent governing body) and, where applicable, the shareholders (or equivalent equity holders), of each of the Security Parties authorizing the execution of each of the Finance Documents, the Ship MOA and the Initial Charter to which that Security Party is a party and, in the case of the Borrower, authorizing an authorized person of the Borrower to give the Drawdown Notice and other notices required under the Finance Documents, in each case certified as of a date reasonably near the date of the Drawdown Notice by an authorized person of such party as being a true and correct copy thereof, and copies of the resolutions of the directors (or equivalent governing body) and, where applicable, the shareholders (or equivalent equity holders), of each of the Approved Manager and TNI, authorizing the Manager's Undertaking, Approved Management Agreement, TNI's guaranty of the Approved Management Agreement and TNI's consent to Assignment of Approved Management Agreement Guaranty.

7. An incumbency certificate in respect of (if applicable) the officers and directors (or equivalent) of each of the Security Parties and signature samples of any signatories to any Finance Document.

8. The original or a certified copy of any power of attorney under which any Finance Document is executed on behalf of a Security Party.

9. Copies of all consents which a Security Party requires to enter into, or make any payment under, any Finance Document, the Ship MOA and the Initial Charter, each certified as of a date reasonably near the date of the Drawdown Notice by an authorized officer of such party as being a true and correct copy thereof, or certification by such authorized person that no such consents are required.

10. Copies of any mandates or other documents required in connection with the opening or operation of the Collection Account, each certified as of a date reasonably near the date of the Drawdown Notice by an authorized person of the Borrower as being a true and correct copy thereof.

11. If the Agent so requires, in respect of any of the documents referred to above, a certified English translation prepared by a translator approved by the Agent.

**PART B**

The following are the documents referred to in Clause 9.1(b):

1. A duly executed original of each Finance Document (and of each document required to be delivered by each Finance Document) other than those referred to in Part A(1).

2. Documentary evidence that:

(a) (i) immediately prior to the sale and purchase contemplated by the TNI MOA, the Ship has been unconditionally delivered to, and accepted by, Valorous Shipping Company, and the full purchase price payable under such MOA has been duly paid in accordance with the terms of such MOA pursuant to the procedure approved by the Lenders; and

(ii) the Ship has thereafter been unconditionally delivered by the Seller to, and accepted by, the Borrower under the Ship MOA, and the full purchase price payable under such MOA (in addition to the part to be financed by the Advance) has been duly paid (including the equity portion payable by the Borrower in the amount of $10,590,000).

(b) the Ship is definitively and permanently registered in the name of the Borrower under an Approved Flag;

(c) the Mortgage has been recorded against the Ship as a valid first preferred ship mortgage in accordance with the laws of the Approved Flag on which the Ship is registered;

(d) the Security Interests intended to be created by each of the Finance Documents have been duly perfected under applicable law;

(e) the Ship is in the absolute and unencumbered ownership of the Borrower save as contemplated by the Finance Documents;

(f) the Ship is insured in accordance with the provisions of Clause 13 of this Agreement and all requirements therein in respect of insurances have been complied with;

(g) the Ship maintains the highest class for vessels of its type with the Classification Society free of any overdue recommendations or adverse notations (which status shall be

established by a Confirmation of Class Certificate issued by the Classification Society and dated a date reasonably near the Drawdown Date (*NB: a "Class Statement" or similar instrument shall not be acceptable for purposes of this clause*)); and

(h) Documentary evidence that (i) an amount sufficient to satisfy the Working Capital Reserve and the Minimum Liquidity Reserve has been deposited in the Collection Account, and (ii) an amount equal to $604,500 representing the operating expenses of the Ship for the first three months after the Delivery Date has been deposited in the Vessel Operating Account (which shall have been opened prior to the Drawdown Date).

3. Valuations of the Fair Market Value and the Fair Scrap Value of the relevant Ship, paid for by the Borrower but addressed to the Agent and the Lenders, stated to be for the purposes of this Agreement and dated not more than 14 days before the Drawdown Date, which evidence that the Market Value LTV Ratio is not greater than 65% and the Scrap Value LTV Ratio is not greater than 120%.

4. A survey report by an Approved Surveyor addressed to the Agent and the Lenders, stated to be for the purposes of this Agreement and dated not more than 30 days before the Drawdown Date in respect of the physical condition of the relevant Ship, which report shall confirm the condition of the Ship to the satisfaction of the Agent and the Lenders, in their sole discretion, and satisfactory responses to the action-items list prepared by such Approved Surveyor, including a timeline for addressing open issues;

5. Copies of all documents signed or issued by the Borrower and the Seller under or in connection with the delivery of the Ship under the terms of the Ship MOA, certified as of the Drawdown Date by an officer, an authorized person or an attorney-in-fact of the Borrower as being a true and correct copy thereof;

6. Documentary evidence that the Borrower has instructed the Classification Society as required by Clause 14.4 and a duly executed original of the Classification Society undertaking required by Clause 14.4.

7. The following documents establishing that the Ship will, as from the Drawdown Date, be managed by an Approved Manager on terms acceptable to the Agent:

(a) a copy of the Approved Management Agreement, certified as of the Drawdown Date by an authorized person of the Borrower as being a true and correct copy thereof; and

(b) copies of each Approved Manager's Document of Compliance and of the ISSC and Safety Management Certificate (together with any other details of the applicable safety management system which the Agent requires), certified as of the Drawdown Date by an authorized person of the Borrower that owns the Ship as being a true and correct copy thereof.

8. A favorable opinion from an independent insurance consultant acceptable to the Agent on such matters relating to the insurances for the Ships as the Agent may require.

9. A favorable opinion of Seward & Kissel LLP, counsel for the Creditor Parties, in form, scope and substance satisfactory to the Creditor Parties.

10. A favorable opinion of CMS, Omani counsel for Creditor Parties, in form, scope and substance satisfactory to the Creditor Parties.

11. Favorable legal opinions from lawyers appointed by the Borrower or the Agent on such matters concerning the laws of such relevant jurisdictions as the Agent may require.

## SCHEDULE 4

## TRANSFER CERTIFICATE

**The Transferor and the Transferee accept exclusive responsibility for ensuring that this Certificate and the transaction to which it relates comply with all legal and regulatory requirements applicable to them respectively**.

To: Old Hill Partners Inc. for itself and for and on behalf of the Borrower, each other Security Party, the Security Trustee and each Lender, as defined in the Loan Agreement referred to below.

[Date]

1. This Certificate relates to a Loan Agreement dated as of June 16, 2020 (as amended or supplemented, the "**Loan Agreement**") among (1) Bravery Maritime Corporation (the "**Borrower**"), (2) the banks and financial institutions named therein as Lenders, (3) Old Hill Partners Inc. as Agent and (4) Old Hill Partners Inc. as Security Trustee for a loan facility of up to $16,575,000.

2. In this Certificate, terms defined in the Loan Agreement shall, unless the contrary intention appears, have the same meanings when used in this Certificate and:

   "**Relevant Parties**" means the Agent, each of the Borrower, the Security Trustee, each Lender;

   "**Transferor**" means [full name] of [lending office];

   "**Transferee**" means [full name] of [lending office].

3. The effective date of this Certificate is [●], **provided that** this Certificate shall not come into effect unless it is signed by the Agent on or before that date.

4. [The Transferor assigns to the Transferee absolutely all rights and interests (present, future or contingent) which the Transferor has as Lender under or by virtue of the Loan Agreement and every other Finance Document in relation to [●]% of its Contribution, which percentage represents $[●].

5. [By virtue of this Certificate and Clause 27 of the Loan Agreement, the Transferor is discharged [entirely from its Commitment which amounts to $[●]] [from [●]% of its Commitment, which percentage represents $[●]] and the Transferee acquires a Commitment of $[●].]

6. The Transferee undertakes with the Transferor and each of the Relevant Parties that the Transferee will observe and perform all the obligations under the Finance Documents which Clause 27 of the Loan Agreement provides will become binding on it upon this Certificate taking effect.

7. The Agent, at the request of the Transferee (which request is hereby made) accepts, for the Agent itself and for and on behalf of every other Relevant Party, this Certificate as a Transfer Certificate taking effect in accordance with Clause 27 of the Loan Agreement.

8. The Transferor:

(a) warrants to the Transferee and each Relevant Party that:

(i) the Transferor has full capacity to enter into this transaction and has taken all corporate action and obtained all consents which are required in connection with this transaction; and

(ii) this Certificate is valid and binding as regards the Transferor;

(b) warrants to the Transferee that the Transferor is absolutely entitled, free of encumbrances, to all the rights and interests covered by the assignment in paragraph 4; and

(c) undertakes with the Transferee that the Transferor will, at its own expense, execute any documents which the Transferee reasonably requests for perfecting in any relevant jurisdiction the Transferee's title under this Certificate or for a similar purpose.

9. The Transferee:

(a) confirms that it has received a copy of the Loan Agreement and each of the other Finance Documents;

(b) agrees that it will have no rights of recourse on any ground against the Transferor, the Agent, the Security Trustee or any Lender in the event that:

(i) any of the Finance Documents prove to be invalid or ineffective;

(ii) the Borrower or any other Security Party fails to observe or perform its obligations, or to discharge its liabilities, under any of the Finance Documents;

(iii) it proves impossible to realize any asset covered by a Security Interest created by a Finance Document, or the proceeds of such assets are insufficient to discharge the liabilities of the Borrower or any other Security Party under any of the Finance Documents;

(c) agrees that it will have no rights of recourse on any ground against the Agent, the Security Trustee or any Lender in the event that this Certificate proves to be invalid or ineffective;

(d) warrants to the Transferor and each Relevant Party that:

(i) it has full capacity to enter into this transaction and has taken all corporate action and obtained all consents which it needs to take or obtain in connection with this transaction; and

(ii) that this Certificate is valid and binding as regards the Transferee; and

(e) confirms the accuracy of the administrative details set out below regarding the Transferee.

10. The Transferor and the Transferee each undertake with the Agent and the Security Trustee severally, on demand, fully to indemnify the Agent and/or the Security Trustee in respect of any claim, proceeding, liability or expense (including all legal expenses) which they or either of them may incur in connection with this Certificate or any matter arising out of it, except such as are shown to have been mainly and directly caused by the gross negligence or willful misconduct of the Agent's or the Security Trustee's own officers or employees.

11. The Transferee shall repay to the Transferor on demand so much of any sum paid by the Transferor under paragraph 10 as exceeds one-half of the amount demanded by the Agent or the Security Trustee in respect of a claim, proceeding, liability or expense which was not reasonably foreseeable at the date of this Certificate; but nothing in this paragraph shall affect the liability of each of the Transferor and the Transferee to the Agent or the Security Trustee for the full amount demanded by it.

[Name of Transferor]

By: ________________________
Name:
Title:
Date:

[Name of Transferee]

By: ________________________
Name:
Title:
Date:

**AGENT**

Signed for itself and for and on behalf of itself
as Agent and for every other Relevant Party

Old Hill Partners Inc.

By: ________________________
Name:
Title:
Date:

**Administrative Details of Transferee**

Name of Transferee:

Lending Office:

Contact Person
(Loan Administration Department):

Telephone:

Fax:

Contact Person
(Credit Administration Department):

Telephone:

Fax:

Account for payments:

**Note**: This Transfer Certificate alone may not be sufficient to transfer a proportionate share of the Transferor's interest in the security constituted by the Finance Documents in the Transferor's or Transferee's jurisdiction. It is the responsibility of each Lender to ascertain whether any other documents are required for this purpose.

**APPENDIX A**

**FORM OF COMPLIANCE CERTIFICATE**

BRAVERY MARITIME CORPORATION

OLD HILL PARTNERS INC., as Agent
1120 Boston Post Road, 2nd Floor
Darien, CT 06820
Attention: John C. Howe

Date [●]

Dear Sirs:

**Compliance Certificate for the Period Ended [●]**

This Compliance Certificate is being delivered to you in connection with the loan agreement dated June [10], 2020 (the "**Loan Agreement**") among (i) Bravery Maritime Corporation as borrower, (ii) NIMR International LLC, as parent guarantor (the "**Parent Guarantor**"), (iii) the banks and financial institutions listed in Schedule 1 thereto as lenders, (iv) Old Hill Partners Inc. as agent (the "**Agent**") and (vi) Old Hill Partners Inc. as security trustee (the "**Security Trustee**"), providing for a term loan facility of up to US$16,575,000. Capitalized terms not otherwise defined herein shall have the meaning provided for in the Loan Agreement.

The undersigned are the [Chief Financial Officer/equivalent position] of the Borrower and [Chief Financial Officer/equivalent position] of the Parent Guarantor and solely in such capacity and not individually, each of the undersigned hereby certifies to the Lenders that:

1. Attached hereto are true, correct and complete copies of

   [(a) the unaudited consolidated financial statements of the Borrower and the Parent Guarantor and its respective subsidiaries for and as of the fiscal quarter ended [●], prepared in accordance with GAAP, which were reviewed by the undersigned.]

   [(a) the audited consolidated financial statements of the Borrower and the Parent Guarantor and its respective subsidiaries, for the Fiscal Year ended [●], prepared in accordance with GAAP, which were audited by [Acceptable Accounting Firm].

2. I have reviewed such financial statements and they fairly present the financial condition and the results of operations of the Borrower and its subsidiaries for the period indicated.

[3. As per the calculations in Annex A attached hereto:

(a) The Parent Guarantor has maintained a minimum balance of Cash and Cash Equivalents equal to $16,750,000; and

(b) The Parent Guarantor has maintained as of the last day of each fiscal quarter of each fiscal year of the Parent Guarantor a ratio of (x) Financial Indebtedness to (y) Total Capital not exceeding 20%.

[4.] Each of the undersigned has reviewed the Loan Agreement and the other Finance Documents and have made, or caused to be made under his/her supervision, a review in reasonable detail of the transactions and the condition of the Borrower or the Guarantor, as the case may be, and its subsidiaries during the accounting period covered by the financial statements referred to in Section 1(a) above and such review has not disclosed the existence during or at the end of such accounting period any condition or event that constitutes an Event of Default or Potential Event of Default, nor do I have knowledge of the existence of any such condition or event as at the date of this Certificate [except [●] - **describe the event or condition, the period of its existence and what action is being taken to remedy the same**].

[5.] Each of the Borrower and the Parent Guarantor maintains in full force and effect, and complies with the conditions and restrictions (if any) imposed in connection with, every consent, authorization, license or approval which may from time to time be necessary or required for the continued performance of all its obligations under the Loan Agreement and the other Finance Documents to which it is a party.

[6.] Each of the Borrower and the Parent Guarantor is in compliance with all of the covenants set forth in the Loan Agreement and the other Finance Documents to which it is a party.

[7.] The representations and warranties stated in Clause 10 of the Loan Agreement (updated mutatis mutandis) are true and correct as of the date hereof.

**BRAVERY MARITIME CORPORATION**

By: ____________________________
Name:
Title:

**NIMR INTERNATIONAL LLC**

By: ____________________________
Name:
Title:

**ANNEX A**

Parent Guarantor Financial Covenant Calculation